UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GARY HAMILTON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil No. 05CV-1549(RBW) ) |
| JOHN SNOW, | ) ) |
| Defendant. | ) ) |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST AND
SECOND REQUEST FOR ADMISSIONS**

Pursuant to Fed. R. Civ. P. 36, Defendant hereby responds to Plaintiff's First and Second Request for Admissions ("RFA") as follows:

1. Please that Plaintiff applied for the position of Safety and Health Manager, Vacancy Announcement Number 15-0200OFH03703 in 2003.

    Response:    Admit.

2. Please admit that Plaintiff was not selected for the position.

    Response:    Admit.

3. Please admit that Annette Burrell was selected for the position in Request No. 1.

    Response:    Admit.

4. Please admit that Annette Burrell has no formal training in safety.

    Response:    Defendant objects to the RFA as the term "formal training" is unclear and undefined. Ms. Burrell received on the job training in safety and attended classes on safety.

1



5. Please admit that Annette Burrell has no formal training in Security.

   Response: Defendant objects to the RFA as the term "formal training" is unclear and undefined. Subject to the foregoing objection, admit. Ms. Burrell, however, had on the job training.

6. Please admit that four candidates applied for the position in Request No. 1.

   Response: Deny. Fourteen candidates applied for the position in Request No. 1. The top four "best qualified" candidates, including Plaintiff, were interviewed for the job.

7. Please admit that the candidates' technical or leadership skills were not considered in the selection for the position in Request No. 1.

   Response: Deny. The candidates' respective application forms, responses to the KSAs, performance evaluations, and (for the four best qualified candidates) responses during the panel interview were considered in the selection for the position in Request No. 1. Therefore, to the extent that the candidates described their "technical or leadership skills" in their respective application forms; responses to the KSA; and (for the four best qualified candidates) responses during the panel interview, then "technical or leadership skills" were considered.

8. Please admit that Annette Burrell was selected for a detail that concluded in 2003.

   Response: Admit.

9. Please admit that Annette Burrell continues to perform the duties she performed during that detail of 2003.

   Response: Deny. Ms. Burrell never had a position called "detail of 2003."

10. Please admit that Camille Caraway applied for the position in Request No. 1.

    Response: Admit.

2

07/25/06: Hamilton v Snow: Depo: John Stuart Burns

PAGE 1 TO PAGE 200

NEAL R. GROSS & CO., INC.

(202) 234-4433

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*NEAL R. GROSS & CO., INC.*
*1323 RHODE ISLAND AVE., NW*
*WASHINGTON, DC   20005*
*Phone:   (202) 234-4433*


GOVERNMENT EXHIBIT B

Page 81

(1) know, wanted to have – wanted to steer the program as (2) well, so it was kind of a transition period.
(3) Q And as part of what he delegated, was (4) supervising or monitoring Annette Burrell part of what (5) he delegated to you at the time during that transition (6) period?
(7) A Yes, all of the staff ultimately (8) transitioned over to me.
(9) Q Oh, okay. Now, that – when you were (10) under Reggie McFadden, you were Chief of Safety?
(11) A Yes.
(12) Q Oh, excuse me. And now, when he told you (13) about this expansion, he mentioned this safety manager (14) position as they wanted it to be filled, right?
(15) A I'm sorry? I was distracted.
(16) Q Part of the expansion, he said – you said (17) he gave you and then you said he didn't really give (18) you, but mentioned that the safety manager position (19) was something that had to be filled as part of the (20) expansion, right?
(21) A Right.
(22) Q Okay. And how was that vacancy announced?

Page 82

(1) A I don't understand the question.
(2) Q In other words, how was it made known to (3) potential or prospective applicants?
(4) A The HR organization put it on the COL (5) which was I think – I don't know what COL stands for.
(6) Q I didn't hear you.
(7) A I don't know what COL stands for.
(8) Q Oh, okay.
(9) A Probably something like Career (10) Opportunities Listing or career – I don't know.
(11) Q Now, who wrote the job description for (12) that position?
(13) A I don't know.
(14) Q Did you have any input at all in the (15) creation of that position?
(16) A No.
(17) Q Okay. I mean, in the creation of the job (18) description.
(19) A No.
(20) Q And you had – you didn't play any role in (21) the creation of that position?
(22) A No.

Page 83

(1) Q Now, when they put it on the COL, what (2) happened?
(3) A I guess people saw it and applied for it.
(4) Q And how did the selection process go?
(5) A I guess the packages were sent to HR. HR (6) probably forwarded the packages in. They were ranked. (7) Highly qualified ones we were given an opportunity to (8) interview and we interviewed them and selected.
(9) Q You were the selecting official for that (10) position, were you not?
(11) A I believe that is correct.
(12) Q Who designated you the selecting official?
(13) A I don't recall the process being really (14) extremely formal.
(15) Q Okay.
(16) A So I don't – I didn't get a letter that (17) said you were delegated as.
(18) Q But at that time, which was June/July of (19) 2003, Reggie McFadden was still at the IRS, wasn't he?
(20) A Yes.
(21) Q Now, you said the applicants were ranked (22) and then you conducted an interview and made a

Page 84

(1) selection, right?
(2) A Um-hum.
(3) Q Why did you conduct an interview?
(4) A Because in my experience, that is standard (5) process.
(6) Q Was it a standard process in this (7) instance?
(8) A Was it a standard in this instance?
(9) Q You said in your experience, it's standard (10) process.
(11) A I have never hired someone without talking (12) to them first, interviewing them first.
(13) Q So your normal way of doing it is to (14) interview before you select?
(15) A Right.
(16) Q Could you have selected without an (17) interview?
(18) A I don't know.
(19) Q Did you consider selection before (20) interview for this position in controversy?
(21) A No.
(22) Q Based on it being what you normally do,

Page 85

(1) right?
(2) **A Right.**
(3) Q Okay. So you considered the interview an (4) important aspect of the selection process. Is that (5) true?
(6) **A Yes.**
(7) Q Did anyone instruct you to conduct an (8) interview?
(9) **A I don't recall.**
(10) Q Did anyone instruct you not to conduct an (11) interview?
(12) **A No, I don't recall. I don't recall.**
(13) Q Okay. Now, who conducted the ranking for (14) this position, the safety health manager position in (15) controversy?
(16) **A Paul Carroll.**
(17) Q Did you tell him to do it?
(18) **A I don't believe I had anything to do with** (19) **the selection of him to do it, although I don't** (20) **recall.**
(21) Q Okay. I can't hear you.
(22) **A Although I don't recall.**

Page 86

(1) Q Could you have designated Paul Carroll to (2) conduct the ranking?
(3) **A I could have asked him, but I couldn't** (4) **have designated that he do it.**
(5) Q Prior to – oh, you could have asked him?
(6) **A I could have asked him, but I couldn't** (7) **designate him to do it.**
(8) Q Okay. If you asked him, he would have (9) agreed, right?
(10) **A I don't know.**
(11) Q Have you ever asked him and he rejected or (12) refused?
(13) MR. TRUONG: Objection. Foundation.
(14) THE WITNESS: I don't – I don't think so.
(15) BY MS. GBENJO:
(16) Q Now, what instructions, if any, did you (17) give Paul Carroll in ranking the candidates?
(18) MR. TRUONG: Objection. Foundation.
(19) THE WITNESS: I don't recall giving any (20) instructions.
(21) BY MS. GBENJO:
(22) Q Okay. What instructions did Paul Carroll

Page 87

(1) give you after he conducted the ranking of the (2) candidates?
(3) **A I don't –**
(4) MR. TRUONG: Same, same objection.
(5) THE WITNESS: I don't recall any (6) conversation with Paul Carroll about the ranking.
(7) BY MS. GBENJO:
(8) Q Now, what communications did you have with (9) the Personnel Office or the HR in relation to this (10) selection process?
(11) MR. TRUONG: Foundation. Objection.
(12) THE WITNESS: I don't believe I had any (13) conversations with HR regarding that selection.
(14) BY MS. GBENJO:
(15) Q Nobody at all from the HR?
(16) **A I don't believe so.**
(17) Q Nobody at all from the Personnel Office?
(18) **A I don't believe so.**
(19) Q Now, how did you get the list of the (20) ranked applicants?
(21) **A I don't recall.**
(22) Q Oh, okay. Now, what did you do after with

Page 88

(1) the list of the selected applicants after it reached (2) you, your possession?
(3) **A What did I –**
(4) Q What did you do, if anything?
(5) **A I guess I tried to coordinate an interview** (6) **for the –**
(7) Q Now, after that interview did you have any (8) communication with Paul Carroll relating to the (9) applicants?
(10) **A After the interview did I have – I don't** (11) **– I mean, I have had conversations with Paul Carroll** (12) **since that time, but I don't recall having** (13) **conversations about the applicant.**
(14) Q Okay. Now, after the interview process, (15) after you had interviewed the candidates, did you (16) confer or have any further communications with the (17) personnel or the HR regarding the applicants?
(18) **A I don't recall having any conversations** (19) **with HR, yes.**
(20) Q Now, with respect to the detail that (21) Annette Burrell occupied when you got to the IRS, at (22) the renewal time was there a formal nomination process