# COPY OF TRANSCRIPT

IN THE U.S. DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

GARY HAMILTON,

    Plaintiff,

vs.        Case No. 05-1549 (RBW)

SNOW,

    Defendant.



EXHIBIT 8

DEPOSITION OF

BRENDA GOULDING,

taken on behalf of the Plaintiff, pursuant to Notice to Take Deposition, beginning at 10:00 a.m. on the 13th day of July, 2006, at the office of Appino & Biggs Reporting Service, in the City of Overland Park, County of Johnson, and State of Kansas, before Douglas R. Stone, Certified Shorthand Reporter.



Appino & Biggs Reporting Service, Inc.

Technology Specialists in Complex Litigation

(Main Office)
511 SW 21st Street
Topeka, KS 66604
785.273.3063

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

www.AppinoBiggs.com

Technology Specialists in Complex Litigation

Page 41

1  Q. Now, what were your job duty --
2  duties as the management program
3  analyst?
4  A. I wasn't there long enough to
5  really do anything.
6  Q. Okay. Now, as a chief of
7  education what were your job duties?
8  A. I managed employee development
9  specialists and clerks.
10  Q. Okay. Did anyone train you to do
11  that or it was on the job?
12  A. Other than my background of
13  managerial experience and training, no.
14  Q. Okay. Okay. You said your
15  position -- you became a -- the manager
16  support service -- I mean, you became
17  chief of support services and managed
18  the support service specialists?
19  A. Correct.
20  Q. How many support service
21  specialists were under you at that time?
22  A. It varied, but at one time, 24.
23  Q. Okay. And what year was that?
24  A. I don't recall specifically. I
25  don't recall.

Page 42

1  Q. Did your job position or title
2  change after being chief of support
3  service?
4  A. Yes.
5  Q. What did it change to?
6  A. Chief security and safety
7  section.
8  Q. Okay. And what year was that?
9  A. I -- I don't recall.
10  Q. Okay. You said you were chief of
11  support services after you were -- well,
12  after you stopped being the manager for,
13  what do you call it, employee
14  development -- after you stopped being
15  the employee development specialist you
16  were -- was there any change or were
17  there changes in your position -- your
18  job duties?
19  A. Between what positions?
20  Q. Between this chief of -- between
21  the chief of support services and the
22  employee development specialist?
23  A. Yes, there were differences.
24  Q. Tell me the differences.
25  A. As an employee development

Page 43

1  specialist I identified training needs
2  for a wide variety of employees and
3  working with managers, and as -- as a
4  manager I provided feedback and guidance
5  to my employees.
6  Q. Okay. Those -- those were the
7  major differences?
8  A. I guess.
9  Q. As a chief of security and safety
10  section, what did you do?
11  A. I managed employees who worked --
12  I'm sorry, what section?
13  Q. You said chief of security, I
14  mean -
15  A. I managed employees who provided
16  security, analyzed security, actually
17  worked the security program for the
18  Kansas City IRS campus. I also managed
19  employees who work the entire Kansas
20  City campus program in the safety arena.
21  Q. Okay. Did this happen in 2002?
22  A. I don't recall specifically. It
23  may have also been 2001. May I also
24  state that when I was the chief of
25  services and support I did have security

Page 44

1  and safety as part of my program areas,
2  as well.
3  Q. When you were chief of what?
4  A. Of services -- support services.
5  Q. Okay. And what part of -- you
6  said you did have what?
7  A. Part of that section was also
8  security and safety.
9  Q. Okay. And tell me what part of
10  that section is security, what did you
11  do in terms of -- what were your duties,
12  how did it relate to what you did? Now,
13  is it -- okay. You said when you were
14  chief of support services, security was
15  part of your section?
16  A. Correct.
17  Q. Does that mean that security was
18  part of a section that you managed?
19  What does it mean -- what -- let me just
20  -- I'm sorry. Let me -- let me let you
21  explain when you said it was part of the
22  section.
23  A. Okay. As chief of services and
24  support my -- the employees in my
25  section performed the work of, I

Appino Biggs Reporting Service, Inc.

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Technology Specialists in Complex Litigation
Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Page 69

1  don't know -- I don't recall
2  specifically when I went to the project
3  office or facilities management.
4     Q. Now, who got to the IRS first,
5  Cheryl Fritts or yourself?
6     A. Ironically, at the same time.
7     Q. Oh. Does Cheryl Fritts, does she
8  have a degree?
9     A. Yes.
10    Q. Do you know in what?
11    A. Communications, I believe.
12    Q. Okay. If I recall, you do not
13 have any kind of degree?
14    A. Correct.
15    Q. Now, when you were a chief of
16 support services you were chief of
17 support services for your office, right?
18 For your office in Missouri? In other
19 words, the question is, were you chief
20 of support services for that office that
21 you were in Missouri or for the entire
22 Missouri metropolitan area?
23    A. I was the chief -- I was the only
24 chief of services and support in the
25 Kansas City Metropolitan area.

Page 70

1     Q. Okay.
2        MR. TRUONG: Can I have a
3  confirmation here, is there such a thing
4  as a Missouri metropolitan area or is it
5  a Kansas City Metropolitan area?
6        THE WITNESS: It's Kansas City
7  Metropolitan area.
8        MS. GBENJO: Oh, okay.
9        MR. TRUONG: Okay. So there's no
10 such thing as Missouri metropolitan
11 area.
12       THE WITNESS: No.
13 BY MS. GBENJO:
14    Q. Okay. Kansas City.
15    A. Kansas City Metropolitan.
16    Q. You were chief of support
17 services for Kansas City Metropolitan
18 area.
19    A. For Kansas City IRS campus which
20 has multiple buildings in the Kansas
21 City Metro area.
22    Q. Okay. Now, what year did you say
23 you became a staff assistant?
24    A. I don't recall -
25    Q. Okay.

Page 71

1     A. -- exactly what year it was.
2     Q. Right. Did Cheryl Fritts put you
3  in that position?
4     A. I elected to go to that position.
5     Q. From which position?
6     A. From chief of security and
7  safety.
8     Q. Why?
9     A. Because I suffered management
10 burnout.
11    Q. What does that mean?
12    A. That means I had to deal with a
13 lot of stress because of 911 and I
14 requested to be going to a different
15 position, nonmanagerial position.
16    Q. Okay. Were you in the security
17 and safety section in 911 -- during the
18 911?
19    A. I was the manager of the group.
20    Q. You were talking about the chief
21 of support group - support services?
22    A. I was -- I don't recall if it was
23 security and safety group at that time
24 or support services. I don't recall
25 which name it was.

Page 72

1     Q. Okay. So you said you elected to
2  go to the staff assistant position
3  because?
4     A. Because of the stress of being
5  the manager during 911.
6     Q. Can you explain the stress?
7     A. We were trying to provide
8  security for all the Kansas City Metro
9  buildings.
10    Q. And that was too much for you?
11 It was -
12    A. Day after day for a period of
13 over three months, yes.
14    Q. And who put you -- who made you
15 the chief of security and safety? Was
16 it Cheryl Fritts?
17    A. You mean from the chief of
18 support services to the chief of
19 security and safety? I chose to go to
20 that position.
21    Q. Okay. Who -
22    A. As -- as manager over those
23 program areas I had -- I had a choice of
24 which one I wanted to do.
25    Q. Okay. Who made -- who -- who

Appino Biggs Reporting Service, Inc.

Technology Specialists in Complex Litigation

(Main Office)
8111 SW 21st Street
Topeka, KS 66604
785.273.3063

Toll Free 888.273.3083
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 77

1  Q. And that was in Philadelphia?
2  A. Yes.
3  Q. And you said the last one you
4  don't recall whether it was within the
5  past five years, it was -- that's the
6  one where I lost you.
7  A. Oh, it may have been more than
8  five years ago.
9  Q. Okay.
10  A. I don't recall exactly when it
11  occurred.
12  Q. I'm only concerned about within
13  the past five years. Now, tell me about
14  the program safety inspection assignment
15  that you went to receive, where did that
16  occur?
17  A. I'm sorry, where?
18  Q. Where did you go to receive -
19  A. Washington D.C.
20  Q. How did that come about?
21  A. I was requested to come to
22  Washington D.C. for program guidance.
23  Q. Okay. Now, who told you to come,
24  who invited you?
25  A. I don't recall.

Page 78

1  Q. Okay. Now, how many times did
2  you go to -- to Washington D.C.
3  Metropolitan area to -- on a trip that
4  related to this program, you know, the
5  safety inspection program?
6  A. Less than five.
7  Q. Okay. And how long did that
8  assignment last?
9  A. It was at least four months and
10  then some follow-up work.
11  Q. Okay. Four months. When did it
12  begin?
13  A. I went to Washington D.C. on
14  August 12th of 2003.
15  Q. Okay. And when did it end?
16  A. I completed the executive report
17  December 18th of 2003.
18  Q. Okay. Now, when you went on
19  August 12th, 2003, with whom did you
20  meet?
21  A. I met with Stu Burns -
22  Q. Uh-huh.
23  A. -- Annette Burell, Gary Hamilton,
24  and I don't recall if the contractor
25  assigned was there.

Page 79

1  Q. Okay. Prior to this particular
2  meeting, you had an initial meeting with
3  Stuart Burns and Annette Burrell in
4  which Gary Hamilton was not present in
5  the initial meeting.
6      MR. TRUONG: Objection.
7  Foundation.
8      THE WITNESS: Are you stating
9  that I did that?
10      BY MS. GBENJO:
11  Q. I'm asking you that.
12  A. Oh. I don't recall one.
13  Q. Now -- all right, now, at this
14  kick-off meeting, I would call it a
15  kick-off meeting where Stuart Burns,
16  Annette Burrell, Gary Hamilton and two
17  consultants were present -
18      MR. TRUONG: Objection.
19  Foundation.
20      BY MS. GBENJO:
21  Q. How -- how long did that meeting
22  last that -
23  A. I don't -- clarify. I mean, I
24  don't recall that there were two
25  consultants presents but -

Page 80

1  Q. Was there any other present other
2  than Gary Hamilton, Annette Burrell and
3  Stuart Burns?
4  A. As I just stated, I don't recall
5  whether the contractor assigned to the
6  project was there.
7  Q. Oh. I'm sorry. Okay. I -- I --
8  okay. You don't recall whether the
9  contractors were present? The
10  contractors were the person that I
11  referred to as consultants, you call
12  them contractors?
13  A. Okay. I don't recall whether the
14  consultants were present at that
15  meeting, either. I -- I don't recall.
16  Q. Okay. You don't recall whether
17  they were present on the first or the
18  second meeting?
19      MR. TRUONG: Objection.
20  Foundation.
21      THE WITNESS: Can you clarify the
22  difference of when the first and the
23  second meetings.
24      BY MS. GBENJO:
25  Q. No. You would be the person to

Appino · Biggs Reporting Service, Inc.

Technology Specialists in Complex Litigation

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 109

1   A.  Oh.  A timeline is a schedule of
2   when things are to occur.
3       Q.  Okay.  This is the same as the
4   time frames you gave me earlier?
5       A.  Correct.
6       Q.  Okay.
7       A.  Were the meeting time frames.
8       Q.  Okay.  You said you knew -
9       A.  Except -
10      Q.  -- timeline.
11      A.  Except what we were given
12  earlier.  I'm sorry.
13          MR. TRUONG:  Oh, no.  Go ahead.
14  Because I -
15          THE WITNESS:  What we were given
16  earlier was basically we needed to roll
17  this out in January.  What Gary and I
18  discussed are the -- were the time
19  frames that were going to get us to
20  rolling out in January.
21          BY MS. GBENJO:
22      Q.  Wasn't that discussion during the
23  August 12th and August 13th meeting?
24      A.  Yes.  But I don't recall if it
25  was just Gary and I present.

Page 110

1       Q.  Yeah.  It's -- I mean, you
2   already said that Stuart Burns, Annette
3   Burrell and probably some others were
4   present for the August 12 and 13?
5       A.  Okay.
6       Q.  My question is, after the August
7   12th, 13th meeting that you said you had
8   in Washington D.C., there was no one
9   time that you had a one-on-one meeting
10  with Gary Hamilton?
11          MR. TRUONG:  Objection.
12          BY MS. GBENJO:
13      Q.  On how to strategize over this
14  assignment?
15          MR. TRUONG:  Objection.
16  Mischaracterizing the testimony and
17  foundation.
18          THE WITNESS:  I don't recall
19  having had met with him, no.
20          BY MS. GBENJO:
21      Q.  Okay.  Now -- so is it fair to
22  say then that you treated Gary Hamilton
23  the same way that you treated the
24  remaining team members?  You can answer.
25      A.  I don't recall if I had -- I

Page 111

1   don't recall our conversations.
2       Q.  Now, did you treat Gary Hamilton
3   in a manner or way different than the
4   way you treated the other team members
5   as it related to this safety inspection
6   assignment?
7           MR. TRUONG:  Objection.
8   Foundation.
9           THE WITNESS:  Can you please
10  clarify that?
11          BY MS. GBENJO:
12      Q.  Tell me what part of it you do
13  not understand and I'd be glad to
14  clarify.
15      A.  Okay.  Can you repeat the
16  question, please?
17      Q.  Is it fair to say that you
18  treated Gary Hamilton the same way and
19  manner that you treated the remaining
20  team members?
21          MR. TRUONG:  Objection.  Asked
22  and answered.
23          MS. GBENJO:  Okay.
24          THE WITNESS:  It is fair to say
25  that I used my resources to get the job

Page 112

1   accomplished.
2           BY MS. GBENJO:
3       Q.  Is that your answer to my
4   question?
5       A.  Did I treat Gary differently, no.
6       Q.  Okay.
7       A.  I --
8       Q.  I'm sorry.  Go ahead.
9       A.  Again, I used the resources and
10  the level of knowledge that the
11  resources had to the advantage of the
12  program.
13      Q.  Okay.  You divided the assignment
14  using your own discretion; is that
15  correct?
16          MR. TRUONG:  Objection.
17  Foundation.
18          THE WITNESS:  Using my own
19  discretion, is that what you said?
20          BY MS. GBENJO:
21      Q.  Uh-huh.
22      A.  I don't recall having done that.
23  I'm sorry.  I don't recall having done
24  that.
25      Q.  Now, prior to that, you said

Appino · Biggs Reporting Service, Inc.

Technology Specialists in Complex Litigation

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 117

1   their -- their knowledge of the safety
2   program, therefore some of the
3   information may not have been accurate.
4       Jane was one of those, however, Jane
5   did have more participation during the
6   pilots because she was here and she was
7   able to coordinate that as the safety
8   officer rather than as a task group --
9   for her on that.
10      Q. Oh, I'm sorry. Finish what you
11  were saying. Did you finish what you
12  were?
13      A. Uh-huh.
14      Q. Okay. Because she was here in
15  Kansas. And she was the only team
16  member who was here in Kansas of all the
17  seven?
18      A. Besides myself, yes.
19      Q. Okay. Did that seven include you
20  or exclude you?
21      A. That includes me.
22      Q. That includes you. So you and
23  six others.
24      A. Correct.
25      Q. Okay. And so one, two, three,

Page 118

1   four, these four people had limited --
2   who else had limited participation?
3       A. That's it.
4       Q. Now, who are the people that did
5   not have limited participation?
6       A. Cathy Orr. It's O-r-r -
7       Q. Uh-huh.
8       A. -- and I want to say his name is
9   Dan but, I'm sorry, his name slips me at
10  the moment. I -- I believe his name was
11  Dan Joines. I'm sorry. Could have told
12  you five minutes ago.
13      Q. Okay. Dan Jones?
14      A. Joines.
15      Q. Joines. Okay. So Cathy Orr and
16  Dan Joines have active participation,
17  was that what you called it? Now,
18  during this assignment how often did you
19  feed Stuart Burns back?
20      A. How often did I what?
21      Q. Did you feed him back. How often
22  did you update him on, you know, the
23  status of the -- the, you know, the
24  safety inspection assignment?
25      A. Did you say -

Page 119

1       MR. TRUONG: Objection.
2   Foundation. Go ahead.
3       THE WITNESS: Did you say Stuart
4   Burns.
5       BY MS. GBENJO:
6       Q. Uh-huh.
7       A. Oh, okay. I don't recall
8   specifically talking to Stuart. I don't
9   recall.
10      Q. Throughout the assignment?
11      A. I may have. I -- I don't recall.
12      Q. Now, how often did you feed the
13  team members back on, you know, what
14  they were doing?
15      A. We had conference calls. You
16  know, I contacted them via telephone,
17  e-mail as needed. We had specific time
18  frames where we were going to have a
19  conference call to discuss the
20  checklist, and those -- I mean, there --
21  there was some time frames established
22  but then a lot of it was on as-needed
23  basis, as well.
24      Q. Okay. Did you tell Jane Forester
25  that her participation was limited and

Page 120

1   that she had to improve on it?
2       A. No. I don't recall.
3       Q. Did you tell Nate Tobias?
4       A. I don't recall having that
5   conversation.
6       Q. Did you tell Rebecca Norcross?
7       A. I don't recall.
8       Q. Did you tell Gary Hamilton?
9       A. I don't recall.
10      Q. Did you tell Stuart Burns that
11  these people were not actively
12  participating in the assignment?
13      MR. TRUONG: Objection.
14  Foundation.
15      THE WITNESS: I don't recall
16  having that conversation.
17      BY MS. GBENJO:
18      Q. Did you tell Stuart Burns that
19  you were the only person doing the work?
20      MR. TRUONG: Same objection.
21      THE WITNESS: I don't recall if I
22  told him that.
23      BY MS. GBENJO:
24      Q. Did you tell Stuart Burns that
25  Gary Hamilton, Rebecca Norcross, Nate

Appino Biggs Reporting Service, Inc.

Technology Specialists in Complex Litigation

(Main Office)
8111 SW 21st Street          Toll Free 888.273.3063          6420 W. 95th Street, Suite 200
Topeka, KS 66604                                              Overland Park, KS 66212
785.273.3063                 Fax 785.273.0782                 913.383.1131

Technology Specialists in Complex Litigation

Page 121

1  Tobias and Jane Forester had limited
2  participation?
3       MR. TRUONG: Objection. Asked
4  and answered.
5       THE WITNESS: I don't recall
6  having that conversation.
7       BY MS. GBENJO:
8   Q. Did you tell Stuart Burns that
9  Cathy Orr and Dan Joines were the only
10 two people actively participating in the
11 assignment?
12      MR. TRUONG: Objection.
13 Foundation.
14      THE WITNESS: I don't recall
15 having that conversation.
16      BY MS. GBENJO:
17  Q. Do you recall telling Stuart
18 Burns anything about the assignment
19 status during that assignment? In other
20 words, between August 12th or 13th,
21 through December 18th, 2003?
22      MR. TRUONG: Objection. Asked
23 and answered.
24      THE WITNESS: I don't recall
25 specifically talking to Stuart.

Page 122

1       BY MS. GBENJO:
2   Q. Now, at -- by the time you run
3  the pilot in Kansas, the assignment had
4  already concluded? Had it already
5  concluded?
6   A. My portion?
7   Q. Of the assignment in it's
8  entirety.
9   A. The pilot was part of the process
10 of creating the safety inspection
11 process.
12  Q. The pilot was what you used to
13 test it?
14  A. Correct.
15  Q. Okay. So at the time you ran
16 that pilot in November you were -- the
17 checklist had already developed? In
18 other words, what you wanted to
19 implement in January of 2004 was already
20 in place; is that correct?
21  A. It was substantially outlined at
22 that point in that there were checklists
23 created that they were using during the
24 pilot.
25  Q. Okay. Now, you said there were

Page 123

1  checklists created using the pilot?
2   A. That were used for the pilot.
3   Q. Oh, okay.
4   A. During the pilot.
5   Q. Oh, yeah. Of course, this is --
6  these were the checklist that were
7  developed over time up until that point
8  -
9   A. Correct.
10  Q. -- in other words?
11  A. Correct.
12  Q. Okay. So was the -- did you do
13 anything else in terms of this --
14 related to this assignment after that
15 pilot?
16  A. Yes.
17  Q. Okay. Tell me what you did?
18  A. We surveyed the pilot
19 participants, the inspectors, to -- to
20 retrieve feedback on the functionality,
21 the usefulness of the sheets and then I
22 crunched all the data, wrote a final
23 report that outlined the entire process
24 from start to finish on -- on what we
25 had done, prepared an executive

Page 124

1  briefing.
2   Q. To test its success, right, at
3  that point? It was to test that it
4  actually worked?
5   A. Correct.
6   Q. Okay. So other than that did you
7  do anything else actively that related
8  to the assignment. In other words, did
9  you develop other checklists after
10 November?
11  A. I don't recall a specific date
12 but we did get feedback from all the
13 safety officers across the country on
14 the -- the checklist.
15  Q. Okay.
16  A. Following -- I -- I don't recall
17 the date, but following that I was asked
18 to assist in preparing the on-line
19 training for the safety inspection
20 process in I believe June of 2004. I --
21 I presented the safety inspection
22 checklist to all the safety officers in
23 the meeting.
24  Q. Did you say June of 2004 which
25 was about a year later on?

Appino   Biggs Reporting Service, Inc.

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Technology Specialists in Complex Litigation

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 129

1    A. Again, I don't recall having done
2 that but I would have to assume that I
3 did, otherwise they wouldn't know what
4 was expected.
5    Q. Did you give them anything in
6 writing stating what I have just said?
7    A. I don't recall.
8    Q. Okay.
9       MS. GBENJO: Now, let's mark this
10 as Goulding No. 1.
11       (THEREUPON, the court reporter
12 marked Goulding Deposition Exhibit-1 for
13 identification.)
14       MR. TRUONG: I think you give the
15 original.
16       MS. GBENJO: Uh-huh.
17 BY MS. GBENJO:
18    Q. Did you under -- I'm showing you
19 what has been marked as Goulding No. 1
20 that has safety inspection checklist.
21 Who prepared this checklist?
22    A. I did.
23    Q. When did you prepare this
24 checklist?
25    A. I don't recall a specific date.

Page 130

1    Q. To whom did you give this
2 checklist, if you gave it to anyone?
3       MR. TRUONG: Objection. Asked
4 and answered.
5       MS. GBENJO: That's not asked and
6 answered.
7       MR. TRUONG: Ms. Goulding, would
8 you like to take a minute to review the
9 document?
10      MS. GBENJO: Oh, glory.
11      THE WITNESS: Definitely.
12 Because -
13      MS. GBENJO: That's what she's
14 doing, counsel, for God's sake. Oh,
15 glory.
16      THE WITNESS: Okay. Would you
17 repeat your question, please?
18 BY MS. GBENJO:
19    Q. Who prepared this checklist?
20    A. I did.
21    Q. Did you distribute this checklist
22 to anyone?
23    A. Yes.
24    Q. To whom? You can answer.
25      MR. TRUONG: Give her a minute.

Page 131

1 She's thinking.
2      MS. GBENJO: Uh-huh. Okay. She
3 can think.
4      THE WITNESS: I can make
5 assumptions of who it was given to but I
6 cannot specifically -- I -- I would not
7 be able to swear to who I gave it to.
8 BY MS. GBENJO:
9    Q. Is it fair to say that you did
10 not give this safety inspection
11 checklist to all of your team members,
12 Ms. Goulding?
13      MR. TRUONG: Objection.
14 Foundation.
15      THE WITNESS: Oh, I don't recall
16 that.
17 BY MS. GBENJO:
18    Q. Okay. You said you don't recall
19 that. I want to clarify that. I --
20 does that mean you don't recall giving
21 it to every member of the team or you
22 just don't recall to whom you gave this
23 safety inspection checklist?
24    A. I don't recall giving it to any
25 portion of the team.

Page 132

1    Q. Now, was -- on -- during the
2 August 12th and 13th meeting that you
3 had with the other members, of course
4 you already said who they were, were you
5 given any handouts during that August 12
6 and 13th meeting that related to the
7 safety inspection assignment?
8    A. I don't recall receiving any.
9    Q. Okay. Now, you had testified
10 earlier that you prepared a general
11 office checklist, that is not the same
12 as safety inspection checklist, Exhibit
13 1, is it?
14    A. No.
15    Q. Okay. Did you use any portion of
16 this Exhibit 1 in determining whether
17 Jane Forester had limited participation?
18    A. No. That's not what this is for.
19    Q. Okay. Now, let me give you what
20 we would be calling Goulding Exhibit 2
21 for identification.
22      (THEREUPON, the court reporter
23 marked Goulding Deposition Exhibit-2 for
24 identification.)
25 BY MS. GBENJO:

Appino-Biggs Reporting Service, Inc.

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Technology Specialists in Complex Litigation

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 133

1  Q. And I just got this in the -
2      MR. TRUONG: Just want to make it
3  a record that Exhibit 1 was not a
4  document produced by the defendant.
5      MS. GBENJO: I just got them in
6  the fax. I mean, I just got them in
7  the, what do you call it, I just got
8  them in PDF.
9      MR. TRUONG: Not from defendant.
10     MS. GBENJO: Huh?
11     MR. TRUONG: We don't -
12     MS. GBENJO: Oh, okay. If that's
13 what you are stating then, I'm sorry,
14 yeah. Clearly.
15     BY MS. GBENJO:
16  Q. Okay. That's Goulding Exhibit 2.
17 Now, we're showing you what has been
18 marked Goulding Exhibit 2. Who prepared
19 this list?
20  A. I did.
21  Q. Did you prepare this single-
22 handedly or in conjunction with another
23 person?
24  A. I don't recall.
25  Q. Did Stuart Burns prepare this

Page 134

1  list with you, this Goulding Exhibit No.
2  2?
3      MR. TRUONG: Objection.
4  Foundation.
5      THE WITNESS: I don't recall.
6      BY MS. GBENJO:
7  Q. Did Annette Burrell assist you in
8  preparing Goulding Exhibit No. 2?
9  A. No.
10 Q. Did Gary Hamilton assist you in
11 preparing Goulding Exhibit No. 2?
12 A. I don't recall.
13 Q. Did you seek Gary Hamilton's
14 participation in developing Goulding
15 Exhibit No. 2?
16 A. I don't recall whether I did or
17 didn't.
18 Q. Now, on Goulding Exhibit No. 2
19 the other team members have three to
20 four areas depending on who they are or
21 depending on how you divided them. You
22 only have the general office; isn't that
23 true?
24 A. Correct.
25 Q. And you gave Mr. Hamilton three

Page 135

1  areas, isn't that also true?
2  A. Correct.
3  Q. And one of the three areas that
4  you give to Mr. Hamilton is day care; is
5  that correct?
6  A. Correct.
7  Q. Another one is printing; isn't
8  that correct?
9  A. Correct.
10 Q. And the last one is vehicle
11 maintenance; isn't that true?
12 A. Correct.
13 Q. You ended up dropping vehicle
14 maintenance from the list, did you not?
15     MR. TRUONG: Objection.
16 Foundation.
17     THE WITNESS: I don't recall
18 doing that.
19     BY MS. GBENJO:
20 Q. Do you recall -- do you recall
21 dropping printing also from the list?
22     MR. TRUONG: Objection.
23 Foundation.
24     THE WITNESS: No, I don't recall
25 doing that.

Page 136

1      BY MS. GBENJO:
2  Q. Do you recall rejecting Mr.
3  Hamilton's proposal on day care
4  resources?
5      MR. TRUONG: Objection.
6  Foundation.
7      THE WITNESS: No. I don't recall
8  doing that.
9      BY MS. GBENJO:
10 Q. Do you recall rejecting Mr.
11 Hamilton's proposal on printing
12 checklists?
13     MR. TRUONG: Same objection.
14     THE WITNESS: No, I don't recall
15 doing that.
16     BY MS. GBENJO:
17 Q. Do you recall stating that you
18 had confirmed that vehicle maintenance
19 was conducted by GSA?
20     MR. TRUONG: Objection.
21 Foundation.
22     THE WITNESS: No, I don't recall
23 that.
24     BY MS. GBENJO:
25 Q. You also don't recall taking

Appino Biggs Reporting Service, Inc.

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Technology Specialists in Complex Litigation

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 137

```
 1   vehicle maintenance and printing from
 2   Mr. Hamilton's list; is that correct?
 3         MR. TRUONG: Objection. Asked
 4   and answered.
 5         THE WITNESS: I don't recall
 6   removing those.
 7         BY MS. GBENJO:
 8       Q. As far as you recall, you gave
 9   him these three and expected him to
10   complete these three assignments?
11         MR. TRUONG: Objection. Asked
12   and answered.
13         BY MS. GBENJO:
14       Q. The assignments in these three
15   areas; is that correct?
16       A. I don't recall that, no.
17       Q. At what point did Rebecca
18   Norcross turn over her own checklist?
19       A. I don't recall.
20       Q. At what point did Jane Forester
21   turn over her checklist?
22       A. I don't recall.
23       Q. At what point did Gary Hamilton
24   turn over his checklist?
25       A. I don't recall.
```

Page 138

```
 1         MR. TRUONG: Objection.
 2         BY MS. GBENJO:
 3       Q. And at what point did Cathy Orr
 4   turn in her checklist?
 5       A. I don't recall.
 6       Q. At what point did Dan Joines turn
 7   in his own checklist?
 8       A. I don't recall.
 9       Q. Was there any conference call
10   between August 12th and December 18
11   during which you told members that their
12   checklists were late or not yet
13   submitted?
14         MR. TRUONG: Objection.
15   Foundation.
16         THE WITNESS: I don't recall.
17         BY MS. GBENJO:
18       Q. Now, you were the chair of this
19   safety inspection assignment, right?
20       A. Correct.
21       Q. And Gary Hamilton was co-chair?
22         MR. TRUONG: Objection.
23         THE WITNESS: I don't believe
24   that we had those titles.
25         BY MS. GBENJO:
```

Page 139

```
 1       Q. Okay. Team -- team leader and -
 2       A. Team assistant.
 3       Q. Assistant team leader?
 4       A. Correct.
 5       Q. That's what you recall?
 6       A. Yes.
 7       Q. You don't recall chair or
 8   co-chair?
 9       A. No.
10       Q. Do you know who made you the
11   chair -- I mean, the team leader?
12         MR. TRUONG: Objection. Asked
13   and answered.
14         THE WITNESS: No, I don't know.
15         BY MS. GBENJO:
16       Q. You don't know who made Gary
17   Hamilton the assistant co -- or team
18   leader?
19       A. I don't know.
20       Q. Do you know Dan Joines'
21   background as it relates to safety?
22       A. Other than he's a safety officer,
23   no, I don't know.
24       Q. How about Cathy Orr?
25       A. I don't know.
```

Page 140

```
 1       Q. How about Rebecca Norcross?
 2       A. I don't know.
 3       Q. Gary Hamilton?
 4       A. I don't know.
 5       Q. Nick Tobias?
 6       A. I don't know.
 7       Q. And Jane Forester?
 8       A. I only know because she was my
 9   employee.
10       Q. In Kansas?
11       A. Correct.
12       Q. Did you conduct a performance
13   appraisal or review on these team
14   members at any point prior to the
15   conclusion of the assignment?
16       A. I know that I did not prepare an
17   appraisal. I do not recall if I
18   provided feedback to anyone other than
19   Jane who was my own employee at the time
20   -- or one time.
21       Q. When you went to Washington D.C.
22   did Jane Forester go with you?
23       A. No.
24       Q. So she was here throughout the
25   assignment?
```

Appino · Biggs Reporting Service, Inc.

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Technology Specialists in Complex Litigation
Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 153

1  lasted three to four months, right?
2     A.  Correct.
3     Q.  Okay.
4     A.  Consistently, yes.
5     Q.  Consistently. Would you call
6  this an assignment or a detail?
7     A.  There was no paperwork done so I
8  would -- I mean, I'd be putting in my
9  own opinion on that one. It was -- it
10 was a task force to work on.
11    Q.  It was just an assignment?
12    A.  Correct.
13    Q.  Did you say correct?
14    A.  Correct.
15    Q.  Okay. Now, did Jim Falcone or
16 Ron Stephens respond to that letter on
17 the NTU when you requested a union rep
18 task force participant? Did they
19 respond to your letter?
20    A.  They wouldn't be the responder,
21 NTU would be the responder.
22    Q.  Okay.
23    A.  It was written on behalf of Ron
24 Stephens, Jim Falcone. And I don't
25 recall which one specifically.

Page 154

1     Q.  Did you receive a response on it?
2     A.  I don't recall whether I did or
3  not.
4     Q.  Okay. Okay.
5        MS. GBENJO:  Let me quickly use
6  the bathroom. I think I'm about done.
7        MR. TRUONG:  But --
8        MS. GBENJO:  Do you want to go
9  lunch?
10       MR. TRUONG:  Off the record.
11       (THEREUPON, a discussion was had
12 off the record.)
13       MR. TRUONG:  Back on the record.
14       (THEREUPON, a discussion was had
15 off the record.)
16       BY MS. GBENJO:
17    Q.  You had testified that you became
18 chief of security and safety around
19 2001, 2002?
20    A.  It was prior to that.
21    Q.  Chief of support services?
22    A.  Well, I'm not sure if -- I'm not
23 sure what the section title was at that
24 period of time. It could have been
25 either/or. But either/or I had safety

Page 155

1  and security as my program areas.
2     Q.  When you were chief of support
3  services?
4     A.  They were two of the nine program
5  areas, yes.
6     Q.  Okay. Did you have any exposure
7  to security and safety prior to being
8  chief of support services?
9     A.  No.
10    Q.  Okay. Now, you do not have any
11 degree in security or safety, do you?
12    A.  No.
13    Q.  Okay. Now, I want to go back to
14 -- now, Goulding No. 2 reflects that you
15 gave Rebecca four different assignments,
16 that's the conference, training work
17 room, health facility slash first aid,
18 stairway traffic and parking. Was there
19 any one of them that you assigned to --
20 that -- that she failed to complete any
21 one of these four.
22       MR. TRUONG:  Objection.
23 Foundation.
24       BY MS. GBENJO:
25    Q.  Huh?

Page 156

1     A.  I don't recall.
2     Q.  Now, how about Nate Tobias. You
3  gave him computing, hallway egress, mail
4  room. I think you gave him four, too.
5  And recreation area. Was there any one
6  of them that he did not complete?
7     A.  I don't recall.
8     Q.  Now, we already said earlier that
9  you gave Gary Hamilton three, and that's
10 vehicle maintenance, printing and day
11 care. Was there any one of them that he
12 did not complete?
13    A.  I don't recall.
14    Q.  Now, Cathy Orr and Dan Joines?
15    A.  Uh-huh, correct.
16    Q.  Okay. Was there any one that
17 they did not complete?
18    A.  I don't recall.
19    Q.  Okay. Now, on sitting here today
20 you cannot tell me that there was
21 something that you -- there was an
22 assignment that you gave to Rebecca
23 Norcross that she did not complete, is
24 that -
25       MR. TRUONG:  Objection.

Appino   Biggs Reporting Service, Inc.

Technology Specialists in Complex Litigation

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 96th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 173

```
 1  security and safety person, how long did
 2  you say you did that for?
 3      A.  I -- I don't recall exactly.  I'm
 4  sorry.
 5      Q.  Was it up to six months?
 6      A.  I'm sorry?
 7      Q.  Was it up to six months?
 8      A.  It was over six months.
 9      Q.  Was it up to a year?
10      A.  It was over a year.
11      Q.  Eighteen months?
12      A.  I don't recall.  I'm sorry.
13      Q.  Could be less than 18 months?
14      A.  I -- I don't recall specifically
15  how long I was -
16      Q.  You don't know?
17      A.  -- involved in security and
18  safety programs.
19      Q.  You don't know whether that's
20  less than 18 months?
21      A.  I don't believe it is, but I
22  don't specifically know that.
23      Q.  You don't know that it's over 18
24  months, do you?
25      THE REPORTER:  I'm sorry.  You
```

Page 174

```
 1  don't know that it's over?
 2      MS. GBENJO:  Eighteen months --
 3  it's in excess of 18 months or it's more
 4  than -
 5      MR. TRUONG:  Objection.  Asked
 6  and answered.
 7      THE WITNESS:  I believe it is,
 8  but I don't -- I would not swear to it
 9  because I don't know.  I don't recall
10  exactly how long I was involved in the
11  safety and security programs.
12  BY MS. GBENJO:
13      Q.  You would not -- you would not
14  swear to it either that it is not less
15  than 18 months?
16      MR. TRUONG:  Objection.
17  Argumentative.  Asked and answered.
18      MS. GBENJO:  She used the word.
19      THE WITNESS:  I -- I don't recall
20  how long it was.
21  BY MS. GBENJO:
22      Q.  Okay.  Did you solicit Mr.
23  Hamilton's input when you completed the
24  executive report or the summary?
25      A.  I don't recall if I did or not.
```

Page 175

```
 1      Q.  Did you solicit Cathy Orr's input
 2  when you developed the executive report
 3  or summary?
 4      A.  Did I -- whose?
 5      Q.  Cathy Orr.
 6      A.  I don't recall having done so.
 7      Q.  I'm sorry.
 8      A.  I don't recall having done so.
 9      Q.  How about Dan Joines?
10      A.  I don't recall.
11      Q.  Did you tell Stuart Burns that
12  you developed this Goulding Exhibit 2 on
13  your own?
14      MR. TRUONG:  Objection.
15  Foundation.  Asked and answered.
16      THE WITNESS:  I don't recall that
17  conversation.
18  BY MS. GBENJO:
19      Q.  You don't recall telling him that
20  you developed this single-handedly?
21      A.  No, I don't.
22      Q.  You don't recall telling him that
23  Mr. Hamilton was not -- did not -- had
24  no input in that division of assignment?
25      MR. TRUONG:  Same objection.
```

Page 176

```
 1      THE WITNESS:  I don't recall
 2  that, no.
 3      BY MS. GBENJO:
 4      Q.  Okay.  I'm not sure, but I
 5  believe I asked you earlier whether you
 6  would consider the safety inspection
 7  thing that you started in August 2003 as
 8  a detail or as an assignment.  I believe
 9  your response was that it was just an
10  assignment.
11      A.  Correct.
12      Q.  Now, upon completion of this
13  safety inspection program, what was your
14  understanding of what the next phase
15  would be?
16      A.  I don't recall the time frame,
17  but I was asked to provide input for
18  developing on-line training for safety
19  inspectors out in the field.  And at --
20  and I also, and I don't recall it being
21  brought to my attention in -- in
22  December at the end of this, but I was
23  asked to do the presentation in June for
24  all safety officers.  The next phase
25  would be the rollout of the program.
```

Appino Biggs Reporting Service, Inc.

(Main Office)
8111 SW 21st Street
Topeka, KS 66604
785.273.3063

Technology Specialists in Complex Litigation
Toll Free 888.273.3063
Fax 785.273.0762

8420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131

Technology Specialists in Complex Litigation

Page 177

```
1    Q.  In January?
2    A.  I -- I don't know at the end of
3  December if that was still a viable --
4  if that was agreed that that was a
5  viable date.  I don't recall that.
6    Q.  Well, did anything happen in
7  January 2004 as it relates to --
8  relating to the safety inspection
9  program?
10   A.  Oh, I don't recall if it did.
11   Q.  So as far as your recall, the --
12 was the -- okay.  Was the inspection,
13 the safety inspection program or the
14 checklist ever implemented?
15   A.  Yes.
16   Q.  When?
17   A.  I don't recall.  I don't know a
18 specific date.
19   Q.  Okay.
20   A.  I do know that after my
21 presentation in June -
22   Q.  Of 2004?
23   A.  -- in June of 2004, that at that
24 time they were working on the database
25 to input the safety inspection
```

Page 178

```
1  information to.  So I don't know the
2  exact date.  I know it was continuing
3  after -- with the next phase after my
4  work was done.
5    Q.  So you don't know when or whether
6  it was implemented?
7    A.  It was implemented.
8    Q.  But you don't when?
9    A.  I don't know exactly when, no.
10   Q.  Now, I don't know if I asked you
11 this, I -- what is your knowledge of --
12 of the success or usability of the
13 web-based inspection, you know, the
14 reporting and tracking?
15   A.  That's what I just mentioned, at
16 the -- the June safety officer CPE, they
17 had some computers set up to provide
18 examples to the safety officers, that
19 would be the database.  Other than that,
20 I have no knowledge.
21   Q.  Okay.
22   A.  It's just what I saw at that
23 conference.
24   Q.  Okay.  This is the RESM safety
25 web page that you're talking about?
```

Page 179

```
1    A.  Oh, I'm sorry.  The what?
2    Q.  The RESM safety web page.
3    A.  Oh, no.  I'm sorry.  I
4  misunderstood.  I thought you were
5  talking specifically about the safety
6  inspection web page.
7    Q.  Okay.
8    A.  The RESM web page, safety web
9  page -- and well, as the manager of
10 safety and security I visited it very
11 frequently.  Multiple times each week.
12 I've made suggestions that have altered
13 that in that I suggested that a -- a
14 link be made to have all best practices
15 listed so that what we in Kansas City do
16 can be shared with others in the country
17 at their convenience.  I'm -- I'm very
18 familiar with it.  I don't know how much
19 detail you need to know on or you want
20 to know on that.
21   Q.  Okay.  Now, was there ever a
22 point where you told all the team
23 members that they're now disbursed or
24 their assignment was over?
25   A.  The seven members?
```

Page 180

```
1    Q.  Uh-huh.
2    A.  I don't recall whether I did that
3  or not.
4    Q.  Did -- did there come a time when
5  Stuart Burns disbursed the same seven
6  team members?
7    A.  I don't recall that ever
8  happening.
9    Q.  Is there a reason that you gave
10 everybody on Goulding No. 2 three to
11 four assignments and you gave yourself
12 only one?
13   A.  I can tell you how I perceive it
14 now.  I cannot tell you exactly what I
15 was thinking then.
16   Q.  Okay.  Well -- so sitting here
17 today you cannot tell me why you gave
18 yourself one and gave the rest of the
19 team members three to four at that time,
20 is that what you're saying?
21   A.  Not with 100 percent certainty,
22 no.
23   Q.  Okay.  Was there ever a time that
24 Stuart Burns asked you whether you and
25 Mr. Hamilton met to discuss the safety
```

Appino Biggs Reporting Service, Inc.

Technology Specialists in Complex Litigation

(Main Office)
5111 SW 21st Street
Topeka, KS 66604
785.273.3063

Toll Free 888.273.3063
Fax 785.273.0762

6420 W. 95th Street, Suite 200
Overland Park, KS 66212
913.383.1131