THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

```
********************************
GARY HAMILTON,                  *
Plaintiff                       *
v.                              *       CASE NO.: 05-cv-1549 (RBW)
JOHN SNOW,                      *
Defendant                       *
********************************
```



EXHIBIT 9

## AFFIDAVIT OF GARY HAMILTON

THE STATEMENTS IN THIS AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY PERSONAL KNOWLEDGE. I AM ADULT, COMPETENT TO GIVE THIS AFFIDAVIT.

1. I graduated from the University of North Alabama with a Bachelors degree in Industrial Hygiene around May 1982. Thereafter, I obtained a Masters degree in Public Health from George Washington University.

2. I began my career as a Industrial Hygienist with the Federal Government approximately twenty-three (23) years ago. During my tenure with the Federal Government, I obtained Master's level Senior Executive Leadership Training for the Federal Government Sector around year 2000. This means learning and acquiring and the principles and also the team work required in the Federal Government procurement, policy, planning, and government budgeting, contract management, leadership in general, accounting practices, employee relation and human resources

3. I worked with the Secretary of Defense and the Department of Navy as an Industrial Hygienist until about 2001, when I joined the Internal Revenue Services ("IRS") in the same position. At the IRS, I worked within the Agency Wide Shared Services (AWSS) of the Real Estate and Facilities Management ("REFM") department.

4. At the inception of my employment with the IRS, the IRS informed me both that I would be dealing mostly with Safety and Security, and that since I was strong in Policy and Procedure, I would complement the skills of Camille Caraway, who was not strong in Policy and the technical aspects of the job.

5. A GS-12 Industrial Hygienist at the IRS, my job duties include: (a) Fire Protection and Life Safety - I conducted assessment of hazards in buildings from fire, application of prevention or protection techniques to prevent or limit damage to buildings from fire and provide for safe egress of people from buildings; (b) Budgeting and Planning Safety - I developed resource assessments of the organization's safety and occupational health needs, developed safety program plans, developed budgets, and assisted management in meeting their safety responsibilities; (c) Administration and Personnel Management Safety - I managed IRS junior level safety inspectors; (d) Problem Solving Safety - I through regular safety inspections and analysis of quarterly safe accidents reporting and tracking, used my knowledge of safety requirements, regulations and codes to analyze and communicate with others in order to effect corrective action; (e) Safety Compliance/Inspection Activity -I conducted Safety Inspection or compliance Inspections evaluating and recommending compliance with regulations and accepted safe practices; (f) Safety Training and Development - I developed, coordinated and provided safety training for management, supervisors and employees; (g) Accident Investigation - I investigated events leading to accidents and determining cause and identify methods to prevent recurrence; (h) Communication - I Communicated with employees, supervisors and management concerning safety procedures, deficiencies, and responsibilities; and (I) I developed and wrote policies

extensively on complicated issues. Among numerous others, I wrote the IRS Territorys' (Washington DC Metro) Facility Safety Inspection Processes and Procedure Policy.

6. In conjunction with the above-mentioned duties, I also performed Construction Safety while I was in the Navy, in that, I conducted Inspections and Evaluations of Constructions activities and application of construction safety standards and managed contractors and safety specialists. Additionally, I was the Manager of Hazard Abatement for many years.

7. Aside from becoming a board certified Industrial Hygienist in 1995, throughout my career, I have been aligned with all of my employers' safety management operations. My professional path in safety led me to pursue the recognition as a Certified Safety Professional ("CSP") and I completed the requirements for the CSP.

8. Around May of 2003, the IRS announced a vacancy for the position of a grade level 14 Safety and Occupational Health Manager ("Safety Manager"),.

9. The Safety Manager position announced in this case requires, among others, that the applicant be able to: Develop policies, procedures and standards for the IRS safety program; Advise top management on the most complex safety matters; Interprets national safety directives for their applicability to the safety program; Formulate broad policy direction regarding the implementation of these directives; and Serve as representative of the Director in performance of top liaison assignments and in contact with professional and trade association, officials of the Treasury Department, representatives of other government department and agencies, OMB, Congress and the public; Serve as a technical authority in assignments requiring the application of new theories and development of safety problems not susceptible to treatment by

accepted safety methods and procedures.

10. In its job announcement and description, IRS identified the categories over which it would gauge and assess the candidates' eligibility for the position. Likewise, IRS specified the points it allotted to each of the categories. The points are as follows: Knowledge: 1550; Level of Difficulty: 1635; Assignment: 325; Communication 180; with a total point of 3690.

11. Four of us made the Best Qualified List – myself, Annette Burrell, Camille Caraway and Michael Perkins.

12. Three of us received a ranking score of 25. The fourth person, a white male, received a ranking score of 19.

13. Of the four candidates, I was the only black. I was the only one with a Masters degree. I was the only one who had dealt with Safety Operations throughout his career. I was the only one with Executive Leadership training for the Federal Sector.

14. The four of us were interviewed by a panel of three (3) members - Stuart Burns (Caucasian male); Mike Huston (Caucasian male) and Tatika Mitchell (who referred to herself as a mixture of Hispanic, African-American and French).

15. The interview panel members did not rate or give us any scores for the interview. They initially refused to produce the notes they said they took during the interview. After quite a while, they produced all the interview notes for all the applicants except me.

16. During my years at the IRS, I knew, based on my familiarity with the promotion selection procedures; tracking the several selection process; and also conferring with applicants for several positions, that interview Panel always consists of

at least three voting members and one person from the personnel office who is a non-voting member to ensure that control and panel actions meet validity and job relatedness requirements. That was the requirement under our merit promotion manual at the time. My Division however did not follow the manual

17. When I was interviewed, for the Safety Manager position however, there was no personnel representative to participate.

18. The Selecting Official selected Annette Burrell, a white female who has a high school education, no college degree, no formal education or training in Safety and no formal training in Security. Additionally, Ms. Burrell, did not submit a complete application until after the closing of the vacancy announcement in this case. Additionally, I observed at the IRS that Ms. Burrell had not satisfied the requisite fifty-two (52) weeks of specialized safety experience necessary to qualify for the GS-14 safety (OPM series 0018) position.

19. The only reason that the IRS gave for not selecting me is that my interview allegedly did not go "very well."

20. The Selecting Official in this case is Mr. Stuart Burns, who has a history or pattern of selecting white female over males in that in the three instances where he was responsible for selection, he selected white females over me, though I made myself available and inquired about the positions.

21. I personally reviewed the IRS's own statistics when I filed my first EEO Complaint. It shows that there are no barriers to White female advancement. Within the Division where I was employed White females receive promotions at a rate 9.75 times that of Black males; and, 6.0 times that of Black females

22. Over the three years preceding the selection in this case, I observed three white females detailed to career enhancing positions/assignments at headquarters of REFM, the Division where I was employed, thus leading to promotional opportunities or permanent positions. Aside from Ms Burrell, others were Sabrina Rutland and Charlotte Phillips. On the other hand, myself and two other black females, namely Theresa Herbert and Belinda Fellers were overlooked. These females informed me that they had expressed interest in higher positions and had been ignored.

23. Prior to the selection in this case, Ms. Burrell, the selected applicant, was detailed to the position that was announced and she was selected for, but IRS gave the position a different title.

24. However, right after her selection for the Safety Manager position, Ms. Burrell continued to perform the same job duties she was performing while on detail.

25. When I found out that I was not selected for the Safety Manager position, I asked the Selecting Official why I did not get the position but was given no answer. At that point I said I did not believe that the selection process was fair and that I would file a complaint. I immediately commenced the process of filing my EEO Complaint around August of 2003.

26. Because I have worked in Safety and Security throughout my career, Safety and Security have become part and parcel of me and vice versa. Thus, I always make myself available and accessible whenever there is any activity that requires my skill or expertise in the field of Safety and Security. It is my primary field and zone of interest. Ironically however, the only time I am allowed to partake of the activities, if at all, is when it would not amount to promotion or lead to recognition. This is so because from

6

my observation, it appears that IRS implements its [silent] policy of clandestinely promoting white females over black males. I am a living testimony of that fact and policy. The positions are rarely announced. Whenever they are, they go to the white female already detailed to them. In this particular instant, I believe it is grossly unfair to select someone with vastly inferior qualifications to mine, for the position of a Safety Manager.

27. About two (2) weeks after the selection for the Safety Manager position, the AWSS of the REFM division solicited volunteers for the Revision of the Safety Inspection Program ("RSIP").

28. As usual, I volunteered for the program and even volunteered to lead it.

29. Rather than allow me to lead it, Mr. Burns selected a white female namely Brenda Goulding, to lead it and told me that he would allow me to be the "selected co-chair". I agreed. Soon thereafter, Brenda Goulding told me that Mr. Burn's order was that I be her assistant. Mr. Burns did not respond to my inquiry on the matter.

30. Brenda Goulding, the person Mr. Burns selected to lead the RSIP, had no degree; no background in Safety; and in fact, had no exposure to Safety prior to about year 2002.

31. Though I was supposed to be co-chair or assistant to the leader, I was not allowed to play any significant role in the program. I was relegated to the roles similar to those of other ordinary volunteers.

32. Immediately the program took off, Mr. Burns met with the key players for the RSIP but excluded me from that meeting. The second kick-off meeting Mr. Burns held with everyone involved i.e., all the volunteers, was the one Mr. Burns invited me to

attend.

33. Additionally, at the inception of the RSIP, I attempted to confer with Brenda Goulding so that we could design a plan for the program but she never returned any of my calls to her. The next thing I knew was that she designated me to be responsible for three (3) of the sixteen Tasks there were, as she did most other volunteers. She however designated herself to be responsible for only one of the Fifteen Tasks, namely, the office environment, which deals with a significantly lesser risk as compared with the other 15 safety functional area inspection checklists.

34. Moreover, when she assigned me the three tasks, she stated that Daycare Task would be due first as the priority task. About three days before the deadline, she changed the priority task to Vehicle Maintenance Task, but then turned around to request Daycare at the same deadline. In any event, Daycare could not be ready as she had directed my focus to another task. Thereafter, she proceeded to change my tasks at least twice; increased my number of tasks to four; and never even once, treated me as a co-leader or co-chair.

35. The RSIP lasted about four months and ended around December 2003.

36. At the end of the RSIP, Mr. Burns once again had another meeting with the key players in the program and again excluded me from it. The only last meeting I participated in, was the one called by Brenda Goulding, in which every volunteer remaining in the program at that time attended via teleconference.

37. My formal EEO Complaint was filed in October 21, 2003. About December 2003, I learned that there would be another vacancy for the Safety Manager position. I inquired about it from Mr. Burns but was ignored. That was not the first time Mr. Burns

would ignore my inquiry about upcoming vacancies. He did exactly the same thing prior to his selection of Annette Burrell for the Safety Manager position.

38. About a month later in January 2004, Camille Carraway, a white female, informed me that Mr. Burns had detailed her to the Safety Manager position and promised her that the position would become permanent.

39. Immediately thereafter, about February 2004, I filed another claim of discrimination as I once again believe that it was unfair that I was not considered for the detail; that another white female was selected over me; and this time around, it was shortly after the Complaint I informed Mr. Burns that I was going to file, became formal.

40. I was not assisted by any lawyer when I filed my claim. Thus, I was not sure what the elements for each cause of action were. At some point I had a Pastor who was also a paralegal. His name was Mr. Howard Wallace. He assisted me for a short period but then died. As a result, I could not amend my claim to include my retaliation claim until early 2005, after I had hired a lawyer.

41. About summer of 2005, I attended a Safety workshop in Dallas Texas. During the social hours, at the bar area, I observed Mr. Burns and Annette Burrell in an unprofessional interaction. The other Safety Officers stated that it was not their first or second time.

42. A few minutes later when Mr. Burns stepped away from the bar, I went to him and said something like, "Oh this is how it works, first you gave her a detail and then you gave her a permanent 14." Mr. Burns looked at me and did not deny it.

43. The whole thing began to make sense after I saw both of them in Dallas; after I remembered that Ms. Burrell was just a collateral safety staff who had no college

degree; no formal training in security or safety; and the way white females are routinely promoted over black males in the REFM Division of the IRS.

44. My issue is with the system as a whole in that most of the time, positions are not announced; white females are routinely detailed to higher position without the competitive process and would often become permanent in those positions.

45. It was only after this case started that I learned that I allegedly did not participate in the RSIP and that Brenda Goulding was the only person doing all the work. This fact is untrue as I did four of the sixteen tasks up until the end of the program while Brenda Goulding did only one. Additionally, only after this case started did I learn that Mr. Burns "detailed" me to the RSIP. To the contrary, the RSIP was a program everyone involved volunteered for. Mr. Burns told me he would allow me to co-chair the RSIP, but then, I was never allowed to play the co-chair role. I actually filed another EEO claim after I found out Mr. Burns' lies about the RSIP but was told that could not be a claim by itself.

46. Likewise, it was only after this case started that I found numerous markings in my personnel file for alleged errors. I checked my personnel before the selection and there were no markings therein.

47. Only after this case started did I learn that I allegedly did not answer some of the questions asked at the interview. That is not true at all as I answered all the questions and answered them well.

48. Furthermore, only after this case started did I learn that Camille Carraway was selected for the January 2004 detail because of her alleged participation in the development of training for the Safety Advisory Committee (SACs). Both Ms. Carraway

10

myself and prepared and delivered training at various times and audiences on this subject. We actually gave a huge Power Point presentation on the subject. The whole Division knew about it, including Ms. Barbara Cohen and Mr. Crandall. In most cases, managers and supervisor from my Division and other Business/Division Units employees congratulated or shook my hand at the end of each presentation for a job well done. Whenever there was a conference on issues relating to Safety, I was almost always called upon to answer just about every question from other participants. On numerous occasions, other Safety officers called me at the end of the conferences for additional assistance. Aside from that, every member of the Division knew how much interest I showed in any and everything relating to Safety. Whenever it was time to volunteer, I was there. Whenever it was time to train, I was there as well. In fact, one of the reasons the IRS hired me was for me to complement the areas that Ms. Carraway was weak or deficient in, particularly in Policies. I developed a Standardized Reporting Process to uniform reporting of inspection results among the Business Units, Safety, and Union employees. That Standardized Reporting Process enhanced and facilitated the Safety Officers' training and development plan.

49. Beyond all that, I have, right from the beginning, expressed my interest in permanent level 14 positions to everybody in authority in my Division. I even told my colleagues that I have told the higher echelons about my interest in GS 14 positions, whether it be as an Industrial Hygienist or Safety Manager. On one occasion, one of the authorities in the Division, Mr. Ed Crandall, a white male, himself told me that he noticed my how much interest I have shown in the field of Safety; that he was about to retire from his GS 14 position; but that he had told all of his other colleagues

11

responsible for hiring about my interest in the position. I informed him that I had also told them. He was a GS 14 Industrial Hygiene position however. Ms. Barbara Cohen as far as I know, is another white female who had received rapid promotions. The white females are the ones who receive exposures to the National Office. Nonetheless, Mr. Burns knew about my interest, experience and participation in the Safety field not only at the IRS but also at the Department of Navy as he was also there when I was.

50. As a result of IRS's conduct, I was stressed, had problems with my weight, and sleep; grinding teeth while asleep, experiencing frequent flashbacks, nightmares, avoidance of similar perceived situations, frequent and severe panic attacks, loss of concentration and focusing, loss of short term memory, headaches, loss of hair such that my physician diagnosed me with, anxiety and depression.

_____    Date  10/5/07
Signature