


COPY

\*\*\*\*\* C O N F I D E N T I A L \*\*\*\*\*

```
 1      IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
 2   ─────────────────────────────────────────
 3   GARY HAMILTON,                       x
                                          :
 4                  Plaintiff,            :
             vs.                          : Civil Action
 5                                        : No. 05-1549
     JOHN SNOW, Secretary Department      :
 6   of Treasury,                         :
                    Defendant.            x
 7   ─────────────────────────────────────────
 8                        Washington, D.C.

 9                        Thursday, August 24, 2006

10

11   VIDEOTAPED DEPOSITION OF:

12                   GARY HAMILTON,

13   the plaintiff, was called for examination by counsel

14   for the defendant in the above-entitled matter,

15   pursuant to Notice and agreement of the parties as

16   to time and date, taken at the offices of the

17   United States Department of Justice, 501 Third

18   Street, N.W., Washington, D.C., convened at

19   approximately 10:10 o'clock, a.m., before Catherine B.

20   Crump, a court reporter and Notary Public in and for

21   the District of Columbia, when were present on

22   behalf of the respective parties:
```



**CAROL J. THOMAS STENOTYPE
REPORTING SERVICES, INC.**
3162 MUSKET COURT
FAIRFAX, VIRGINIA 22030
(703) 273-9221

1       THE WITNESS:  As I answered your answer
2  before -- your question before -- excuse me -- I
3  left or involuntarily was forced to leave, and I
4  described that adverse action taken against me.  I
5  already explained that, and I was involuntarily
6  forced to leave December of 2005.
7       BY MR. TRUONG:
8       Q.   Where did you go after you left the
9  Internal Revenue Service?
10      A.   I went to the Department of Labor.
11      Q.   What do you do there now?
12      A.   I'm a Safety and Occupational Health
13 Specialist.
14      Q.   Let's talk about the claims that you
15 have against the Internal Revenue Service in this
16 case.  What is your understanding of those claims
17 against the Internal Revenue Service?
18      A.   My claims against the Internal Revenue
19 Service deals with giving white females preferential
20 treatment in violation of the Merit Promotion Plan
21 of the agency and then later in the future giving
22 them permanent positions, promotions, that otherwise

```
 1   meetings where            s and Ms.           was
 2   present, they indicated to me that that was -- their
 3   relationship went much beyond
 4   matters, that it was
 5   inappropriate for the workplace.
 6              And to answer your question I went up to
 7   him and I said, So, Mr. Burns, this is how it works;
 8   you give Burrell a detail and then later, you give
 9   her a permanent 14.
10       Q.   When was that conversation?
11       A.   Sir.
12       Q.   I'm sorry.  Could you finish?
13       A.   Let me finish.  Thank you.
14       Q.   I apologize.
15       A.   Thank you, sir.  He said -- actually, he
16   just stared at me.  There was no response, and he
17   just turned off and walked away.  He did not deny
18   what I confronted him with, that statement, and that
19   was last summer.
20       Q.   Is that your answer?
21       A.   Yes.
22       Q.   So, basically, your allegation is where
```

```
1      A.   I don't recall right now.
2      Q.   Okay.  Do you know when was Ms. Burrell
3 first selected for the detail?
4      A.   I don't recall that.  I don't recall.
5      Q.   Do you know when Mr. Burns first started
6 with the Internal Revenue Service?
7      A.   I don't recall.
8      Q.   Okay.
9      A.   I know he was at Treasury and he came --
10 if my recollection is correct, he came after I came.
11 That's for sure, but there was a transition where he
12 could have and, based on my knowledge, he was
13 working for Treasury -- not Treasury, but Internal
14 Revenue unofficially because he was working on a
15 project for Treasury that involved Internal Revenue.
16     Q.   When was that?
17     A.   I don't recollect the exact time, but it
18 was before the announcement of Burrell being
19 selected for the permanent position.
20     Q.   And when did Ms. Burrell's announcement
21 for the -- strike that.  You said for the permanent
22 position?
```

```
1          MR. TRUONG:  Please don't assume.
2          THE WITNESS:  I don't recall.
3          MR. TRUONG:  Okay.  Thank you.
4          Please don't assume, because that is an
5  inaccurate assumption.  I was talking about
6  Ms. Burrell's detail, and that did not take place in
7  2003.
8          MS. GBENJO:  Okay.  You said first
9  detail.  All right.
10         BY MR. TRUONG:
11    Q.   Let's talk about the claims in this
12 case, and I believe you stated earlier today that --
13 well, let me ask you this:  Are you making a claim
14 of discrimination for the fact that you were not
15 selected for the position, for the permanent
16 position, that Ms. Burrell was selected for?
17    A.   Could you repeat that, please?
18    Q.   Sure.  Are you making a claim of
19 discrimination for your non-selection of the
20 position that Ms. Burrell permanently was selected
21 for?
22    A.   I am making a claim concerning that I
```

1 was not selected for the permanent position that she
2 got.
3       Q.   Okay.  Are you making a claim of
4 discrimination for Ms. Burrell's selection of the
5 detail?
6       A.   Yes.  I am alleging discrimination that
7 Ms. Burrell got a detail that I should have been
8 afforded.
9       Q.   Okay.  Did you apply for the detail that
10 Ms. Burrell got?
11            MS. GBENJO:  Objection, because the
12 question assumes there was an application process.
13            THE WITNESS:  To the extent I have
14 already testified, the circumstances did not require
15 any application, but I was qualified for it, the
16 position.
17            BY MR. TRUONG:
18       Q.   Did you make it known to anyone that you
19 would like to have the detail position that
20 Ms. Burrell got?
21            MS. GBENJO:  Objection to the extent
22 that such opportunity was available and he was

 1  asked.

 2            THE WITNESS:  It was a common practice
 3  that blacks generally was not afforded details
 4  similar to whites.  It was grossly, even more gross
 5  disparate when you looked at white females versus
 6  black males.

 7            BY MR. TRUONG:

 8       Q.   Are you finished with your answer?

 9            MS. GBENJO:  Objection.  Let him finish.

10            THE WITNESS:  Ms. Burrell had inferior
11  qualification s.  Ms. Burrell didn't have a degree.
12  Ms. Burrell had one or two accounting courses.  I
13  have Executive Leadership specific to the Federal
14  Government.  I have a master's degree in a
15  health-related and safety-related field.  At the
16  time, I had 17 years of specialized safety
17  experience in the Federal Government.  Ms. Burrell
18  did not have such qualification, and that is my
19  answer.

20            BY MR. TRUONG:

21       Q.   Leaving aside the qualifications that
22  you describe, did you make it known to anyone that



```
 1  ago.
 2        A.    The only thing I might add to that, in
 3  addition to what I already said, was that Stuart
 4  Burns was allowed to reel his authority to select,
 5  to detail, or assignment, when you use the word
 6  "assignment" and "detail", what'S the difference?
 7  They can put it on their resume and say this is
 8  qualified experience, one year.
 9        Q.    Who allowed Mr. Stuart Burns to do that,
10  to reel his authority like you described?
11        A.    The agency allowed him to do it.
12        Q.    Who in the agency?
13        A.    The agency is who I'm suing.  They are
14  responsible for the malicious action or
15  discriminatory practices, and, therefore, the agency
16  is who I'm suing because they are the one
17  responsible for letting him do it.
18        Q.    Who are these people?  Who are the
19  "they" that you're referring to?
20        A.    The agency.  I'm suing Snow, Secretary
21  Snow.
22        Q.    So Secretary Snow is allowing Mr. Stuart
```

1  sir?

2      A.   A retaliation claim.

3      Q.   A retaliation claim, and tell me the
4  basis for your belief that you were retaliated
5  against.

6      A.   I filed the initial claim about
7  detailing white females, and shortly thereafter,
8  another detail was given that otherwise I would have
9  been given if I had not filed the initial one.

10     Q.   How do you know that, sir?

11          MS. GBENJO:  Objection.

12          THE WITNESS:  Camille Caraway, as I
13 said, is a white female.  There is a disparate
14 pattern and practice of promoting whites in general.
15 I have a vast amount of time in the Federal Service,
16 including Federal executive level training that
17 Camille Caraway do not have.  She worked 10 of her
18 20 years for herself, self-employed.  She had no
19 specialized experience working as what we call in
20 the safety -- in the Federal sector designated
21 safety and health official.  She has did discrete
22 tasks that normally a Federal safety person would

1 determines which questions are relevant to
2 plaintiff's case.
3        BY MS. GBENJO:
4    Q.   Mr. Hamilton, please answer my question.
5 How did you become involved in the safety inspection
6 program in the year 2003?
7    A.   An E-mail came out soliciting volunteers
8 for the project. I was selected as co-chair. Some
9 places I've read, that it was co-lead. Another
10 lady, white, Caucasian, Ms. Golden was lead and
11 sometimes referred as chair.
12   Q.   And was there anybody -- based on your
13 knowledge, was there anybody who volunteered, but
14 was rejected?
15   A.   I know of no one that volunteered and
16 was rejected.
17   Q.   Now, did Brenda Golden treat you as a
18 co-chair or co-lead or assistant lead in that safety
19 program?
20        MR. TRUONG: Objection. Irrelevant.
21 Foundation.
22        MS. GBENJO: Plaintiff's counsel

```
 1  determines which questions are relevant to
 2  plaintiff's case.
 3              BY MR. TRUONG:
 4       Q.    Answer my question, Mr. Hamilton.
 5       A.    Can you repeat it, please?
 6       Q.    Did Brenda Golden, the female Caucasian
 7  that you just mentioned, did she you -- did she
 8  treat you as the co-chair or co-lead or assistant
 9  team leader in that safety inspection program?
10              MR. TRUONG:  Objection.  Foundation.
11              THE WITNESS:  Absolutely not.
12              BY MS. GBENJO:
13       Q.    Now, with respect to that safety
14  inspection program, was there a kickoff meeting or
15  were there kickoff meetings?
16       A.    Yes.
17       Q.    And how many kickoff meetings were
18  there?
19              MR. TRUONG:  Objection.  Relevance.
20              THE WITNESS:  To my knowledge, it was
21  two.
22              BY MR. TRUONG:
```

1   Q.   Were you a part of any one of those two
2  meetings?
3   A.   Only one.
4   Q.   Was it the first or the second?
5        MR. TRUONG: Objection. Foundation.
6        THE WITNESS: I think it was the second.
7        BY MS. GBENJO:
8   Q.   Did anybody tell you why you were not a
9  part of the first meeting?
10       MR. TRUONG: Objection. Foundation.
11       THE WITNESS: No. Nobody told me why I
12 was not part of the first meeting.
13       BY MS. GBENJO:
14  Q.   Now, to the best of your recollection,
15 how many of the safety inspections that you had to
16 do did Brenda Golden do?
17  A.   She did one.
18  Q.   And how many did you, yourself, do?
19       MR. TRUONG: Objection. Relevance.
20 Foundation.
21       THE WITNESS: I did four.
22       BY MS. GBENJO:

```
 1       Q.    Selected whom?
 2       A.    Ms. Burrell.
 3       Q.    Okay.  Now --
 4             [Videographer confers with Mr. Truong.]
 5             MR. TRUONG:  Okay.
 6             MS. GBENJO:  Oh.  We have to stop?  I
 7 think I'm done, but I'm just looking.
 8             VIDEOGRAPHER:  We're off the record at
 9 4:35.
10             [Recess for videographer to change
11 tape.]
12             VIDEOGRAPHER:  We're back on the record
13 at 4:37.
14             BY MS. GBENJO:
15       Q.    Mr. Hamilton, during your tenure at the
16 IRS, did you ever have the opportunity to observe
17 Paul Carroll and Stuart Burns's relationship?
18       A.    Yes, I did.
19       Q.    And how would you describe it?
20       A.    Very close friends.
21       Q.    What is that based on?
22       A.    They went out to lunch together a lot
```

1  like usual friends do.

2       Q.   Okay.  And going back to the caveat, the
3  last question that Mr. Troung asked you relating to
4  that reprimand, what was your understanding of
5  what -- what was your understanding of the
6  representation you could make on that letter of
7  reprimand?

8       A.   Repeat that again, please.

9       Q.   What was your understanding of the
10 representation you could make at a future date about
11 that reprimand?

12      A.   Oh.  I could put on any document or
13 reply to any -- whether it's a job application or
14 anything like that, that I had not been reprimanded
15 after one year.

16      Q.   Okay.  Did you check your OPF after that
17 one-year period?

18      A.   Yes, ma'am.

19      Q.   Was the letter of reprimand actually
20 removed as per the agreement?

21      A.   Yes, ma'am.

22           MS. GBENJO:  I have no further