THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

```
********************************* *
GARY HAMILTON,                    *
Plaintiff                         *
                                  *
v.                                *        CASE NO.: 05-cv-1549 (RBW)
                                  *
JOHN SNOW,                        *
Defendant                         *
*********************************
```

## MEMORANDUM  IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff, Gary Hamilton, African-American male, obtained a Bachelors degree in Industrial Hygiene in May 1982.  Shortly thereafter he obtained a Masters degree in Public Health from George Washington University.  He began his career with the Federal Government as an Industrial Hygienist about twenty-three (23) years ago.  He has throughout his career, worked in the Safety field and aligned with all of his employers' safety management operations. He worked with the Secretary of Defense and the Department of Navy until year 2001, when he joined the Internal Revenue Service ("IRS") as GS-12 Industrial Hygienist.

About May of 2003, the IRS announced a vacancy  for the position of a Safety and Occupational Health Manager ("Safety Manager"). Four candidates made the Best Qualified List. Of the four candidates, Plaintiff was the only black.  Plaintiff was the only one with a Masters degree.  Plaintiff was the only one who had dealt with Safety Operations throughout his career. Plaintiff was the only one with Executive Leadership training specific to the Federal Sector.

The Selecting Official was directed to select with or without interviewing the candidates. Nonetheless, he and two others interviewed the candidates.  He then selected a **white female**, namely, Annette Burrell ("Ms. Burrell") who has a high school education, with no college degree, no formal

1

education or training in Safety or in Security.  Moreover, Ms. Burrell did not meet the deadline to submit

her application package for the position.  Furthermore, she had already been on a detail for a year which

detail helped her get selected for the permanent position

Defendant admits that the interview is dispensable but that interview was conducted in this case

was "because the interview panelists and the selecting official did not know all of the candidates well."

Likewise, the only reason that the Defendant gave for Plaintiff's nonselection for the permanent position

is that Plaintiff's interview allegedly did not go "very well." Defendant fails to advance any legitimate

nondiscriminatory reason for renewing Ms. Burrell's detail for up to a year to the Plaintiff's detriment.

Nonetheless, the selection process is replete with innumerable irregularities and gross deviations from

established protocol. Significantly, record evidence in this case reveals contradictions in the panelist

testimony; improper subjectivity in selection and defendant's preferential treatment to **white females**.

Thus, Plaintiff brings this suit for sex and age discrimination.  He also sues for retaliation in that,

shortly after he filed his formal Complaint in October 2003, another **white female**, Camille Carraway,

was  selected over him for a detail to a Safety Manager position in January 2004.  As demonstrated

below, Defendant's reasons are not worthy of credence. This Honorable Court should deny the

Defendant's Motion for Summary Judgment and set this matter for trial.

## II.  UNDISPUTED BACKGROUND FACTS

**Plaintiff incorporates herein his Statement of Genuine Issue of Material Facts in its**

**entirety.**

### SUMMARY OF UNDISPUTED BACKGROUND FACTS

#### (a)  SUMMARY OF PLAINTIFF'S PROFESSIONAL BACKGROUND

Plaintiff, Gary Hamilton, African-American male,  graduated from the University of North

Alabama with a Bachelors degree in Industrial Hygiene in May 1982, and shortly thereafter obtained a

Masters degree in Public Health from George Washington University. He began his career with the

2

Federal Government approximately twenty-three (23) years ago. About year 2000, he obtained Master's level Senior Executive Leadership Training Specific to the Federal Government Sector. Plaintiff worked with the Secretary of Defense and the Department of Defense (Navy) as an Industrial Hygienist until about 2001, when he joined the Internal Revenue Services ("IRS") in the same position. Aside from becoming a board certified Industrial Hygienist in 1995, Plaintiff throughout his career, has been aligned with all of his employers' safety management operations. Plaintiff's also completed the requirements for Certified Safety Professional ("CSP"). Both at the IRS and the Navy, he dealt with Safety and Security and developed and wrote policies on same. He was Manager of Hazard Abatement for many years. *Exh.9 ¶ 1-7; Exh. 39 ;Exh.1 @ 46:10-17*

### (b). SUMMARY OF THE SELECTION PROCESS

About May of 2003, the IRS announced a vacancy for the position of a Safety and Occupational Health Manager ("Safety Manager").*Exh.16* The position requires inter alia, that the applicant be able to: Develop policies, procedures and standards for the IRS safety program; Advise top management on the most complex safety matters; and Serve as a technical authority in assignments requiring the application of new theories and development of safety problems not susceptible to treatment by accepted safety methods and procedures. The Job Description allots points to the different categories over which the candidates' eligibility for the position would be gauged as follows: Knowlege:1550; Level of Difficulty:1635; Assignment:325; and Communication:180 with a total point of 3690. *Exh.22.*

Four people, two males and two females, namely, Annette Burrell, Camille Caraway, Michael Perkins and Plaintiff made the Best Qualified List. Three of the four candidates received a ranking score of 25. One of them was the Plaintiff. The fourth person, a white male, received a ranking score of 19. Of the four candidates, Plaintiff was the only black. Plaintiff was the only one with a Masters degree. Plaintiff was the only one who had dealt with Safety Operations throughout his career. Plaintiff was the only one with Executive Leadership training specific to the Federal Sector.*Exh.18-21; Exhs.1 @ 46: 10-*

*17; Exh9 ¶ 13; Exhs. 39-42.*

The Internal Revenue Manual ("IRM") and the Management Selection Program, control Defendant's promotion process. They require that (1). Ranking panels/officials consist of subject matter experts who are at or above the grade of the position to be filled. (2). that interview Panel consists of **at least three** voting members and a representative of personnel office to also participate as a non-voting member to ensure that control and panel actions meet validity and job relatedness requirements (3). that in making a selection, the weight to be given leadership cores   must be at least fifty percent (50% ) and technical cores must be no more than fifty percent (50%) *Exhs. 43 & 44*

The Ranking Official is not a subject matter expert in Safety; has no formal training in Safety or in Security; and no training in Ranking.  The Selecting Official did not invite any personnel representative to participate in the interview.  Neither the Ranking Official nor the Selecting Official know anything about these requirements of the IRM or Management Selection Program. The Selecting Official and the Ranking Official are "very close." They work in the same department and eat lunch together a lot. *Exh.3 @ 17: 14-20; 30:7-11; 80: 19-21;Exh.1 @ 181: 15-182:1.*

The Selecting Official in this case was directed to select the best candidate with or without the interview. *Exh.23*  Nonetheless, he and two others interviewed the candidates. The panel members all took notes at the interview but did not give the candidates any scores. *Exh.2 @ 119: 2-5*The Defendant produced all the interview notes for all the applicants except Plaintiff. *Exhs. 24-35.*  (Defendant claims it could not find some pages of Plaintiff's interview notes). Ms. Burrell, a **white female** was selected. *Exh. 2 @  96:11-13* Ms. Burrell only has a high school education, no college degree, no formal education training in Safety and no formal training in Security .*Exh. 4 @ 47: 17-48:14*  Further, Ms. Burrell did not submit a complete application until after the closing of the vacancy announcement in this case. *Exh. 4  @ 79: 14- 80- 14. Exh. 16; Exh. 40* The Selecting Official himself testified that it was his own decision to select Ms. Burrell for the position.  He  also testified that the selection process in this case was

4

subjective. ***Exh. 2 @ 124: 22- 125:7***

The only reason that the Defendant gave for Plaintiff's nonselection is that Plaintiff's interview allegedly did not go "very well" (***Exh. 10 @ 2***) The panelists gave conflicting or contradicting testimony on the selection process and Plaintiff's performance at the interview. None of the interview notes reflects anything about their reasons for rejecting Plaintiff for the position. In fact a panelist's note reflects that Plaintiff did what he expected of all the candidates at the interview. ***Exh. 2 @ 128: 10-16; Exh. 5 @ 134:20-135; Exh. 12 @ 3; Exh. 5 @ 62: 2-4***; ***Exh. 32; (Exh. 6 @ 57: 11-17; Exhs. 25, 29, & 32***

The Selecting Official in this case has a history or pattern of selecting **white female** over males in that in the three instances where he was responsible for selection, he selected **white females** over Plaintiff, though Plaintiff made himself available and inquired about the positions. Additionally, because he also was in the Department of Navy prior to joining the IRS, the Selecting Official was cognizant of Plaintiff's skills and abilities for the Safety Manager position. He actually testified that, Plaintiff by default would be able to perform the job of a Safety Manager, based on his skills and certifications. ***Exh. 10 @ 3; Exh. 2 @ 96:11-13; Exh. 52 @ 2***

The Defendant's own report reveals that **white females** receive promotion at a rate which exceeds their population by ten percent (10%). ***Exh. 45*** Over the three years preceding the selection in this case, several **white females** were detailed to a higher position and most eventually made permanent in the positions. Examples are Sabrina Rutland and Charlotte Phillips. Prior to the selection in this case, Ms. Burrell, was detailed to a GS-14 position which helped her get selected for the permanent position. Ms. Burrell testified that even after her selection for the Safety Manager position, she continued to perform the same job duties she was performing while on detail. ***Exh. 7 @ 32: 16 - 33:10; Exh. 58***

### ( c).  SUMMARY OF POST SELECTION INCIDENTS

Early in August of 2003, Plaintiff found out that he was not selected for the Safety Manager position. He asked the Selecting Official why he did not get the position but was given no answer.  At

that point Plaintiff said he did not believe that the selection process was fair and that he would file a complaint. Thus, he commenced the process of the filing of his EEO Complaint. ***Exh. 7 @ 32*** About two (2) weeks after the selection, the Division solicited volunteers for the Revision of the Safety Inspection Program ("RSIP") Plaintiff volunteered for the program and even volunteered to chair or lead it.  Rather than allow him to chair it, the Selecting Official selected a **white female** namely Brenda Goulding ("Goulding"), to chair it and told Plaintiff that he would be the "selected co-chair".  Plaintiff agreed. Immediately thereafter, Plaintiff was told that he would only be Goulding's Assistant. Goulding had no degree; no background in Safety; and in fact, had no exposure to Safety prior to year 2001.    Though Plaintiff was supposed to be the co-chair or Assistant Leader, he was not allowed to play any significant role in the program. ***Exh. 2 @ 69: 9-17; Exh. 9  ¶ 27*** -31; ***Exh. 8 @ 42-43;  69: 12-14; 155: 6 - 12; Exh 1 @ 174:17 -175: 11; Exh. 8 @ 111: 17 - 112:***

The Selecting Official met with the key players for the RSIP at the beginning and at the end but excluded Plaintiff from those meetings.  The only meeting Plaintiff was allowed to attend was the one he held with everyone involved (all the volunteers). The RSIP lasted about four  months and ended around December 2003. ***Exh. 9  ¶ 32*** -36;

About December 2003, Plaintiff learned that there would be another vacancy for the Safety Manager position.  He inquired about it from the Selecting Official but was ignored.  About a month later in January 2004, Camille Carraway, a **white female**, informed Plaintiff that the Selecting Official had detailed her to a Safety Manager position and had promised her that the position would become permanent. About February 2004, Plaintiff, filed another claim of discrimination against his employer. Because he was not assisted by a lawyer when he filed his claims and was not sure what the elements for each cause of action was, Plaintiff amended his claim after he hired a lawyer around January 2005 to include his retaliation claim. **Exh. 9  ¶ 38; Exh. 58 p. 1-2; Exh. 7 @ 7: 14-21; 11: 5-17; Exh. 9 ¶ 40**; ***Def's motion @ 14.***

6

In his effort to explain away Plaintiff's claim, the Selecting Official testified that he "selected" Plaintiff and Goulding for a "detail" on RSIP.  He testified further that Plaintiff did not participate but that Goulding did the work alone.  Goulding testified that RSIP was just an assignment covered by volunteers and that Plaintiff was her Assistant Team Lead.  Additionally, record evidence shows that Plaintiff performed four of the sixteen Tasks and Goulding performed only one. Exh. *8 @ 138: 18- 139: 11; 153: 5-12.*

Defendant's conduct caused Plaintiff undue stress such that his physician diagnosed him with anxiety and depression. *Exh. 9 ¶50; Exh. 15.*

## III.  ARGUMENT

### (a)  SUMMARY JUDGMENT STANDARD

"[S]ummary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.   In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554 (1990).

### (A).  PLAINTIFF'S RACE AND GENDER CLAIM  ON THE PERMANENT SAFETY MANAGER POSITION

A plaintiff "makes out a prima facie case of disparate-treatment discrimination" by establishing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination *Czekalski, v. Peters,* 475 F.3d 360 (D.C. Cir. 2007).  Defendant concedes that Plaintiff  has established a prima facie case on both race and gender claims.  Defendant however states that it has a legitimate non-discriminatory reason for selecting Burrell for the permanent Safety Manager Position - that Burrell performed better at the interview. As

7

discussed infra, Defendant's reasons are unworthy of credence.

## SUMMARY OF ARGUMENT

Plaintiff is significantly better qualified than Burrell for the Safety Manager Position. The inexplicable gulf between the credentials of Plaintiff and Burrell is such from which one could draw an inference of discrimination. Additionally, the circumstances surrounding the instant selection process - the history and pattern of the Division's improper selection of **white females** to higher positions under the guise of detailing; the promotion of a **white female** within the same year that she was hired; the Selecting Official's selection of **white females** over Plaintiff on at least three to four different occasions; considering **a white female's** application for the position after the deadline; using a Ranking Official who is not a subject matter expert on Safety; Using a Selecting Official and a Ranking Official who know nothing about the Management Selection Program for selection of managerial position; the close relationship of the Selecting Official and the Ranking Official; the failure to use a representative from personnel at the interview; disregard for the points allotted in the position description, yet testifying that the position description controls; the failure to produce only Plaintiff's interview notes in its entirety; the failure of the Ranking Official to  give the candidates' educational background any weight; the improper subjectivity of the interview; the contradictions of the interview panelists' testimony; one panelist's testimony that she thought she was interviewing for a different position; Defendant's admission that the interview in this case was dispensable but that interview was conducted "because the interview panelists and the selecting official did not know all of the candidates well," and the selection of Burrell, a **white female** with only a high school diploma over Plaintiff who not only has a Masters degree and Certification as an Industrial Hygienist but also has Executive Leadership training specific to the Federal Sector and Completion of the requirements of Certified Safety Professional - all lead to the inescapable conclusion that the Defendant here consciously selected a less-qualified candidate - something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.  For these reasons, Plaintiff humbly requests that this Honorable Court deny the Defendant's motion

on this claim.

**ARGUMENT**

In support of its Motion for Summary Judgment, Defendant likens this case to ***Brown v. Small***, 437 F. Supp.2d 125, 131 (D.D.C. 2006).  Defendant's reliance on ***Brown*** is not only flawed and faulty, it is misguided.  ***Brown*** is clearly and unmistakably from distinguishable from this case.

***BROWN* IS DISTINGUISHABLE AND INAPPOSITE**

***Brown*** involves a plaintiff whose previous position was eliminated and was given the opportunity to apply for another position with duties that were not quite the same as her original position. She failed to avail herself of the opportunity to interview for one of the two announced vacancies; interviewed for the second vacancy; scored lower than the other two candidates who were also previous employees of the defendant but was not selected.  At the interview, she told the panelist that she found her inspiration from drinking a glass of wine.  She acknowledged that **she did not have a wealth of experience handling several responsibilities essential to that position**.  The ***Brown*** plaintiff **"do[es] not challenge the qualifications of the two individuals selected."** A four-panel member interviewed the applicants and applied the requirements of the Position Description in making their decision. Furthermore, the ***Brown*** panelists applied an impartial method for assessing the ability of each candidate to succeed in the position by using the same criteria to grade all applicants, and were specific on the areas in which the ***Brown*** Plaintiff was deficient.  For example, all four interviewers noted that "the plaintiff. . . was not comfortable handling money," a factor distinguishing her from the other candidates. The interviewers expressed concern with the plaintiff's inability to articulate responses, her working relationship with others, and ultimately her productivity and sincere interest in the position. As a result, the ***Brown*** plaintiff received a score in the 20s and the selectees 40s to 50s. Her complaint allege that she is more qualified based on her longer tenure on the job. Emphasis added.

In granting the ***Brown*** defendant's motion for summary judgment, this Honorable Court considered: the ***Brown*** plaintiff 's substantially lower ratings compared to the selectees; her response about

9

finding inspiration in drinking a glass of wine; the facts that she acknowledges that she did not have a wealth

of experience handling several responsibilities essential to that position; that she does not suggest that the

ratings were not objectively reasonable or that they were the result of discriminatory animus; her failure to

offer a comparison of hiring statistics by her employer based on race; the panelists' utilization of an

impartial method for assessing the ability of each candidate to succeed in the position by using the same

criteria listed in the Job Announcement and Description to grade all applicants.  This Court concluded that

the ***Brown*** plaintiff  failed to establish that she was significantly better qualified than the successful

applicants such that a reasonable jury could infer discrimination.

   Unlike the ***Brown*** plaintiff, the consistent theme of the instant Plaintiff's complaint is that

he is significantly better qualified than the selected applicant, Burrell.  In fact, he described Burrell  as

having  "observably inferior qualifications" to his.***Exh. 46.***   This is undoubtedly because, unlike Burrell,

who has only high school education with no college degree,  no formal education or training in Safety and no

formal training in Security, ***Exh.4 @ 47:17- 48:14*** the instant Plaintiff has a Masters degree,  Certification

as an Industrial Hygienist, Executive Leadership training specific to the Federal Sector where he has worked

for over two decades and Completion of the requirements of Certified Safety Professional.  Besides, he has

throughout his career, worked in Safety and Security and has been aligned with all of his employers' safety

management operations, such that Safety and Security have become part and parcel of him. ***Exh.1 @ 46:10-***

***17***; Exh. 9 ¶ ***1-7***; ¶26

  To be sure, at no point has the instant Plaintiff suggested or insinuated that Burrell or any other

candidate for the Safety Manager position possess any qualifications, experience or credentials that he does

not have.  In fact, he is considered a subject matter expert in Safety in that he is the person almost always

called upon whenever there were safety questions in his Division. ***9 ¶ 48***

  Significantly, the panelist in ***Brown*** complied with their own internal procedure, hence the four-

member panel, who not only applied the requirements of the job announcement and job description but also

utilized an impartial method for assessing the ability of each candidate to succeed in the position. Thus, with the appropriate publicized and apparent tools, they gave the candidates the appropriate scores; specified the areas in which the **Brown** plaintiff was deficient; and even gave examples of the questions she could not answer or answered inappropriately.

By contrast, in derogation, violation and contravention of the IRM, the instant defendant  failed to have a representative of the personnel present at the interview - which was why the panelists were only three.  Additionally, the Job Announcement in the instant case requires that application package be submitted by the deadline of May 19, 2003 .  The selected **white female**  in this case did not submit a complete package until after the deadline had passed  and yet she was selected for the position. *Exh. 16; Exh. 40; Exh. 4 @ 79: 14- 80- 14*.  **Brown** is devoid of anything like that.

Moreover, the instant Job Description reflects points allotted to the areas to be used in assessing the ability of each candidate to succeed in the position as follows: Knowlege carries1,550 points; Level of Difficulty = 1,635 points; Assignment = 325 points; and Communication, the least, =180 points with a total point of 3,690. .*Exh. 22.*   At the interview however, the panelists disregarded those points and could not give any reason why they did.  *Exh. 2 @ 187: 5-8.* Significantly, when the instant panelists were asked to specify which questions the instant Plaintiff failed to answer or did not answer well, none was given other than a generalized bald assertion that the interview did not go well. *Exh.53 @2*.  **Brown**'s facts present virtually the exact opposite

Again, unlike **Brown,** the instant panelist did not rate or score the candidates. *Exh.2 @ 119: 2-5*. They received only pre-interview ranking.  Unlike the **Brown** plaintiff who does not suggest that the ratings were not objectively reasonable or that they were the result of discriminatory animus, the instant Plaintiff took serious issues with the ranking scores. *Exh. 50 @2*

Though Defendant finds it convenient to borrow the term "diverse panel" from **Brown** and labels one of the instant three panelists "African American," the panelist herself testified that she is a mixture of

"French, Hispanic and African American". **Exh. 5 @ 55: 13-15**  With that testimony, whether the panel

was  truly "diverse" will depend on who is looking at them and is a question of fact for the jury.[1]

        Aside from that, unlike the **Brown** plaintiff, the instant Plaintiff produces evidence of this

Defendant's history of detailing **white females** to permanent positions in the guise of detail and evidence of

**white female** getting promoted within the first year of hire.  **Exh. 7 @ 32: 16 - 33:10; Exh. 10 @ 3; Exh. 9**

**¶ 22**  More than that, this Plaintiff produces this Defendant's own statistics showing that unlike black

males, it promotes **white females** at a rate which exceeds their population by ten percent (10%).**Exh. 45.**

In any event, the evidence in this case is such as would lead a reasonable person to conclude that Brown

does not help the instant Defendant.

## DEFENDANT'S NONDISCRIMINATORY REASON IS UNWORTHY OF CREDENCE

    Once the plaintiff establishes his prima facie case and the employer has met its burden of

producing a nondiscriminatory reasons for its actions, the focus of proceedings at trial (and at

summary judgment) will be on whether the jury could infer discrimination from the combination of

(1) the plaintiff's <u>prima facie</u> case; (2) any evidence the plaintiff presents to attack the employer's

proffered explanation for its actions; and (3) any further evidence of discrimination that may be

available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on

the part of the employer). That is not to say that every plaintiff must always present evidence in

each of these categories in order to avoid summary judgment. **Aka**.

## THE PLAINTIFF'S PRIMA FACIES CASE

      As stated, Defendant concedes that Plaintiff has established a prima facie case on his

race and sex.  This fact needs not be readdressed.

## THE EVIDENCE PLAINTIFF PRESENTS

---

[1]By the way, there was no "mixed" or  "mixture" of anything within the panelist in Brown as
each panelist identified their exact race.

**Plaintiff is Significantly More Qualified Than Burrell**

The selection process for the Safety Manager position is replete with innumerable

irregularities, gross deviation without justification from established procedures and immeasurable

incongruities. Specifically, the Safety Manager position requires that the applicant be able to, inter

alia:

> Develop policies, procedures and standards for the IRS safety program;
> Have extensive knowledge of ***Executive Orders, OMB, OPM*** and other national
> safety and occupational health directives applicable to the Safety Program;
> *Advise top management on the **most complex safety matters;*** Interprets national
> safety directives for their applicability to the safety program; ***Formulate broad
> policy*** direction regarding the implementation of these directives; *Serve as
> representative of the Director in performance of top liaison assignments and in
> contact with professional and trade association, officials of the Treasury
> Department, representatives of other government department and agencies,
> OMB, Congress and the public*; ***and Serve as a technical authority in
> assignments requiring the application of new theories and development of
> safety problems not susceptible to treatment by accepted safety methods and
> procedures***. Emphasis added. ***Exh. 22.***

Burrell, the selected **white female** does not recall when she ever developed or wrote

policies. Nor does she recall the name of any policy she has written. Additionally, Burrell could not

give examples of OMB, OPM, or Executive Order.  Nor does she recall if she has she ever dealt

with highly hazardous operational and research problems. In fact she is uncertain as to her

knowledge of the conflicts in policy and program objectives as it relates to safety.  Essentially,

based on her testimony, there is virtually nothing in the Job Description that Burrell could

demonstrate knowledge of.***Exh. 4 @ 58-70***  This is understandably so in light of the fact that she has

only  a high school education, with no college degree, no formal education training in Safety and no

formal training in Security.***Exh. 4 @ 47:17- 48:14***

The Defendant conveniently claims it did not give any weight to the applicant's background

***Exh.3 @ 62: 5-11.*** because the position does not require any educational background but fails to

explain how someone without a college degree, without specialized knowledge or without formal

13

training in the subject could "*Advise top management on the **most complex safety matters***; and

perform extremely complex and significant functions in the development of decisions and policies

and provide **technical guidance** designed to protect **Service personnel, facilities, property and

other assets**, both tangible and intangible, from the full spectrum of intentional and non-intentional

human threats, as well as ***man-made and natural disasters***".  To accept defendant's position will be

tantamount to accepting the idea that anybody with absolutely no educational background could

interview for the job and get it.  Plaintiff submits that such would be something  that employers do

not usually do, unless some other strong consideration, such as discrimination, enters into the

picture.  More notably, Defendant's own authority, ***Whitener v. England***, No. 04-0273, 2006 WL

3755220,  6 (D.D.C. Dec. 19, 2006) (See Def's motn.@ 10) emphasizes the importance of an advance

degree when dealing with supervisory position and supports the instant Plaintiff on this issue.

Essentially, the Plaintiff in ***Whitener*** lost because he had no advance degree which the instant Plaintiff

has.  By contrast, the instant selectee has no degree at all for a managerial position dealing with complex

matters.

Of crucial importance is the fact that, Burrell completed high school in 1976; took only one

college course in 1984[2]; assisted managers to maintain keys and locks, kept accident reports and insured

that managers review them; took a 40-hour OSHA class around 1991; became Occupational Safety and

Health Manager (same as the instant position) around 1992 and held that position for about three (3)

years; moved thereafter to other non-safety related positions for about ten (10) years, i.e. Space

Acquisition Specialist - in which she rented office space and  Client Service Specialist - in which she

worked as a problem solver until August 2002 when she was detailed to a Management Analyst position,

wherein she brought in representatives from business units to develop processes and procedures; and was

---

[2]Burrell testified that she took one to two college courses. Her resume reflects only one.

thereafter selected for the instant position in 2003. *Exh. 4 @ 21:15- 22:21; 27:5-15; 46:9 -47:5; 28:16 - 31: 18; 58 - 70.*

By contrast, Plaintiff graduated from the University of North Alabama with a Bachelors degree in Industrial Hygiene in May 1982, and shortly thereafter obtained a Masters degree in Public Health from George Washington University. He began his career with the Federal Government  approximately twenty-three (23) years ago.  In year 2000, he obtained Master's level Senior Executive Leadership Training Specific to the Federal Government Sector.  Plaintiff worked with the Secretary of Defense and the Department of Defense (Navy) as an Industrial Hygienist until about 2001, when he joined the Internal Revenue Services ("IRS") in the same position. As an Industrial Hygienist both in the Navy and at the IRS, Plaintiff's job duties include: (a) Fire Protection and Life Safety; (b) Budgeting and Planning Safety;  (c) Administration and Personnel Management Safety; (d) Problem Solving Safety; (e) Safety Compliance/Inspection Activity; (f) Safety Training and Developments; (g)Accident Investigation; (h) Communication  with employees, supervisors and management concerning safety procedures, deficiencies, and responsibilities; and (I) Developing and Writing Policies. Plaintiff also performed Construction Safety while he was in the Navy.    Additionally, he was the Manager of Hazard Abatement for many years. He became a board certified Industrial Hygienist in 1995 and also completed the requirement for Certified Safety Professional (CSP).  In fact, IRS hired him partly because of his strong background in Policy and Procedures.  He actually developed and wrote the IRS Territory's (Washington DC Metro) Facility Safety Inspection Processes and Procedure Policy. *Exh.9 ¶ 1-7; Exh. 39 ;Exh.1 @ 46:10-17*

Clearly, this is not a case where the only distinguishable factor in credentials is longer tenure on the job. *Brown*.  Nor is it a case where the qualifications of the applicants are similar. *Whitener*.  Rather, it is a case where the disparities in qualifications are so apparent as to virtually jump off the page and slap one in the face.  Where a plaintiff's qualifications are so vastly superior than the selectee's, this may

15

be considered as evidence of pretext, casting doubt on the legitimate, non-discriminatory explanation offered by the employer and creating a question of material fact. *Hammond v. Chao,* 383 F. Supp. 2d 47, 57 (D.D.C. 2005) citing *Choates v. Powell*, 265 F.Supp.2d 81, 95 (D.D.C.2003).   Significantly, if selection of Burrell for the instant position was attributable to one or more specific factors encompassed within a broader and more general job description, or to other reasons that emerged at the interview that caused the panelists to abandon the Job Description, *Jackson v. Gonzalez*, 496 F.3d 703 (D.C. Cir. 2007) absent the other circumstances surrounding the selection, the instant defendant might have some support in the law.

However, on the instant Job Description, Communication, which is clearly spelt out and not buried or encompassed elsewhere, carries only 180 of 3,690 points. *Exh. 22* Thus, if that changed at any point, the panelists should be able to voice it out upon inquiry, after the interview.   Interestingly however, after the selection, when he was asked to rank the duties and responsibilities of the Safety Manager position in order of importance, the Selecting Official testified that the <u>duties and responsibilities for the Safety Manager position were consistent with the Position Description</u> which was distributed to the applicants. *Exh. 53 @ 2* If that be true, then the points allotted in the Job Description must apply.  Consequently, communication, which carries the lowest points should hardly be the reason for any  candidate's downfall let alone Plaintiff's, whose qualification amidst the candidates is matchless. After all, the panelists agree that, Plaintiff was much more qualified than Burell in Safety and is a subject matter expert in certain areas; and that Plaintiff has "strong skill set." *Exhs.10-12*  Plaintiff submits that if all that is true (and they are), it should remain a jury question why Plaintiff will be dropped and Burrell selected based only on 180 (one hundred and eighty) of the 3,690 (three thousand, six hundred and ninety) points.   Likewise, it is strange that the panel, for no reason, failed to apply the points on the Job Description which they led the candidates to believe would be applied in making the selection.  Yet the Selecting Official admitted to the validity of the points, even after the interview.  *Exh. 2 @ 183: 15-17; 187: 5-8; Exh. 22.* Without question, the Selecting Official's position is much more than contradictory.

16

In *Salazar* **v.** *WMATA,* 401 F.3d 504, 508-09 (D.C. Cir. 2005), prior to the interview, the employer promised the plaintiff one thing but delivered quite another at the interview. The *Salazar* plaintiff felt that his employer's betrayal was undertaken for a discriminatory purpose. The D.C. Circuit agreed with him as "his challenge turns instead on the specific process used by WMATA in selecting a candidate for the Metro Center position" and rejected the application of *Fischbach v. District of Columbia Department of Corrections*, 86 F.3d 1180 (D.C. Cir. 1996) to his case. As in *Salazar*, the instant Plaintiff takes issue with the specific process used by the Defendant in selecting Burrell. The applicants were (mis)led into believing that the points on the Job Description would apply and the employer failed to apply them. Yet the employer attested to the validity of the points after the interview. This is nothing short of betrayal in highest degree.

Defendant should not now be heard to argue that Plaintiff did not score all of the remaining 3,510 points, or that Burrell scored more than the 180 because it failed to rate them at the interview and failed to utilize an impartial method for assessing the ability of each candidate to succeed in the position. In fact, Defendant claims that its selection process, both in pre-interview ranking and selection at interview was **purely subjective**. *Exh. 3 @ 44:1-3*; *Exh. 2 @ 124: 22- 125:7)* Likewise, it failed to state with specificity what questions it claims Plaintiff did not answer appropriately or failed to answer at all but gave a bald generalized statement that Plaintiff's interview did not go "very well". *Exh. 53 @2.* By no means is this partial reliance on subjective determinations. This is heavy and absolute reliance on subjective considerations. Although employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution," *Buggs v. Powell,* 293 F. Supp .2d 135, (D.D.C. 2003) citing *Aka, a v. Washington Hospital Center,* 156 F.3d 1284 (D.C. Cir. 1998) 156 F.3d at 1298.

### The Selection Process Is Replete with Innumerable Irregularities

Additionally, according to the Selecting Official, a tardy application package should not be

17

considered at all. *Exh. 2 @ 152: 7-10*. But why was Burrells? Defendant is yet to explain. Application deadline was May 19, 2003. Burrell did not submit a complete application package until June 5, 2003. As at this day, Burrell herself has no explanation *Exh. 16; Exh. 40; Exh. 4 @ 79: 14- 80- 14.* . It appears from the document submitted on June 5, 2003 that a Performance Appraisal with all outstanding ratings was purposefully created for Burrell so as to give the impression that she is a stellar candidate. Her deposition testimony however reveals the exact opposite when it comes to Safety. *Exh.4@ 58-70.* Bottom line, her application should never have been considered at all. If Defendant points to personnel or any other party as being responsible for consideration of Burrell's package, Defendant must also concede that its selection system as a whole is egregiously faulty, flawed and "fishy."

Similarly, why was Carroll, a close friend of Burns (the Selecting Official) ; who eat lunch with Burns a lot; who has no training in ranking; and who (in derogation of the IRM) is neither a subject matter expert in Safety nor in Security allowed to rank the candidates?*Exh. 3 @ 17: 14-20;* Defendant is without a response. Almost shockingly, in contravention of the Management Selection Program, Carroll, does not know how many points to give the candidates for leadership cores. Nor does he know how many points to give them for technical cores. Burns himself knows absolutely nothing about the points to give the candidates for leadership and technical cores. *Exh. 3 @ 40:3- 41:17; Exh. 2 @ 123: 17-124:21.* Yet this is a Safety **Manager** position, a GS-14 position for that matter. Should the process be carried out arbitrarily and without regard to the possible and actual adverse effect on others like Plaintiff? Plaintiff submits "no." Needless to say that if people who are ignorant of the Management Selection Program, the IRM and the MPP are allowed to select candidates for a managerial position (which they did in this instant), an absurd result would (and it did) obtain. These gross and inscrutable deviations from established protocol did not stop there. They extended to the interview phase of the selection process. Has the defendant explained why, in contravention of the Merit Promotion Plain, it failed to have someone from the personnel sit in at the interview? Clearly not - which was why there was a panel of three and not four (as in *Brown*)

conducting the instant interview. *Exhs. 43 & 44*

This is not a situation where deviation from procedure has become the norm[3]. *Fischbach,* as Plaintiff himself had tracked several other interviews and selections and they were not like this.It is a situation where the deviation from procedure was purposefully orchestrated in order to carry out the pattern and perpetuate the practice of promoting **white females** to the detriment of others like Plaintiff.

### A Panelist believed She Was Interviewing The Candidates For a Different Position

More notably, a panelist believed that she was interviewing the candidates for the position of a Management Analyst - why?  Because that was the position that Burrell was already detailed into before she was eventually selected {for the Safety Manager position}.  The particular panelist was arguably preinformed that Burrell was to become permanent in the position she was detailed to[4].  In ascertaining that the undersigned counsel was unmistakably clear about the position the panelist interviewed the candidates for, the panelist referred to the position as "Management Analyst or Analyst" about five (5) times throughout her deposition. In fact, she attributes her failure to review the Job Description to her familiarity with the Management Analyst position.*Exh.5 @ 52: 19-21; 113: 6 - 114: 18; 115: 4-8; 116: 11 - 17).*

That alone creates a genuine issue of material fact, especially because Defendant admitted during discovery that the two positions are clearly distinguishable by submitting two different Job Descriptions for them.   Needless to say that, if the candidates present themselves to be interviewed for a Safety Manager position where  a panelist, throughout the interview, assessed their capabilities by focusing on the qualities, skills, knowledge and abilities necessary and needed for a Management Analyst position, an absurd result would obtain. To contend otherwise would strain credulity.  Likewise, since said panelist assessed the

---

[3] The testimony of Micheal Perkins who has been an IRS manager for over fifteen (15) years, shows that deviation from procedure is not the norm. *Exh. 14 @ 27:4-6; 32: 1-10*

[4]That explains why the date on the promotion certificate *Exhibit 17*, looks funny - it appears to have been changed from 5/31/03 to 7/31/03 - so as to give meaning to the selection.

19

responses of the candidates as they relate to a Management Analyst position and **NOT** the Safety Manager

position, her vote should not count and should be stricken.  Consequently, there would not have been a

quorum for the interview under the IRM. ***Exhs. 43 & 44.***   Undoubtedly, none of the authorities relied upon

by the Defendant presents this anomaly. Thus, a jury question remains as to whether the two positions are

the same.

### Of All the Candidates, Only Plaintiff's Interview Notes Was Not Produced in its Entirety[5]

More critically and even curious is the fact that defendant produced all the interview notes for all

the candidates except Plaintiff.  It is interesting that, the panelists all testified that they submitted their notes

to the Selecting Official. ***Exh. 6 @ 36: 1-3 Exh.53 @3.***   What is questionable and puzzling is what

"anyone"did with the portions of Plaintiff's interview notes that are "missing."  Plaintiff submits that this is

another fact that creates a genuine issue.  Why? First, defendant is required to keep this type of record for at

least two years.   At the EEO level, defendant initially refused to produce the records at all. That was early

in 2005 - which was less than two years from the date of occurrence or interview.  After numerous inquiries

by this then-pro se Plaintiff, and subsequently his lawyer,  defendant eventually released all notes for all the

candidates save Plaintiff.  More significantly, a panelist, namely Mr. Huston's note reflects that Plaintiff

"thinks through answers." ***Exh. 25*** At deposition, Mr. Huston testified that what Plaintiff did - thinking

through the answers - was what he expected all the candidates to do. ***Exh. 6 @ 57: 11-17*** Amazingly, what

is "missing" is a page of Mr. Huston's notes on Plaintiff's interview.  Since Mr. Huston's testimony

supports the fact that Plaintiff did the right thing at the interview and the [disclosed ] portions of his notes

corroborates that fact, who knows what the missing (or withheld) page says to the Plaintiff's benefit, honor

and credit? Would it be [speculative] to assume that the note conspicuously says: **"WE CAN NEVER GET**

**A BETTER CANDIDATE THAN THIS FOR THE POSITION"** and it mysteriously disappears?

---

[5]Since the Defendant claims that the document was never found, Plaintiff had no reason to file a
motion to compel on the issue.

Probably not.  Nonetheless, Defendant should not now be heard to contend that Mr. Huston testified that the "two females were up and the two males were down" as that clearly contradicts his previous testimony wherein he stated he could not comment on any particular candidate's performance at the interview.  Nor do his interview notes reflect such negativity. ***Exhs. 11 & 25***

### None of the Panelists' Interview Notes Reflects Their Testimony On Plaintiff's Performance

More importantly, it is strange that nowhere in the panelists' notes does any of them comment on the Plaintiff's communication skills. Nowhere did they note that he only elaborated on issues when asked a follow up questions; or that "his responses were consistently difficult to follow; that he provided extraneous and irrelevant information, and in some cases did not respond to the question at all."***Exhs. 25, 29, & 32*** An interviewer explaining why a candidate was not hired would ordinarily take note of this type of fact.  In a jury's eyes, this omission might also count as evidence that the panelists' account of the interview was invented after the fact.  ***Aka v. WashingtonHosp. Ctr.,*** 156 F.3d 1284, 1288 (D.C. Cir. 1998).  The instant omissions create a genuine issue.

### The Testimony of the Panelist Contain Numerous Contradictions or Incongruities.

Additionally creating a genuine issue in this case are the inconsistencies, incongruities, and contradictions in the panelists deposition testimony and their declarations. For example, the Selecting Official testified on the one hand that there were instances in which Plaintiff did not answer the interview questions at all. ***Exh. 10*** On the other hand, he testified that Plaintiff answered all the interview questions. ***Exh. 2 @ 128: 10-16)*** Yet in preparation for his deposition, the Selecting Official reviewed his declaration. The revelation that Plaintiff answered all the interview questions significantly weakens the Defendant's reasons and creates a jury question.  Aside from that, Ms. Mitchell, a panelist testified that she noted her concern about Plaintiff's communication skills in her interview notes. ***Exh. 12 @ 3*** Her interview notes reflects no such thing. ***Exh. 32*** She later admitted that fact but said she noted what was relevant. ***Exh. 5 @***

*62: 2-4*) While the Selecting Official testified that the panel conferred about six (6) times on the day of the interview and that includes the four times they conferred after each candidate's interview to discuss their performance, Ms. Mitchell testified that no such thing occurred and that the panel only conferred once and that was at the end of all the interviews. *Exh. 2 @ 123: 1-16); (Exh. 5 @ 65: 9-13)* The story may be a little different if one panelist says they conferred four times and another says six times. Here its six times with one panelist and just once with another. It remains questionable whether they met at all - which would show that the entire thing was orchestrated by prearrangement.

Additionally, the third panelist, Mr. Huston, initially testified that he could not comment on the quality of performance of any of the candidates at the interview as it occurred "eighteen months ago." *Exh. 11 @ 2* Thirty-eight months later, he testified that the "two females were up and the two males were down." *Exh. 6 @ 68: 8-18 )* He testified that he would routinely place whatever he considers important in his interview notes. *Exh. 6 @ 58: 20 - 59: 6)* As already stated, his interview notes reflects nothing to the effect that Plaintiff "was down." Plaintiff submits that these inconsistencies in aggregate, make this case one for the jury to resolve. *Exh. 25.*

### Defendant's Only reason for Plaintiff's Rejection, Is By the Defendant's Own Admission, [Otherwise] Dispensable

Beyond that, the selection in this case could have been made with or without the interview, since by the Defendant's own admission, the interview is dispensable. *Exh. 36* After all, that was the instruction to the Selecting Official. *Exh. 23* But because the Selecting Official had his own agenda, he proceeded to conduct interview anyway. Particularly interesting and suspect is Defendant's contention that the interview was conducted "because the interview panelists and the selecting official did not know all of the candidates well." *Exh. 36* Why did the panelist have to know all the candidates well if the main and only concern and objective was to select the best candidate for the job? Inherent in Defendant's reason is the manifestation that there is something "fishy" underlying the interview selection. In essence, the reason clearly shows that

the selection process was geared not to finding the best person for the position, but rather to keeping

Plaintiff from advancing. That is particularly so where, as here, the panel agree that Plaintiff has "**strong**

**skill set ... leadership experience, more technically qualified than the selectee**" and that **"the selectee**

**was not as qualified as the [Plaintiff] in the technical aspects of industrial hygiene and safety**." *Exhs.*

*10 -12* More so where as here, the focus of the job is to serve as a <u>technical authority</u> and <u>develop policies</u>

both of which Plaintiff has done outstandingly; and neither of which the selected candidate recalls doing or

when she did them.   A jury question is raised where the selection process was geared not to finding the

best person for the position, but rather to keeping [plaintiff] from advancing. *McIntyre v. Peters*  460

F.Supp.2d 125 (D.D.C.,2006) citing *Salazar* **v.** *WMATA,* 401 F.3d 504, 508-09 (D.C. Cir. 2005).

### INDEPENDENT EVIDENCE OF DISCRIMINATION

In discrimination cases, "the central focus of the inquiry … is always whether the employer is

treating some people less favorably than others because of their race, color, religion, sex, or national

origin." *Brown* citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978).  Here,  Plaintiff

himself observed three **white females (** Annette Burrell, Sabrina Rutland and Charlotte Phillips) placed

on detail and eventually made permanent. *Exh. 58; Exh. 9 ¶22* In fact the Ranking Official in this case

testified that a **white female's** (Burrell's) detail helped  her score high *Exh. 13 @ 3* - she made the Best

Qualified List, and subsequently a permanent position. Another **white female** (Camille Caraway) was

promoted within the first year of her employment. *Exh. 7 @ 32: 16 - 33:10*  Yet another **white female**

(Brenda Goulding- see below) was selected over Plaintiff to lead the RSIP. **Exh. 9 ¶30** Furthermore, a

**white female** (Burrell) was asked to continue a detail that should have been made competitive at the

time. *Exh. 4 @ 111: 18 - 112* Also, a **white female** (Camille Caraway) was asked what could be done to

make her permanent in the higher position she was on detail in 2004. *Exh. 7 @ 10:21 - 11: 1-4* Yet

Plaintiff, a black male who consistently expressed interest in a GS-14 position for four years, and several

23

other black females, for example, Bellinda Fellers and Theresa Herbert, who expressed similar interests were overlooked for promotion. ***Exh.9¶ 22; Exh. 58***

Particularly telling is the fact that defendant's own statistics show that unlike black males, or other blacks, **white females** are promoted at a rate which exceeds their population by ten percent (10%). ***Exh. 45.*** This is clear evidence of disparate treatment, which explains why the Selecting Official in this case selected **white females** on the three to four occasions that he was responsible for selection. It goes without saying that selecting **white females** in derogation of the law is Defendant's practice.  It is the Defendant's pattern. It is the Defendant's precedent.  This undoubtedly is evidence of discriminatory attitudes on the part of the Defendant.  Evidence of discriminatory statements or attitudes on the part of the employer may support a verdict for a Title VII plaintiff. ***Aka*** 156 F.3d at 1289.  Clearly, Defendant's reason is unworthy of credence. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." ***Reeves* v. *Sanderson Plumbing Prods.,*** 530 U.S. 133,150 (2000) 530 U.S. at 147.

**Defendant's Business Decision**

To be sure, Plaintiff is not unreasonably asking this Honorable Court to sit as super personnel department that reexamines the defendant's business decisions.  However, while an employer is protected from courts second-guessing which legitimate reasons it chooses to base employment decisions on, it is not protected "against attacks on its credibility." ***McIntyre v. Peters*** 460 F.Supp.2d 125 (D.D.C.,2006) citing ***Chapman* v. *AI Transp.,*** 229 F.3d 1012, 1048 (11th Cir. 2000) (en banc).  Plaintiff submits that he has produced, sufficient attacks on Defendant's credibility.  Thus, Plaintiff humbly requests that this Honorable Court consider all the evidence "in its full context" ***Buggs*** , and make the appropriate determination on the defendant's reasons.

Plaintiff has presented evidence in the three categories:  His prima facie case is not in dispute. He

has presented evidence to attack Defendant's explanation and has produced other evidence of discrimination. With all the foregoing, Plaintiff prays that the Court set this matter down for a jury trial as there remain numerous genuine issues of material fact.

### (B).  PLAINTIFF'S RACE AND GENDER CLAIM  ON THE BURRELL DETAIL

In the instant case, there is no dispute that, as an African-American male, Plaintiff is a member of a protected class.  Nor is there a dispute that he suffered adverse employment action as he was not selected for the detail of 2002 - 2003.  Likewise, it clearly has not been disputed that the unfavorable action gives rise to an inference of discrimination.

### SUMMARY OF ARGUMENT

Under the Defendant's Merit Promotion Plan ("MPP") and *IRM,* any detail in excess of 120 days must be competitive. Ms. Burrell, a **white female** was detailed to the position of Management Analyst for about one year from 2002-2003.  Defendant's failure to make it competitive pursuant to the MPP stripped Plaintiff of the opportunity to compete for the position.  Additionally, as described above, Plaintiff with his various certifications and credentials, is significantly more qualified than Burrell.

More importantly, though clearly cognizant of all of Plaintiff's claims, Defendant fails to articulate a legitimate nondiscriminatory reason for repeatedly selecting Burrell for detail from 2002 to 2003 and not making it competitive.  Plaintiff submits that such failure constitutes Defendant's concession that Defendant has no reason at all, let alone a legitimate one for its action. Critically, such failure constitutes a waiver of any defenses on the claim.  Allowing the defendant to advance any defenses at this time would not only violate this Court's Scheduling Order, it would also be grossly and irreparably prejudicial to Plaintiff. Plaintiff humbly requests that this Honorable Court grant him Judgment on this claim.

### ARGUMENT

### THE DEFENDANT WAS CLEARLY COGNIZANT OF PLAINTIFF'S CLAIMS.

25

Throughout his Complaints from the administrative to the judicial level, Plaintiff clearly and unmistakably alleged that he was discriminated against when Annette Burrell was selected for a detail to a higher GS-14 position in violation of the Defendant's own Merit Promotion plan. Perceiving that it lacks a legitimate reason for its action, Defendant fails to contest it in its motion. Defendant has not and cannot argue that it fails to do so because there are two counts in the Complaint. In order to [now] make that argument, Defendant must also concede that it willfully elected to address only two of the three claims and disregarded the claim incorporated into each count at its own peril.

Notably, in confirming its understanding of Plaintiff's claim, Defendant examined Plaintiff extensively on the subject throughout discovery, both in its Interrogatories[6] and during deposition. Specifically, the deposition testimony goes:

Q:  Okay.  Are you making a claim of discrimination for Ms. Burrell's selection of the detail

A:  Yes.  I am alleging discrimination that Ms. Burrell got a detail that I should have been afforded. ***Exh. 1 @ 45: 3 - 8***

With these clarifications, Defendant remains clear at all times regarding Plaintiff's claims. The only detail Burrell got that is in controversy is the detail of years 2002 to 2003. The Selecting Official in this case does not deny that he renewed Burrell's detail. He merely does not recall ***Exh. 2 @ 80: 1-10*** . Moreover, if Defendant contends that this was an impossibility because of time frame, the fact that prior to April 2003, the Selecting Official worked on and off IRS site for quite some months during his transition

---

[6] The Interrogatory goes: Q:  State whether you believe that Mr. John Burns discriminated against you because of your race and gender when he purportedly gave Ms. Burrell a 120-day detail assignment, and specifically state each and every reason in support of your belief.
Response: (Objections omitted).  Yes.  Upon his arrival at the IRS, Mr. Burns picked up where his predecessors left off and supported the continued detail status of Ms Burrell without regard to the adverse effects of his conduct on others like Plaintiff.  Mr. Burns failed to consider Plaintiff for the detail.  In essence, he overlooked, denied and deprived Plaintiff the opportunity he gave Ms. Burrell.

**Exh. 1 @ 40: 11-15; Exh. 7 @ 35:13 - 36:3** from his previous employment to the IRS makes it more likely than not, that he was responsible for the renewal of Burrell's detail[7]. Even if Mr. McFadden or any other official of the Agency official was responsible for renewing Burrell's detail, that should not affect the validity of Plaintiff's claim, particularly where, as here, Defendant has not disputed it or proffered any legitimate reason for it. Regardless of who renewed the detail, the length of time Burrell was admittedly detailed proves that she was renewed without the competitive process required by the MPP to the Plaintiff's detriment.

Aside from that, during Plaintiff's deposition, the Defendant inquired and received clarifications from him with respect to whom he is holding responsible for the Burrell's detail. ***Exh. 1 @ 90*** Further, Plaintiff attests that: "from my observation, it appears that IRS implements its [silent] policy of clandestinely promoting **white female**s over black males." Plaintiff testifies further that his issue is with the system as a whole "in that most of the time, positions are not announced; **white females** are routinely detailed to higher position without the competitive process and would often become permanent in those positions" ***Exh. 9¶ 26 &44*** As already stated, it does not matter who was responsible for renewal of the detail, they would have carried out the Defendant's silent policy to Plaintiff's detriment. Nonetheless, Plaintiff remains aggrieved as he was significantly better qualified than the selected **white female**. Notwithstanding, failing to address the claim after seeking at least two extensions to file its Motion for Summary Judgment, Defendant waives its defenses on same. Failure to assert a defense constitutes waiver of that defense for the purposes of a Motion for Summary Judgment. ***Baker v. Snyder*** 2006 WL 2645163 citing ***Lot v. Sexton,*** 132 Fed. Appx. 624, 628 (6th Cir.2005); Defendant's Motion for Summary Judgment must be denied as Defendant's failure to address certain aspects Plaintiff's claims demonstrates the existence of disputed issues of material fact relative to that claim ***Purcell v. Pennsylvania Dept. of***

---

[7]The incongruities in Burrell's testimony about her employment history and about her relationship with the Selecting Official and Mr. McFadden, makes her testimony on the issue unreliable.

27

*Corrections* 2006 WL 891449; Denial of defendant's motion for summary judgment where plaintiff allege

sufficient facts to survive summary judgment and defendant failed to specifically address some of plaintiff's

claims in its motion. *Anderson-Bey v. District of Columbia* 466 F.Supp.2d 51 **(**D.D.C.,2006). At the very

minimum, there is a genuine issue on this claim.

### RECORD EVIDENCE BUTTRESSES PLAINTIFF'S CLAIM

More importantly, as already described supra, record evidence shows Defendant's preferential

treatments to **white females** to the detriment of others like Plaintiff.  In fact, Defendant's own admission

includes the fact that the detail helped Burrell make the Best Qualified List for a permanent positions *Exh.*

*13 @ 3* More than that, Defendant's own admission - its record -  shows that it promoted **white female**s at a

rate 10% higher than their population in the workforce. *Exh. 45*

Significantly, when Plaintiff confronted the Selecting Official and charged him with first detailing

Burrell to a GS-14 position and then making her permanent in the position,  the Selecting Official never

denied that fact. *Exh. 9 ¶ 42; Exh. 1 @ 30: 6 -19* In fact, the Selecting Official was not only involved in all

the selections made in the Division during the pertinent period: Burrell's, Goulding's & Carraway, he

actually made the selections. *Exhs.10 & 52.*

Similarly, on the one hand, Burrell testifies that her detail began in August of 2002. *Exh. 4 @ 37:*

*13-20.* The document submitted in her name says the detail commenced in May 2002.  The only thing clear

is that Burrell's detail went past the initial 120 day period and contravenes the Merit Promotion plan

("MPP").  That necessarily translates into the fact that at least two renewals of the detail occurred.   Since

the MPP requires that a detail of over 120 days be open for competition but this never was, Defendant

denied Plaintiff the opportunity to compete for the promotion. In fact Defendant asked Burrell to continue a

detail that should have been made competitive at the time.*Exh. 4 @111:18-112:4*  Thus, if Defendant

argues that Plaintiff did not apply for the Burrell detail, Defendant must concede that it never gave Plaintiff

the opportunity to do so by unjustifiably and improperly renewing it for Burrell for about a year.

In ***Cones v. Shalala*** 199 F.3d 512,(D.C.Cir 2000), the Defendant argued that since it never opened the position for competition, the plaintiff could not establish either that he was qualified for the position or that he applied for it. The D.C. Circuit rejected that notion and held that "Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie case of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer." *citing **EEOC v. Metal Service Co.***, 892 F.2d 341, 348 (3d Cir. 1990) ); ***Holsey v. Armour & Co.,*** 743 F.2d 199, 208-09 (4th Cir. 1984); ***Grant v. Bethlehem Steel Corp***., 635 F.2d 1007, 1016 (2nd Cir. 1980).

In this case, Plaintiff expressed interest in being promoted. ***Exh. 9¶ 49*** He even informed his colleagues of his expressed interest to the higher echelons in his Division. Carraway admitted that fact. He was interested in a GS-14 position. ***Exh. 7 @ 41:3-8*** Rather than announce the positions, Defendant "clandestinely" details a **white female** to it and subsequently makes them permanent. By so doing, Defendant deprives Plaintiff of a permanent position that he otherwise would have been qualified for and entitled to. Plaintiff takes issue with the means by which Defendant places **white females** in the permanent positions over which he has expressed interest. As it turns out, a detail is in essence, a subterfuge for a permanent position within the Plaintiff's Division.

Plaintiff submits that Defendant should not be now heard to argue that Plaintiff did not express his interest in any specific detail or Burrell's detail because the Defendant has waived its defenses to this claim. This is not just a failure to address an issue. It is a complete failure to address a claim in the Complaint. Additionally, for subsequent placements, the Selecting Official himself testified that he "selected" (though he did not) Plaintiff for a detail on RSIP and that his selection was based on "interest expressed by the detailees." . Since Plaintiff expressed interest to the Selecting Official, the latter can hardly be heard to deny

29

knowledge of Plaintiff's interest. The Selecting Official did not deny that Plaintiff expressed interest. He

simply does not recall ***Exh. 10 & 52*** . Nonetheless, the crux of Plaintiff's complaint on this claim is, the

means by which the permanent positions are filled.

In light of the totality of the circumstances surrounding the Burrell detail; failure of the Selecting

Official to deny the allegation when confronted by Plaintiff; Defendant's violation of its own procedures on

MPP; the inferior qualifications of Burrell vis a vis the superior qualifications of Plaintiff; and the absence

of a legitimate nondiscriminatory reason; the failure of the Defendant to raise any genuine issue on this

claim against the Plaintiff, in aggregate, make this claim one on which this Honorable Court should grant

judgment to the Plaintiff. For these reasons and other reasons that appear to this Honorable Court to be

proper and just, Plaintiff prays that the Court grant him judgment on this claim.[8]

### (C).  PLAINTIFF'S RETALIATION CLAIM

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in statutorily

protected activity; (2) he suffered an adverse employment action; and (3) a causal connection existed

between the protected activity and the adverse employment action. ***Mitchell v. Baldrige***  759 F.2d 80, 86

(D.C. Cir. 1985); ***McKenna v. Weinberger,*** 729 F.2d 783 , 790 (D.C. Cir 1984).

In the instant case, there is no dispute that Plaintiff engaged in a protected activity as he filed at

least two EEO complaints. ***Exh. 9 ¶ 37 & 39*** Nor is there a dispute that he suffered adverse employment

action as he was not selected for the detail of January 2004.  Defendant however advances three argument in

support of its motion on this claim.  First, defendant argues that Plaintiff's claim is untimely; that Plaintiff

cannot establish a prima facie case; and that even if Plaintiff can establish a prima facie case, it has a

---

[8]If this Honorable Court construes this request as a Partial Motion for Summary Judgment,
Plaintiff incorporates herein the Statement of Genuine Issues attached and humbly requests that this
Honorable Court allow him to file a Reply on this claim; advise him on when the Reply is due; and allow
him to file his proposed order, consistent with the Court's construction at the same time as his Reply.

legitimate nonretaliatory reason for selecting Camille Caraway (Caraway) for the January 2004 detail.

## SUMMARY OF ARGUMENT

Defendant bases its untimeliness argument on the fact that Plaintiff did not include his retaliation claim in his Complaint until eleven (11) months after his initial complaint. Under **29 C.F.R. § 1601.12** and **F.R.C.P Rule 15(c)**, amendment relates back to the date of original filing and leave to do so shall be freely given. Moreover, the retaliation is directly related and grew out of the same set of facts as Plaintiff's discrimination claim which he filed when he was Pro Se. Additionally, since the defendant was cognizant of the amendment when it was filed and failed to timely raise its defense of untimeliness, it waived that defense and is now estopped from asserting it more than two years later. Thus, defendant cannot and should not now be heard to charge Plaintiff with what the defendant is itself guilty of.

Likewise, defendant's argument that Plaintiff cannot establish a prima facie case is based on its erroneous theory that the causation element of a prima facie case is destroyed by "a six-month lapse between {Plaintiff's} initial EEO contact and the alleged retaliatory conduct." First of all, contacting an EEO counselor, without more, is neither the equivalent of the filing of an EEO Complaint. Nor does it constitute a protected activity. Even if it does, the law is clear that, evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection. Furthermore, where there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference. There exists both discriminatory treatment as well as a pattern of antagonism - following the protected activity in this case.

Moreover, Defendant's proffered legitimate nonretaliatory reason that it selected Camille Carraway for the January 2004 detail at the recommendation of another person is disingenuous and without merit because the Selecting Official promised Camille Carraway a detail which would become permanent at the

same time he notified her of her rejection for the first Safety Manager position. Significantly, the Selecting

Official is himself aware that Plaintiff contributed as much (or even more) than Camille Carraway to the

field of Safety.  The training/mentoring plan referenced and attributed to Caraway as being the reason for

her selection for detail, was jointly prepared and presented by both the Plaintiff and Caraway.  Likewise,

Plaintiff expressed his interest in permanent GS-14 position to the authorities or higher echelons within his

Division. For these reasons and the discussion below, defendant's arguments must fail.

## ARGUMENT

### AMENDMENT RELATES BACK TO THE DATE OF THE ORIGINAL FILING

Under *F.R.C.P Rule 15(c),* "An amendment of a pleading relates back to the date of the original

pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct,

transaction or occurrence set forth or attempted to be set forth in the original pleading."  Likewise, *29*

*C.F.R. § 1601.12* states:

> Notwithstanding the provisions of paragraph (a) of this section, a charge is
> sufficient when the Commission receives from the person making the charge a written
> statement sufficiently precise to identify the parties, and to describe generally the action or
> practices complained of. A charge may be amended to cure technical defects or omissions,
> including failure to verify the charge, or to clarify and amplify allegations made therein.
> Such amendments and amendments alleging additional acts which constitute unlawful
> employment practices *related to or growing out of the subject matter of the original*
> *charge will relate back* to the date the charge was first received  (Emphasis added.)

In this case, Defendant has not asserted that Plaintiff's retaliation claim is not directly related to

the original charge.  Neither has it argued that the retaliation did not grow out of the subject matter of same.

Rather, defendant argues that the retaliation claim is untimely because it was not raised in Plaintiff's

original and timely discrimination claim.  That argument has no support in the law.  Plaintiff filed a

complaint about February 2004 in which he alleged facts constituting both the discrimination and retaliation

claims. *Exh. 9 ¶37* He however only alleged discrimination at that time as he was without counsel and was

oblivious of what the elements of the causes of action were *Exh. 9 ¶ 40*.  He amended that complaint to

include his retaliation claim about January 2005 after he hired a lawyer Clearly, when he filed his complaint

about February of 2004, defendant was placed on notice of his claim. He did not change the facts of the

complaint when he amended it in 2005. Since both the discrimination and the retaliation claims grew out of

the same facts and conduct, the amendment relates back to the date of original filing.

## DEFENDANT WAIVED ITS DEFENSE OF UNTIMELINESS

More notably, it is undisputed that at the time Plaintiff filed his original charge he did not have

the benefit of counsel.  Nor is it disputed that Plaintiff has no background in law.  The well established law

is that the requirements of the law are relaxed where a party is Pro Se.  Where Plaintiff is proceeding pro se,

his complaint is held to  less stringent standards

than formal pleadings drafted by lawyers. *Jackson v. Bowne & Company Inc*. 2006 WL 751318, (D.D.C.

2006) citing *Voinche v. FBI*, 412 F.Supp.2d 60, 70 (D.D.C.2006).

Significantly, Defendant was cognizant of Plaintiff's amendment more than two years ago.  It

failed to assert any defense of untimeliness at that time; it conducted discovery at that time  up until January

10, 2005 (**Exh. 55**) when it first deposed Plaintiff, but failed to conduct it on the issue, though it received

notice of Plaintiff's amendment on January 4, 2005 (**See Def's motn. @11**); and it  failed to place any

objection on the record.  Having so failed, defendant slept on and waived its right to now do so almost three

years later.  Plaintiff submits that defendant should not now be heard to charge Plaintiff with unclean hands

when the defendant's own hands are filthy.

## PLAINTIFF ESTABLISHES A PRIMA FACIE CASE OF RETALIATION

Aside from that, defendant also argues that Plaintiff cannot establish a prima facie case based on

the date he contacted an EEO Counselor.  First of all, contrary to the defendant's assertion, Plaintiff's filed a

formal EEO Complaint in October 2003  and not in August 2003.  In its desperate effort to escape liability

however, defendant swaps the date of commencement of the process of filing a Complaint with  the actual

date of filing a Complaint.  It appears to have eluded the defendant that  commencement of the process

without more, is not the equivalent of, nor is it tantamount to the filing of a Complaint.  This is particularly

so within the public sector where: hundreds of people commence the process but never bring it to fruition;

hundreds of complaints are rejected or dismissed at the initial phase by the agencies; and where hundreds of

people contact the EEO counselors only to inquire whether their claims are ripe, unripe or whether they

have standing at all.  While the defendant is quick to swap these two occurrences, it fails to point this

Honorable Court to any authority supporting its position on that point.  Specifically, defendant fails to

proffer, advance or adduce any authority for the proposition that, contacting an EEO Counselor without

more, constitutes engagement in a protected activity. Plaintiff submits that the want of that authority simply

makes the defendant defenseless on this point. Consequently, since Plaintiff suffered adverse employment in

January 2004, which was  within three months of the filing of his  EEO Complaint of October 2003,

defendant's own authority helps Plaintiff and supports the cogent fact that Plaintiff has established

causation, ***Willingham v. Gonzales***, 391 F. Supp.2d 52, 60 (D.D.C. 2005), (citing ***Buggs v. Powell,*** 293

F.Supp.2d 135, 148 (D.D.C.2003) (See Def's motion at 16); and hence a prima facie case of retaliation.

### THE PATTERN OF ANTAGONISM  FOLLOWING PLAINTIFF'S COMPLAINT SUFFICIENTLY ESTABLISHES CAUSATION

Assuming arguendo that contacting an EEO counselor, which Plaintiff did about August of 2003,

constitutes engagement in protected activity, Plaintiff's set of fact survives the defendant's arguments based

on the chain of events and the pattern of antagonism following said engagement in protected activity.

Specifically, right after he found out he was not selected for the Safety Manager position, Plaintiff inquired

of the Selecting Official as to why he was not selected for the position.  The Selecting Official ignored him.

He informed the Selecting Official that he did not believe the selection process was fair and that he would

file a complaint.***Exh. 9 ¶ 25.***  From that moment, the Selecting Official was on notice that "something" was

or may be imminent. A causal connection existed based on the time plaintiff first became vulnerable to retaliation, even though that time occurred three years after plaintiff engaged in protected activity. ***Buggs v.*** citing ***Hayes v. Shalala,*** 902 F.Supp. 259, 264 (D.D.C.1995).

Furthermore, a few weeks after the selection occurred, the Division solicited volunteers for the Revision of the Safety Inspection Program ("RSIP")Plaintiff volunteered for the program and even volunteered to chair or lead it.  The same Selecting Official selected another **white female**, namely Brenda Goulding over Plaintiff, to lead the RSIP but told Plaintiff that Plaintiff would be the "selected co-chair". As in the previous selection for the Safety Manager Position, Goulding the selected **white female** does not have a degree, has no  background in Safety; and in fact, had no exposure to Safety at all prior to year 2001. ***Exh. 2 @ 69: 9-17; Exh. 9  ¶ 27-***29 As already stated supra, Plaintiff has a Master's degree and a career of about two decades in Safety. The Selecting Official knew of Plaintiff's capabilities having been in the Navy the same time Plaintiff was.  He in fact testified that Plaintiff, with his certification and skills, can by default, perform the roles and duties of a Safety Officer.***Exh. 52 @ 2*** Nonetheless, he once again selected a **white female** with significantly inferior Safety background over Plaintiff to lead the RSIP.  This arguably is adverse employment action and/or evidence of discriminatory or disparate treatment.  ***Exh. 9  ¶ 29-30***

Though the Selecting Official informed Plaintiff that he would be the "selected co-chair" for RSIP, he immediately gave orders to demote Plaintiff to "Assistant Team Lead."  That is not all.  The Selecting Official failed to respond or address the issue when Plaintiff attempted to clarify same. More fundamentally, he excluded Plaintiff from the kick-off and final meetings he held with key players of the RSIP.[9]  The only meetings Plaintiff was allowed to attend was the one all the volunteers attended. ***Exh. 8 @129:10-19 ; 9  ¶ 32***; All of these shows that those time periods were not without incidents. Nor were they

---

[9]Goulding does not recall Plaintiff's exclusion from any kick-off meeting. Exh.8 @79. However Burrell recalls it but upon counsel's prompts, changed her testimony to say there was only one meeting. Exh. 4 @ 129 - 130

35

inconsequential. Essentially, they tie, link and connect to Plaintiff's inquiries and the Selecting Official's motives. They constitute evidence of discriminatory or disparate treatment. Where there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference. **Kachmar v. SunGard Data Systems, Inc.,** 109 F.3d 173 (3d Cir.1997).

Because Plaintiff's demotion emanated from the Selecting Official, Plaintiff's preclusion from playing a co-chair's, co-lead or Assistant-Team-Lead arguably emanated from him as well. After all, it was not by accident that Plaintiff was excluded from the first and last meetings. Clearly, his preclusion from playing the role he was allegedly "selected" for, is by no means happenstance or coincidental. Notably, Goulding treated Plaintiff exactly the way she treated all other volunteers and failed to accord Plaintiff the honor and dignity appurtenant to his role. Since Plaintiff volunteered, he arguably could not be fired from the program. But employment of other means of frustrating him were exploited - by Goulding operating as a conduit for the Selecting Official. This is particularly evident from the fact that not only did Goulding misdirect Plaintiff's priorities on the tasks in the program. She also encumbered him with additional responsibilities by apportioning him extra tasks, which he had to accomplish by the end of the RSIP about December 18, 2003. Plaintiff performed four (4) but Goulding performed only one (1) of the sixteen tasks there were in RSIP. **Exh. 59.** In fact, Goulding does not recall why she did only one and others did much more of the Tasks on RSIP **Exh. 8 @ 180: 9-22**. Yet the Selecting Official testified that Goulding was the person doing all the work and that Plaintiff did not participate. Goulding testifies that her recollection is not consistent with the Selecting Official's testimony. **Exh. 8 @ 175: 11 - 176: 1-; 120: 10 - 121: 1-22** Additionally, contrary to the Selecting Official's testimony, Goulding confirmed that the RSIP was not a detail but an assignment and that it was covered by volunteers - which negates Defendant's assertion that the Selecting Official "selected" Plaintiff for a detail. **Exh. 8 @ 176: 4-11**. Nonetheless, Plaintiff had to endure the brunt of the endeavor for the entire four month period of the RSIP, having already stepped up to the play. All of these arguably occurred in compliance with and the implementation of the directives of the

36

Selecting Official and not by coincidence. They constitute evidence of discriminatory or disparate treatment and pattern of antagonism.

More fundamentally, around December of 2003 when Plaintiff learned that another vacancy for the position of a Safety Manager was imminent, he inquired about it from the Selecting Official. Rather than give him the appropriate response, the Selecting Official ignored his inquiries about it. ***Exh. 9¶ 37*** At the time Plaintiff made the inquiry, his formal EEO Complained had already been filed - in October 2003. The Selecting Official was not oblivious of it having been previously informed of same. Interestingly, Defendant has not denied that fact.(In fact, based on its argument on the issue, Defendant's contention that Plaintiff contacted the EEO in August 2003 is an admission that it was aware of it at that time).

Since the Selecting Official detailed another **white female** to the position of a Safety Manager in January 2004, less than three months after Plaintiff filed his formal EEO Complaint, Plaintiff suffered adverse employment action and his cause of action for retaliation accrues. Plaintiff did not know anything about the Selecting Official's promise to Caraway prior to January 2004. Thus, Plaintiff's cause of action accrues the moment he gains knowledge of the unfairness in the selection. Plaintiff can only expect that the selection process be fair whether it be for a detail or a permanent position, regardless of his EEO Complaint.

Consequently, no matter how it is construed, Plaintiff establishes causation, whether August 2003 (as described above) or whether October 2003 date is the date of protected activity because even from October 2003 when Plaintiff filed his formal EEO Complaint, he endured antagonism through December of 2003 when the RSIP ended. Clearly, the time period between the filing of his formal Complaint and the adverse employment action is not entirely without incident. That fact, combined with the fact that the Selecting Official ignored him in December 2003, when he learned and inquired about the impending vacancy, in aggregate, compound the antagonism. The causal link required by the third prong of the prima facie case does not rise to the level of a "but for" standard. The plaintiff "need not prove that his protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal

37

link' element of a prima facie case." **Long v. Eastfield Coll.,** *88 F.3d 300, 305 n. 4 (5th Cir.1996).*

### DEFENDANT'S LEGITIMATE NONRETALIATORY REASON IS SPURIOUS

As its legitimate and nonretaliatory reason, defendant asserts that the Selecting Official  selected

Caraway for the January 2004 detail because: (1). Of the relationship of the Safety Program and her skills

and abilities; as she had demonstrated interest, experience and aptitude in the Safety field  in past; and had

participated along with **other Safety Officers** in the development of training for the Safety Advisory

Committee (SAC); (2). Barbara Cohen, another **white female,** recommended Caraway for the program in

that she had been helpful to the National Office on **other projects** and had skills and interest in Safety

Officer training and development; and (3). Mr. Edward Crandall, a white male, shared with the Selecting

Official, information about Ms. Carraway's frustration with her current work situation.  As discussed below,

all these reasons are disingenuous, baseless and without merit.  Essentially, they are not worthy of credence.

First of all, contrary to the Defendant's assertion, the Selecting Official promised Carraway a

detail to a GS-14 Safety Manager position at the same time he notified her of her rejection for the first like

position which he selected Burrell for.[10] **Exh. 7 @ 7: 12-21** Thus, the reference to suggestions by Cohen, a

**white female** and Crandall, an authority in the Division, is nothing but a subterfuge.

Assuming arguendo that Defendant's purported reason is true (and it is not) Plaintiff, much more

---

[10]Carraway is uncertain as to when she was exactly called by the Selecting Official about the detail.  However since the selection for the first Safety Manager position occurred about July of 2003, it makes sense to deduce that the Selecting Official made that promise at that time.  It would not make sense to deduce that the Selecting Official told her in January 2004 when she began the detail otherwise she would not have had a reason to commence the process of filing a complaint about her nonselection. She arguably commenced the process when the Selecting Official did not promptly make good on his promise to her, but waited till almost six months later. However, she told Plaintiff in January 2004 that the Selecting Official had detailed her (which was true) to a GS-14 Safety Manager position, and had promised her that the position would be permanent. (though Caraway testified that she got that impression while she was on the detail.  **Exh. 7 @ 11: 5-12** Whichever one it is, that message of permanency in the position was conveyed by the Selecting Official to Caraway.  Also Caraway was already a GS-13 but applied for the same position in May 2003 for more money. Exh. 7 @ 7: 2-5; 20: 10-16 Thus, under **Cones v. Shala**, Defendant cannot allude to Plaintiff's lower GS-12 for its argument.

than Caraway, demonstrated interest, experience and aptitude in the Safety field throughout his employment

with the IRS.  Even Caraway herself testified that Plaintiff has "extensive experience" and that his job at the

IRS was beneath him. More importantly, one of the reasons he was hired by the IRS was to complement

Caraway's weaknesses. ***Exh. 51.*** Thus, at the IRS, Plaintiff inter alia, provided training to the Washington

DC Metro Territory Safety inspectors with regard to the policy and guidance issued in a standardized safety

Inspection Process.  He also developed as a Standard Operation Procedure (SOP).  He was the person

almost always called upon whenever there were questions on Safety. As to the development of training for

the Safety Advisory Committee (SAC), both Plaintiff and Caraway prepared  and delivered  training at

various times and audiences on the subject. The whole Division knew about it, including Ms. Barbara

Cohen and Mr. Crandall.  In most cases, managers and supervisor from the Division and other

Business/Division Units employees congratulated or shook Plaintiff's hand at the end of each presentation

for a job well done. ***Exh. 9¶ 48***  With all that, it can hardly be said that Plaintiff was other than ubiquitous

or recognized in the Safety field.

Rather than attribute the effort or work to both Plaintiff and Caraway, defendant mentions only

Caraway "and other Safety Officers."  It needs no argument to conclude that the failure of the defendant to

attribute any effort or work on Safety matters to Plaintiff, obviates the need to inquire as to why Plaintiff

was not selected.   Additionally, not only did Plaintiff also voice his own ideas about standardization of

training and development of the Safety Officers, he went further to developed a Standardized Reporting

Process to uniform reporting of inspection results among the Business Units, Safety, and Union employees.

That Standardized Reporting Process enhanced and facilitated the Safety Officers' training and development

plan. ***Id.***

Significantly, defendant fails to attach any affidavit from Babara Cohen[11] to its motion and it is now

---

[11]Ed Crandall's affidavit would have been inadmissible hearsay within hearsay anyway.

too late to do so.  Thus, the Selecting Official's representations with respect to their representations are

inadmissible hearsay.  Aside from that, neither these individuals nor the Selecting Official contends that

Plaintiff contributed less than Caraway to the Safety field, or that he played no role or showed no interest in

same field.  Nor has anyone claimed that Caraway is more qualified than Plaintiff in the field of Safety.  The

only assertions made are that Caraway, a **white female,** expressed or demonstrated interest and experience;

and that a **suggestion** was made by another **white female** to select Caraway, for the detail.  For that reason,

the defendant argues, the selecting official did not consider Plaintiff for the detail.

That brings us to the crux and cynosure of Plaintiff's claim. At deposition when Plaintiff  was asked

by the defense counsel what his understanding of his claims against the IRS were, he said his claims deals

with "giving white females preferential treatment in violation of the Merit Promotion Plan of the Agency

and then later in the future giving them permanent positions, promotions that otherwise that I, myself as an

African-American was not afforded ... the reprisal dealt with similar issues detailing a white female at the

detriment of myself." ***Exh. 1 @ 20: 14 -21:1-7*** He states further that: "My issue is with the system as a

whole in that most of the time, positions are not announced; white females are routinely detailed to higher

positions without the competitive process and would often become permanent in those positions." ***Exh. 9¶***

***44***

Significantly, when defense counsel asked Plaintiff the basis of his retaliation claim he said: "I filed

the initial claim about detailing **white females,** and shortly thereafter, another detail was given that

otherwise I would have been given if I had not filed the initial one." ***Exh. 1 @ 104: 3-9*** In this case, within

the three years preceding this particular detail, three **white females** were detailed to higher positions and

were eventually made permanent in the positions. Additionally, Carraway herself, a **white female** was

promoted within the same year that she was hired in 2000. ***Exh. 7 @ 32: 16 - 33:10*** On top of that,

Carraway, **white female** was again selected over Plaintiff for a higher position at the recommendation of yet

another **white female**.   Also, while Carraway a **white female** was on the 2004 detail, the Selecting Official

asked what he could do to keep her and make her permanent in that position.***Exh. 7 @ 10:21 - 11: 1-4*** Yet

Plaintiff was with the IRS from 2001 to 2005, not even once was he considered for promotion. Yet he

informed the authorities in his Division that he was interested in a permanent GS-14 position.   Yet Mr.

Crandall, one of the authorities at the IRS, assured Plaintiff that he had told his colleagues responsible for

hiring about Plaintiff's expressed interest (which was already common knowledge) in a GS 14 position.

***Exh. 9 ¶ 49*** As an IRS authority, Crandall's statements to Plaintiff constitute an admission by the

defendant.  Above that, Plaintiff's certification, skills and expertise are well known to the Selecting Official

who selected **white females** over Plaintiff on at least three different occasions.  As Plaintiff testified, "the

**white females** are the ones who receive exposure to the National Office" ***Id.*** . This obviously is why they

get {improperly) promoted.  With that, the selecting officials can hide under that exposure as a basis for

selecting **white females**  - which happened in this case.  Such conduct defies the mandates of Title VII..

More notably, the facts that Plaintiff expressed interest in a higher position; previously volunteered

for RSIP; and previously applied for a GS-14 Safety Manager position should constitute adequate notice to

the Selecting Official that Plaintiff was interested in a GS-14 Safety Manager position whether it be

permanent or detail.  But he selected Caraway, a **white female** for

detail partly because Crandall allegedly discussed with the Selecting Official, Caraway's frustration with

her job.  It obviously does not matter to the defendant whether Plaintiff's frustration with his then-present

job led him to express his interest in a higher GS-14 position.    Rather than consider Plaintiff, defendant

repeatedly considers **white females** to the Plaintiff's detriment. These facts are buttressed by defendant's

own report that it promotes **white females** at a rate which exceeds their population by ten percent (10%)

and there are no barriers to their advancement.  ***Exh. 45.***

As discussed supra, the chain of events leading to the Selection of Camille Caraway; combined with

41

the history or the pattern of this Selecting Official's selection of **white females** over Plaintiff; coupled with the fact that the Selecting Official's testimony is incongruous with record evidence, make it more likely than not, that retaliatory motives drove the Selecting Official to Select Caraway; hence making resolution of this issue, one for the jury. In essence this set of facts substantially negates and debunks the Defendant's nonretaliatory reason. This Honorable Court should deny defendant's motion for summary judgment on this claim.

### Conclusion

Based on the foregoing reasons, this Honorable Court should deny the Defendant's Motion .

Respectfully submitted,

**THE GBENJO LAW GROUP**

_____ /s/ _____

Anne J.A. Gbenjo, Bar #: 447840,

8449 West Bellfort Avenue Suite 100

Houston, Texas 77071

Phone: 713-771-4775 ; Fax: 713-771-4784

Counsel for Plaintiff

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT, on this 17th day of October 2007, I sent via first class and E-filing a copy of the foregoing Opposition to all parties as follows: John C. Truong, Esquire, 555 4th Street N.W. Washington, D.C. 20001

_____ /s/ _____

Anne Gbenjo