THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

```
*******************************
GARY HAMILTON,                *
Plaintiff                     *
                              *
v.                            *        CASE NO.: 05-cv-1549 (RBW)
                              *
JOHN SNOW,                    *
Defendant                     *
*******************************
```

## PLAINTIFF'S STATEMENTS OF GENUINE ISSUE OF MATERIAL FACTS NECESSARY TO BE LITIGATED

1. Plaintiff, Gary Hamilton, African-American male, graduated from the University of North Alabama with a Bachelors degree in Industrial Hygiene in May 1982, and shortly thereafter obtained a Masters degree in Public Health from George Washington University. ***Exh. 9 ¶ 1-7 (Pla. Affid.); Exh. 39 (Pla. Application).***

2. Plaintiff commenced his employment with the Federal Government approximately twenty-three (23) years ago. During his tenure with the Federal Government, he obtained Master's level Senior Executive Leadership Training for the Federal Government Sector around year 2000. ***Id.; Exh.1 @ 46:10-17 (Pla.dep).***

3. Plaintiff worked with the Department of Defense (Navy) as an Industrial Hygienist until about 2001, when he joined the Internal Revenue Services ("IRS") in the same position. He worked within the Real Estate and Facilities Management ("REFM") of the Agency Wide Shared Services (AWSS) in the Division of the IRS. ***Exh. 9 ¶ 3; Exh. 39.***

4. As a GS-12 Industrial Hygienist at the IRS, Plaintiff's job duties include: (a) Fire Protection and Life Safety - he conducted assessment of hazards in buildings from fire, application of prevention or protection techniques to prevent or limit damage to buildings from

fire and provide for safe egress of people from buildings; (b) Budgeting and Planning Safety - he developed resource assessments of the organization's safety and occupational health needs, developed safety program plans, developed budgets, and assisted management in meeting their safety responsibilities; (c) Administration and Personnel Management Safety - he managed IRS junior level safety inspectors; (d) Problem Solving Safety - he through regular safety inspections and analysis of quarterly safe accidents reporting and tracking, used his knowledge of safety requirements, regulations and codes to analyze and communicate with others in order to effect corrective action; (e) Safety Compliance/Inspection Activity - he Conducted Safety Inspection or compliance Inspections evaluating and recommending compliance with regulations and accepted safe practices; (f) Safety Training and Development - he developed, coordinated and provided safety training for management, supervisors and employees; (g)Accident Investigation - investigated events leading to accidents and determining cause and identify methods to prevent recurrence; (h) Communication - Communicated with employees, supervisors and management concerning safety procedures, deficiencies, and responsibilities; and (I) Policies - Plaintiff developed and wrote policies extensively on complicated issues such as . the IRS Territorys' (Washington DC meto) Facility Safety Inspection Processes and Procedure Policy. *Id.*

5. In conjunction with the above-mentioned duties, Plaintiff also performed Construction Safety while he was in the Navy, in that, he Conducted Inspections and evaluations of construction activities and application of construction safety standards and managed contractors and safety specialists. Additionally, he was the Manager of Hazard Abatement for many years. *Id.*

6. Aside from becoming a board certified Industrial Hygienist in 1995, Plaintiff

throughout his career, has been aligned with all of his employers' safety management operations. Plaintiff's professional path in safety led him to pursue the recognition as a Certified Safety Professional ("CSP") and he completed the requirements for the CSP. *Id*.

7. About May of 2003, the IRS announced a vacancy for the position of a Safety and Occupational Health Manager ("Safety Manager"). ***Exh. 16 (Job Announcement)***.

8. The Safety Manager position announced in this case requires inter alia, that the applicant be able to: Develop policies, procedures and standards for the IRS safety program; Advise top management on the most complex safety matters; Interprets national safety directives for their applicability to the safety program; Formulate broad policy direction regarding the implementation of these directives; and Serve as representative of the Director in performance of top liaison assignments and in contact with professional and trade association, officials of the Treasury Department, representatives of other government department and agencies, OMB, Congress and the public; Serve as a technical authority in assignments requiring the application of new theories and development of safety problems not susceptible to treatment by accepted safety methods and procedures. ***Exh. 22. (Job Position Description)***.

9. In its Job Description, defendant identified the categories over which it would gauge and assess the candidates' eligibility for the position. Likewise, Defendant specified the points it allotted to each of the categories. The points are as follows: Knowlege: 1550; Level of Difficulty: 1635; Assignment: 325; Communication: 180 with a total point of 3690. ***Id.***

10. Four people, two males and two females, namely, Annette Burrell, Camille Caraway, Michael Perkins and Plaintiff made the Best Qualified List. (***Exh. 18 - 21)***

11. Three of the four candidates received a ranking score of 25. One of them was the

Plaintiff. The fourth person, a white male, received a ranking score of 19. (***Exh. 18 - 21)***

12. Of the four candidates, Plaintiff was the only black. Plaintiff was the only one with a Masters degree. Plaintiff was the only one who had dealt with Safety Operations throughout his career. Plaintiff was the only one with Executive Leadership training specific to the Federal Sector. ***Exhs.1 @ 46: 10-17; Exh9 ¶ 13; Exhs. 39-42; (All candidates' application pkge.)***

13. The Selecting Official in this case was directed to select the best candidate with or without the interview. Nonetheless, he selected two others to join him to interview the candidates. The Defendant admits that the interview in this case was dispensable. ***Exh. 2 @ 85: 7-12 (Stuart Burn's deposition); Exh. 36 @ 34 (Defendant's Response to Plaintiff's Requests for Admissions) Exh. 23 (directives from personnel)***.

14. The four applicants were interviewed by a panel of three (3) members, viz: Stuart Burns (Caucasian male); Mike Huston (Caucasian male) and Tatika Mitchell (who testified that she is a mixture of Hispanic, African-American and French). Mike Huston did not receive the candidates application packages. ***Exh. 10 @ 1 (Burns' Declaration); Exh. 11 @ 1 (Mike Huston's Declaration); Exh. 5 @ 55: 13-15 (deposition of Tatika Mitchell)***.

15. The panel members all took notes at the interview ("interview notes"). However, they did not rate or give the applicants any scores.***Exh.2 @ 119: 2-5***; ***Exhs. 24-35 (interview notes) Exh. 38 (panel summary rating sheet).***

16. Defendant produced all the interview notes for all the applicants except Plaintiff. ***Exhs. 24-35.***

17. The Internal Revenue Manual ("IRM") guides, inter alia, the defendant's promotion process. It requires that interview Panel consists of at least three voting members and a

4

representative of personnel office to also participate as a non-voting member to ensure that control and panel actions meet validity and job relatedness requirements. ***Exh. 43. (IRM)***

18. In this case, the Selecting Official did not invite any personnel representative to participate. He invited only two other (voting) members to conduct the interview. ***Exh.2 @ 95: 20 - 96:3***

19. In ranking and rating candidates for promotion, the Management Selection Program and the IRM require that the weight to be given leadership cores must be at least fifty percent (50%) and technical cores must be no more than fifty percent (50%) The Selecting Official and the Ranking Official in this case know nothing about these requirements. ***Exhs. 43 & 44; Exh. 3 @ 40:3- 41:17; Exh. 2 @ 123: 17-124:21.***

20. The Selecting Official selected Annette Burrell ("Ms. Burrell"), a white female who has a high school education, no college degree, no formal education training in Safety and no formal training in Security. ***Exh. 2 @ 96:11-13; Exh. 4 @ 47:17- 48:14 (Annette Burrell's depo).***

21. The deadline to submit complete applications for the Safety Manager position was May 19, 2003. Ms. Burrell, the selected applicant, did not submit a complete application until June 5, 2003 - after the closing of the vacancy announcement in this case. ***Exh. 16; Exh. 40; Exh. 4 @ 79: 14- 80- 14.***

22. The Selecting Official testified that any application that missed deadline does not get considered. ***Exh. 2 @ 152: 7-10.***

23. The only reason that the defendant gave for Plaintiff's nonselection is that Plaintiff's interview allegedly did not go "very well." ***Exh.2 @ 115:5-7; 122: 16-19***; When the Selecting

5

Official was asked to specify which questions the instant Plaintiff failed to answer or did not answer well, none was given other than a generalized bald assertion that the interview did not go well. ***Exh.53 @2.***

24. When he was asked to rank the duties and responsibilities of the Safety Manger position in order of importance, the Selecting Official however testified that the duties and responsibilities for the Safety Manager position were consistent with the position description. ***Exh. 53 @ 2 question 8. (Burns' response to Plaintiff's interrogatories at EEO level HAM 1463***)

25. The panelists however did not apply the points allotted in the Position Description. ***Exh. 2 @ 187: 5-8.***

26. The Internal Revenue Manual ("IRM")guides, inter alia, the defendant's promotion process. It requires that Ranking panels/officials consist of subject matter experts who are at or above the grade of the position to be filled. It also requires that Ranking Officials and panel members be carefully selected and trained. ***Exh. 43.***

27. The Ranking Official in this case, Mr. Paul Carroll, is not a subject matter expert in Safety; he has no formal training in Safety; no formal training in Security; and no training in Ranking. ***Exh. 3 @ 17: 14-20;  30: 7-11; 80: 19-21. (Paul Carroll's deposition transcripts***).

28. Significantly, the Mr. Carroll testified that he was not to select the best candidates for the position. ***Exh. 3 @ 95: 2-5.*** As a result,  he ranked the candidates against the KSAs (Knowledge Skills and Abilities) given to him by personnel, ***Id.  @ 94: 20-95:1*** but testified that of the three candidates that received the highest score of 25, Plaintiff was the only one he did not know prior to ranking them. ***Id. 46: 4-12*** Mr. Carroll ranked the two candidates he already

knew, the same time and the two people he did not know on different days. *Id. 94: 5-12.*

29. The Selecting Official does not recall whether he selected Mr. Carroll to conduct the ranking. *Exh. 2 @ 85: 13-19.* The Selecting Official and the Ranking Official are "very close." They work in the same department and eat lunch together a lot. *Exh. 1 @ 181: 15 - 182:1.*

30. The Ranking Official testifies that his ranking of the candidates is subjective. *Exh. 3 @ 44:1-3.* The Ranking Official testifies that he gave absolutely no weight to the applicants' educational background. *Id. @ 62: 5-11.* He also testifies that Ms. Burrell's detail helped her score high (*Exh. 13 @ 3 Paul Carroll's Declaration*) - she made the Best Qualified List and subsequently got a permanent position.

31. The Selecting Official also testifies that the interview selection process is subjective. *Exh. 2 @ 124: 22- 125:7)*

32. The Selecting Official in this case has a history or pattern of selecting white female over males in that on about three to four instances where he was responsible for selection, he selected white females over Plaintiff, though Plaintiff made himself available and inquired about the positions. *Exh. 2 @ 96:11-13; Exh. 10 @ 3 questn. 8 (Declaration of Stuart Burns). Exhs. 46 & 57 (Plaintiff's EEO Complaints).*

33. The defendant's own statistics show that white females receive promotion at a rate which exceeds their population by ten percent (10%) and there are no barriers to their advancement. *Exh. 45 (Defendant's Report).*

34. Over the three years preceding the selection in this case, three white females were detailed to a higher position and were eventually made permanent in the positions. They are Annette Burrell, Sabrina Rutland and Charlotte Phillips (*Exh. 9 ¶ 22*) Additionally, a white

7

female, Camille Carraway, was promoted within the same year that she was hired. ***Exh. 7 @ 32: 16 - 33:10 (Carraway's deposition transcript). Exh. 58 (Pla's declaration at the eeo level).*** Even while she was on detail in 2004, the Selecting Official asked what he could do to keep her permanent in the position. ***Exh. 7 @ 10:21 - 11: 1-4***

35. About a year prior to the selection in this case, Ms. Burrell, the white female who was the selected applicant for the Safety Manager position, was on a detail to the position of Management Analyst. She was asked to continue for a year, a detail which, under the IRM should have been made competitive after 120 days. ***Exh. 4 @ 111: 18 - 112: 4; Exh. 54.; Exh. 56. Exh. 37 & Exh. 43***

36. However, Ms. Burrell testified that even after her selection for the Safety Manager position, she continued to perform the same job duties she was performing while on detail. ***Exh. 4 @ 39: 21 - 40:1.***

37. In terms of previous training or experience, Ms. Burrell has only (a). assisted managers to maintain keys and locks, kept accident reports and insured that managers review them; (b) took a 40-hour OSHA class around 1991 and some other 2-3 day classes; (c). became Occupational Safety and Health Manager (same as the instant position) around 1992 and held that position for about three (3) years; (d). moved thereafter to other non-safety related positions for about ten (10) years, i.e. Space Acquisition Specialist - in which she rented office space and Client Service Specialist - in which she worked as a problem solver until August 2002; and (e). at that time detailed to a Management Analyst position, wherein she brought in representatives from business units to develop processes and procedures. She neither recalls when she wrote policies or names of which policies she wrote. She could not give examples of OMB, OPM, or

Executive Order. Nor does she recall if she has she ever dealt with highly hazardous operational and research problems. ***Exh. 4 @ 21:15- 22:21; 27:5-15; 46:9 -47:5; 28:16 -31: 18; 58 - 70.***

38. The Selecting Official does not recall if he detailed or renewed Ms. Burrell's detail to the position prior to the selection on the permanent position in this case.***Exh. 2 @ 80: 1-10)***

39. When Plaintiff found out that he was not selected for the Safety Manager position, he asked the Selecting Official why he did not get the position but was given no answer. At that point Plaintiff said he did not believe that the selection process was fair and that he would file a complaint. ***Exh. 9 ¶ 25.***

40. About two (2) weeks after the selection, the Plaintiff's Division solicited volunteers for the Revision of the Safety Inspection Program ("RSIP) ***Exh. 2 @ 69: 9-17; Exh. 9 ¶ 27)***

41. Plaintiff volunteered for the program and even volunteered to chair it. ***Exh. 9 ¶ 28***

42. Rather than allow him to Chair it, the Selecting Official selected a white female namely Brenda Goulding, to chair it and told Plaintiff that Plaintiff would be the "selected co-chair". Plaintiff agreed. Plaintiff was soon notified that he would only be Goulding's Assistant. ***Exh. 9 ¶ 29***; ***Exh. 8@ 138: 18- 139: 11***

43. Brenda Goulding had no degree; no background in Safety; and in fact, had no exposure to Safety prior to year 2001. ***Exh. 8 @ 42-43;  69: 12-14; 155: 6 - 12; (Brenda Goulding's deposition transcript.) Exh. 9 Exh.  ¶ 30.***

44. Though Plaintiff was supposed to be the co-chair or Assistant, he was not allowed to play any significant role in the program. He was allowed to only play roles similar to that of other regular volunteers. ***Exh 1 @ 174:17 -175: 11***; ***Exh. 9  ¶ 31;  Exh. 8 @ 111: 17 - 112: 5;***

45. Immediately the RSIP took off, the Selecting Official met with the key players for

the program but excluded Plaintiff from that meeting. The second meeting he held with everyone involved (all the volunteers) was the only kick-off meeting Plaintiff was allowed to attend. ***Exh. 1 @ 175: 13- 176: 12; Exh. 9 ¶ 32.***

46. Plaintiff filed his formal EEO Complaint about October 2003. ***Exh. 46. Exh. 9 ¶ 37***

47. The RSIP lasted about four months and ended around December of 2003. ***Exh. . 9 ¶ 35. Exh. 8 @ 78: 1-17***

48. At the end of the RSIP, the Selecting Official once again had another meeting with the key players in the program and again excluded Plaintiff from it. The only last meeting Plaintiff participated in was the one called by Brenda Goulding, in which every volunteer remaining in the program at that time attended via teleconference. **9 ¶ *36.***

49. About December 2003, Plaintiff learned that there would be another vacancy for the Safety Manager position. He inquired about it from the Selecting Official but was ignored. This was just a similar position as was announced previously but on which Annette Burrell was selected. ***. 9 ¶ 37.***

50. About a month later in January 2004, Camille Carraway, a white female, informed Plaintiff that the Selecting Official had detailed her to a GS-14 Safety Manager position and had promised her that the position would become permanent. Plaintiff verified that fact. ***Exh. 9 ¶ 38; Exh. 58 p. 1-2; Exh. 7 @ 7: 14-21; 11: 5-17; .***

51. Immediately thereafter, about February 2004, Plaintiff, filed another EEO claiming discrimination based on race and gender. ***Exh. 57 (Pla's 2nd eeo complaint).***

52. Because he was not assisted by a lawyer when he filed his claims and was not sure what the elements for each cause of action were, Plaintiff amended his claim after he hired a

10

lawyer around January 2005 to include his retaliation claim. *Exh. 9 ¶ 40*; *Def's motion @ 14;*

53. After the selection in this case, Camille Carraway commenced the process of filing a Complaint as she believed that Ms. Burrell was not qualified for the position. She was however discouraged from proceeding with the Complaint and was told she would have the reputation of a trouble maker if she did. To avoid the creation of that reputation, she abandoned the process. *Exh. 7 @ 43: 6- 44:9; 45: 22- 47: 7*

54. Discovery in this case reveals the fact that: (1). The Selecting Officials testimony during deposition contradicts his declaration at the administrative level. In the one he testified that Plaintiff was not selected because his interview did not go "very well" as Plaintiff did not answer some of the questions. **(*Exh. 10 @ 2)*** In the other, he testified that Plaintiff answered all of the questions. ***(Exh. 2 @ 128: 10-16)*** (2). The other two panelists' testimony at deposition contradict their declarations at the administrative level or record evidence. On the one hand Ms. Mitchell testified that she indicated on her interview notes feed back on Plaintiff's communication skills. ***(Exh. 12 @ 3)*** She later testified that she did not ***( Exh. 5 @ 134:20-135: 9)*** but testified that her interview notes would have reflected anything she considered relevant. ***(Exh. 5 @ 62: 2-4)*** Her interview notes do not reflect any problem about Plaintiff's communication skills.***(Exh. 32 ).*** Likewise, Mr. Houston initially testified that he could not comment on any particular applicant's interview performance as could not recall since the interview occurred "eighteen months ago" (in 2003). ***(Exh. 11 @ 2).*** However, thirty-eight (38) months later (2006), with the defense' counsel's prompts, he testified that the two females did better than the two male applicants. ***(Exh. 6 @ 68: 8-18 ).***

55. Mr. Huston also testified that his interview notes would have reflected anything he

11

considered important or any issue of concern. (*Exh. 6 @ 58: 20 - 59: 6*). His interview notes reflect that Plaintiff "thinks through answers" (*Exh. 25*) He testified that what Plaintiff did - thinking through answers - was what he expected all the candidates to do. (*Exh. 6 @ 57: 11-17*). His notes do not reflect any negativity about Plaintiff's performance at the interview. Nor do the other panelists. (*Exhs. 25, 29, & 32*).

56. Discovery in this case also reveals that Tatika Mitchell, one of the panelists thought she was interviewing the candidates for a Management Analyst position. As a result, she deemed it unnecessary to go over the Job Description since she was already familiar with the Job Description for a Management Analyst. (*Exh. 5 @ 52: 19-21; 113: 6 - 114: 18; 115: 4-8; 116: 11 - 17*).

57. The panelists agree that Plaintiff is more qualified than Burrell, the selected candidate save for the interview. (*Exhs. 10 @ 3; Exh. 12 @ 2; Exh.2 @ 122: 16-19*)

58. The Selecting Official testified that the panelists conferred about six times throughout the interview day to discuss the performance of the candidates. Ms. Mitchell, another panelist testified that they conferred only once. (*Exh. 2 @ 123: 1-16*); (*Exh. 5 @ 65: 9-13*)

59. Defendant, in its Responses to Plaintiff's Request for Admission stated that the reason the interview was conducted in this case was "because the interview panelists and the selecting official did not know all of the candidates well,"(*Exh. 36 @ 6*).

60. Mr. Michael Perkins, one of the candidates for the Safety Manager position testified that he had been in management at the IRS for over fifteen (15) years and that it is not customary to ignore applicant's application package when making a selection. *Exh. 14 @ 27:4-6; 32: 1-10*

61. Plaintiff and some other Safety Officers observed Ms. Burrell and the Selecting

12

Official together in summer of 2005. During that period, Plaintiff charged the Selecting Official with first detailing Burrell to a GS-14 position and then making her permanent in it. The Selecting Official did not deny having done so. (***Exh. 9 ¶ 41 - 42).***

62. At all pertinent times, Plaintiff was a in a GS-12 position. He expressed interest in GS-14 position. (***Exh. 7 @ 41: 2-7; Exh. 9 ¶ 50***) (***Exh.55 @ 49: 16-23).***

63. Like Plaintiff, other similarly situated blacks like Bellinda Fellers and Theresa Herbert were overlooked for detail and permanent positions. (***Exh. 58 @ 2) Exh. 9 ¶ 22***

64. All the details and permanent positions mentioned above were GS-14 (***Exh. 7 @ 7: 2-5; Exh. 4 @) 134: 6-8; Exhs. 16 & 22)***

65. The Selecting Official knew of Plaintiff's capabilities having been in the Navy the same time Plaintiff was. He testified that Plaintiff, with his certification and skills, can by default, perform the roles and duties of a Safety Officer. ***Exh. 52 @ 2; Exh. 9 ¶49 Exh. 58.***

66. As a result of defendant's conduct, Plaintiff was stressed, had problems with his weight, sleeping, focusing such that his physician diagnosed him with inter alia, anxiety, depression***. (Exh.9 ¶ 50).***

67. All these consequences of defendant's conduct took its toll on Plaintiff's wife of twenty-five (25) years and their children. ***(Exh. 15)***

**TO THE EXTENT THAT THE "DEFENDANT'S STATEMENTS OF MATERIAL FACT NOT IN GENUINE DISPUTE" ARE INCONSISTENT WITH PLAINTIFF'S STATEMENT OF GENUINE ISSUES LISTED HEREIN, DEFENDANT'S STATEMENT OF MATERIAL FACTS ARE IN SERIOUS DISPUTE.**

Respectfully submitted,

**THE GBENJO LAW GROUP**

/s/
───────────────────────
Anne J.A. Gbenjo, Bar #: 447840,
8449 West Bellfort Avenue Suite 100
Houston, Texas 77071
Phone: 713-771-4775
Fax: 713-771-4784
Counsel for Plaintiff