EXHIBIT 3

1

IN THE U.S. DISTRICT COURT
OF THE DISTRICT OF COLUMBIA

GARY HAMILTON,

    Plaintiff.

v.

                              CASE NO.: 05-1549
                              (RBW)

JOHN SNOW, Secretary
U.S. Department of the
Treasury

    Defendant.

                    Washington, D.C.
                    Friday, August 4, 2006

DEPOSITION OF:

                    PAUL CARROLL

called for examination by counsel for the plaintiff, pursuant to notice of deposition, in the offices of Neal Gross & Co., 1323 Rhode Island Avenue, N.W., when were present on behalf of the respective parties:

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

1   the IRS, did you receive any type of on-the-job
2   training?
3       A   Yes.
4       Q   Tell me about it?
5       A   Well, yes, on-the-job training. I also
6   received several courses in contract administration.
7   There were formal GSA courses, IRS Acquisition
8   Training Institute, I believe it is. I received
9   training for negotiation, administration of
10  architectural engineering contracts, COTR training
11  course, which is a specific course requirement. And
12  a number of others that I can't recall over the
13  years.
14      Q   Did you receive any training in
15  security?
16      A   In security?
17      Q   Yes.
18      A   No formal training in security.
19      Q   Any formal training in safety?
20      A   No formal training in safety.
21      Q   Now when was the first time you met Mr.
22  Stuart Burns?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C. 20005-3701         www.nealrgross.com

Page 29

(1) you asking -- go ahead.
(2) Q No, no, no. No, no. That was part of (3) my instruction at the beginning.
(4) A Yes.
(5) Q If you don't understand the question, (6) ask me to --
(7) A I'm not sure I'm clear on what you're (8) asking.
(9) Q Okay. The position that you ranked the (10) candidates on that we are here for today, what was (11) that position?
(12) A I believe it was a Safety and Health (13) Manager, GS-14.
(14) Q Okay. At the time you were asked to (15) rank for that position, Safety and Health Manager, (16) you were not a management official, were you?
(17) A Yes, I was.
(18) Q Okay. So if anybody said you were not, (19) the person would be lying. Is that your statement?
(20) A They may not know that I was, but yes, I (21) was a management official. My position description (22) is titled "Management Program Analyst." It is a

Page 30

(1) management official's position.
(2) Q Okay. Now at the time that you (3) conducted this ranking in 2003, you testified (4) earlier that you had no formal training in safety or (5) security. Is that correct?
(6) A Yes.
(7) Q So it would be fair to say that as to (8) that safety health manager position, you were not a (9) subject matter expert. Is that a fair statement?
(10) MR. TRUONG: Objection; foundation.
(11) THE WITNESS: I was not a subject matter (12) expert.
(13) BY MS. GBENJO:
(14) Q In that field.
(15) A In that field.
(16) Q Now at the time that you were asked to (17) rank those candidates, how many candidates were you (18) given packages for?
(19) A In that --
(20) Q For that position, for the Safety Health (21) Manager position.
(22) A I believe 10 to 12, approximately.

Page 31

(1) Q Okay. And how long did it take you to (2) rank those 10 to 12 packages?
(3) A I believe it was three days.
(4) Q Did you tell either personnel or Fannie (5) Braswell, or the staff assistant, whomever gave you (6) the package, that you were not a subject matter (7) expert in the field of safety?
(8) A No.
(9) Q Now at the time that you were asked to (10) rank these 10 to 12 packages, I believe you said it (11) took you about two to three days.
(12) A About three days.
(13) Q And you eliminated some of the (14) applicants. Is that correct?
(15) A I don't eliminate any of the applicants.
(16) Q Did all the 12 applicants make the final (17) list?
(18) A Are you asking me if it is the best (19) qualified list, do they all make the best qualified (20) list?
(21) Q That's --
(22) A The answer is typically, no, but I don't

Page 32

(1) establish that cut-off score.
(2) Q Or your's is just to rank them.
(3) A That's right.
(4) Q And then forward them back to whomever (5) does the --
(6) A To personnel.
(7) Q Oh, to personnel.
(8) A They go back to personnel.
(9) Q Okay. Now when you gave this package to (10) personnel, what did you tell personnel?
(11) A I provided them with a list of the (12) ranked -- the names with their scores in the order (13) from highest score to lowest. I had no verbal (14) communication with personnel.
(15) Q Okay. Did personnel or what is it (16) called, Fannie Braswell, or the Staff Assistant --
(17) A Can I clarify?
(18) Q Okay. Go ahead.
(19) A Fannie Braswell is the Staff Assistant.
(20) Q Oh, sorry.
(21) A That's all right.
(22) Q Sorry. Okay. And you said --

Page 37

(1) on asbestos abatement on major buildings. As a (2) carpenter and construction superintendent, I worked (3) with OSHA, Industrial Hygienist on shoring and those (4) types of issues, so I have worked with Industrial (5) Hygienists all throughout my career.
(6) Q Okay. That was the extent of your (7) informal training.
(8) **A Right.**
(9) Q I can't hear you.
(10) **A Yes.**
(11) Q Okay. Do you know when OSHA was created (12) by an act of Congress?
(13) **A No.**
(14) MR. TRUONG: Objection; relevance.
(15) MS. GBENJO: I can't hear you.
(16) THE WITNESS: No.
(17) BY MS. GBENJO:
(18) Q Okay. Now with respect to the ranking (19) procedure when personnel gives a package to REFM and (20) REFM gives it the ranking official, and the ranking (21) official ranks it, then what happens after the (22) ranking official concludes his ranking?

Page 38

(1) MR. TRUONG: Objection; asked and (2) answered.
(3) THE WITNESS: I put the package back (4) together, provide a list of the ranked applicants, (5) and provide it back to personnel.
(6) BY MS. GBENJO:
(7) Q And that's it at that point.
(8) **A That's it.**
(9) Q And have there been instances where (10) personnel returned the packages to you?
(11) **A No.**
(12) Q Whatever you give personnel, personnel (13) accepts.
(14) **A Yes.**
(15) Q Did you have any communication with (16) Stuart Burns with respect to ranking this individual (17) in this case that we are here for today?
(18) **A No.**
(19) Q Did you have any communications with any (20) of the members, the panel members that conducted the (21) interview in this case that we're here for today?
(22) **A Discussing ranking the package?**

Page 39

(1) Q Yes.
(2) **A No.**
(3) Q Discussing anything in the selection (4) process?
(5) **A No.**
(6) Q Discussing how the candidates were (7) ranked?
(8) **A No.**
(9) Q Now in ranking the candidates, what (10) percentage of the total points did you allocate for (11) the technical course, for example?
(12) **A I don't understand the question.**
(13) Q Okay. You testified earlier that (14) personnel gives you KSAs, and they give you the (15) criteria. And the maximum number of points a (16) particular candidate can score on a particular KSA (17) is five.
(18) **A Correct.**
(19) Q Of that five, in other words, you cannot (20) go higher than five. Is that it?
(21) **A Yes, it is.**
(22) Q Okay. And I believe you cannot go lower

Page 40

(1) than zero.
(2) **A Correct.**
(3) Q Now what percentage of that five that (4) you give to each individual, what percentage of that (5) five did you allocate or give based on their (6) technical course or skills?
(7) **A As articulated in the application?**
(8) Q Yes.
(9) **A One hundred percent.**
(10) Q Okay. Now what percentage of that five (11) did you give each candidate based on their (12) leadership scores?
(13) **A If the KSA was addressing leadership, (14) their technical abilities and what they articulated (15) in their application is 100 percent attributable (16) towards that KSA.**
(17) Q I'm not clear on that response. Can you (18) give it to me again?
(19) **A If an applicant – if the KSA is (20) addressing their leadership skills or leadership (21) experience, then how they articulate that in their (22) application determines what score I will give them.**

Page 41

(1) It is 100 percent against that five. What the (2) applicant types in their response to the KSAs or in (3) their application, or in their manager's performance (4) appraisal, if I have to go that far looking for it, (5) determines what score I give it. It's 100 percent.
(6) Q Okay. Now if the KSA is addressing both (7) the technical and leadership scores, how would you (8) apportion that?
(9) MR. TRUONG: Objection; clarification. (10) Both qualifications on the same question?
(11) MS. GBENJO: Yes. Let the witness state (12) if he's unclear.
(13) BY MS. GBENJO:
(14) Q If the particular KSA deals with both (15) technical and leadership scores, how would you (16) apportion the percentage?
(17) A I wouldn't divide it by percentage. I (18) don't set a percentage.
(19) Q Okay. If you are required to score an (20) applicant based on your familiarity with the ranking (21) procedures at IRS, if you are required to gauge a (22) particular applicant's leadership and technical

Page 42

(1) scores, how would you apportion that?
(2) MR. TRUONG: Objection; speculation.
(3) THE WITNESS: I have not had that (4) situation before, so I can't say how I would do it.
(5) MS. GBENJO: Okay.
(6) THE WITNESS: I would do it however (7) personnel told me to.
(8) BY MS. GBENJO:
(9) Q Now under IRS procedures, what (10) percentage are you required to give leadership (11) scores?
(12) MR. TRUONG: Objection; foundation.
(13) THE WITNESS: I'm not aware of any (14) percentage that IRS has addressed to that.
(15) BY MS. GBENJO:
(16) Q And under IRS procedures, what (17) percentage are you required to give technical (18) scores?
(19) A I'm not aware of any percentage (20) established.
(21) Q How often do you conduct rankings?
(22) MR. TRUONG: Objection; asked and

Page 43

(1) answered.
(2) THE WITNESS: Ad hoc, as requested.
(3) BY MS. GBENJO:
(4) Q Now you have testified that you would (5) give a particular candidate 100 percent based on (6) what they type if it addresses the particular KSA.
(7) A Yes.
(8) Q Is that correct?
(9) A Yes.
(10) Q Okay. Now if – is it your testimony, (11) therefore, that so long as a particular applicant (12) addresses the particular KSA, they can get a score (13) of 100 percent? In other words, the five?
(14) A If the candidate has addressed all or (15) substantially all of the issues listed in that (16) criteria that says this is what it takes to get a (17) five, then I will give them that five.
(18) Q Okay. What is the cut-off? In other (19) words, forget about what personnel gave to you in (20) this case, what do you consider sufficient (21) information in when you give them the score?
(22) A It's subjective.

Page 44

(1) Q Okay. So everything – the scores that (2) you give them on those KSAs is subjective.
(3) A Yes.
(4) Q Okay. Now in terms of the highly (5) qualified or best qualified cut-off, you said that's (6) done by personnel. It has nothing to do with you. (7) Right?
(8) A That's correct.
(9) Q Okay. So when you receive all of the (10) packages, you return the entire package to personnel (11) as they gave it to you, after ranking all of that.
(12) A That's correct.
(13) Q Okay. And then the personnel or (14) whomever is in charge, takes care of the rest of the (15) matters from that point on.
(16) A That's correct.
(17) Q You play no further role beyond ranking.
(18) A I do not.
(19) Q Okay. Were you given any guidance in (20) terms of how to score those people?
(21) A Generally, or for this specific case?
(22) Q For this specific case we're here for

Page 61

(1) Q Okay. Based on what you said earlier, (2) they did not get credit for their educational (3) background. Is that correct?
(4) A Yes.
(5) Q Okay. Is there any reason that they did (6) not get credit for their educational background?
(7) A To my knowledge, there was no (8) educational requirement for this job.
(9) Q Isn't it also true that there was no (10) number of years of experience requirement?
(11) A Not written out.
(12) Q Okay. Same thing as education. Right? (13) Education was not written out, nor was years of (14) experience. Isn't that true?
(15) A That's correct.
(16) Q Why did you give weight to their (17) experience and not to the education?
(18) A Because the experiences that they wrote (19) are appraised against, or applied against the (20) ranking criteria.
(21) Q What does that mean?
(22) A How they presented their experience in

Page 62

(1) their application package is what I am evaluating (2) against the KSA. There was no minimal education (3) requirement; so, therefore, I did not review their (4) education requirement, or apply it.
(5) Q Is it fair, therefore, to say that you (6) gave absolutely no weight to their educational (7) background?
(8) MR. TRUONG: Objection; asked and (9) answered.
(10) THE WITNESS: No, I did not give any (11) weight to their education.
(12) BY MS. GBENJO:
(13) Q Now in your ranking sheet - in your (14) declaration that you said you reviewed in (15) preparation for this deposition, you indicated that (16) –
(17) MR. TRUONG: Objection. I'm not sure (18) the witness ever said that he reviewed his (19) declaration. He said documents.
(20) MS. GBENJO: I'm sorry.
(21) BY MS. GBENJO:
(22) Q Then tell me what documents you reviewed

Page 63

(1) in preparation for this deposition.
(2) A As I said, I reviewed the -- my ranking (3) sheets of the four best qualified applicants. I (4) reviewed my Excel sheet, spreadsheet, Microsoft (5) Excel spreadsheet, the list of the ranked candidates (6) that I provided to personnel, and I reviewed my (7) affidavit that I gave to, I believe, it was EEO (8) called me in December of 2004.
(9) Q Okay. In that affidavit that you just (10) referred to, you said that you considered Annette (11) Burrell's assignment in giving her – in scoring (12) her. In other words, when you gave them the scores, (13) you considered Annette Burrell's assignments. All (14) right. Now given that –
(15) MR. TRUONG: Wait. Is that a testimony, (16) or is that a –
(17) MS. GBENJO: No, no, no, no. Let me (18) finish. Please don't interrupt me.
(19) BY MS. GBENJO:
(20) Q In your affidavit that you just referred (21) to, you stated there that Annette Burrell's (22) assignments, you considered Annette Burrell's

Page 64

(1) assignments in conducting the ranking. In other (2) words, you factored that into consideration.
(3) A Her detail?
(4) Q Yes.
(5) A Okay.
(6) Q Did you or did you not?
(7) MR. TRUONG: Objection. To understand (8) it, Mr. Carroll's affidavit, the affidavit speaks (9) for itself. You have it as an exhibit. Let's show (10) the exhibit and –
(11) MS. GBENJO: The witness has not a (12) sudden loss of memory or failure to recollect, so (13) you're misapplying the rule.
(14) BY MS. GBENJO:
(15) Q Okay. Now when you said the assignment, (16) you were referring to the detail. Am I correct?
(17) A I don't recall whether I said detail or (18) assignment in the affidavit.
(19) Q Okay. Whichever you say, what were you (20) referring to?
(21) A Her experience when she was detailed.
(22) Q Okay. Now absent – without that

1    Q    Okay. What race is Camille Carraway?

2    A    I don't know.

3    Q    What is Annette Burrell's race?

4    A    She appears to be white.

5    Q    How about Gary Hamilton?

6    A    He is African-American, black.

7    Q    And Michael Perkins?

8    A    I don't know.

9    Q    Now when was the first time ever that
10   you ranked candidates?

11   A    I don't recall.

12   Q    Has it been more than five years?

13   A    Yes. It was at NIH.

14   Q    Oh, prior to IRS.

15   A    Yes.

16   Q    Okay. When was the first time that you
17   ranked candidates at IRS?

18   A    I don't recall.

19   Q    Did you receive any training on ranking
20   the candidates?

21   A    No.

22   Q    Now the first time that you ranked

### Page 93

(1) Q Is that your signature?
(2) **A Yes, it is.**
(3) Q And next to the signature box is a date. (4) What date is that?
(5) **A That is June 25th, '03.**
(6) Q What does that mean?
(7) MS. GBENJO: Objection, same objection. (8) The date is clear on its face, the document speaks (9) for itself. It is improper.
(10) THE WITNESS: That's the date that I (11) completed the evaluation of Annette Burrell's (12) package.
(13) BY MR. TRUONG:
(14) Q Now let's look at 2D. Whose application (15) is that?
(16) **A That's Gary Hamilton's.**
(17) Q Is that your signature?
(18) **A Yes, it is.**
(19) Q And what's the date on that application, (20) and what does it mean?
(21) **A 6/27/03. It's the date that I completed (22) the evaluation of Gary Hamilton's package.**

### Page 94

(1) MR. TRUONG: I have no more questions.
(2) MS. GBENJO: Okay.
(3) REDIRECT EXAMINATION
(4) BY MS. GBENJO:
(5) Q It appears that with respect to Camille (6) Carraway and Annette Burrell, you ranked these (7) candidates on the same date. Is that a fact?
(8) **A Yes, it is.**
(9) Q And with respect to Michael Perkins and (10) Gary Hamilton, you ranked one before, and the other (11) after the two female candidates. Is that a fact?
(12) **A That's correct.**
(13) Q Were you given all the application (14) packages at the same time, Mr. Carroll?
(15) **A Yes, I was.**
(16) Q You stated that you evaluate the KSAs (17) based on the interpretation you give the data (18) submitted by the applicants. Is that a fact?
(19) **A Yes, it is.**
(20) Q You also said that you do not compare (21) these individuals against one another, but against (22) the KSA given to you by personnel. Is that a fact?

### Page 95

(1) **A That's a fact.**
(2) Q Is it also a fact that personnel did not (3) tell you to select which one of these candidates is (4) the best candidate for the position?
(5) **A That's correct.**
(6) MS. GBENJO: I have no further (7) questions.
(8) MR. TRUONG: The witness will reserve (9) its right to read and review. We are closing this (10) deposition.
(11) (Whereupon, the proceedings went off the (12) record at 1:34 p.m.)
(13) (Signature not waived.)