**08/25/06: Hamilton v Treasury: Depo: Joy Carraway**

**PAGE 1 TO PAGE 48**

**NEAL R. GROSS & CO., INC.**

**(202) 234-4433**

**CONDENSED TRANSCRIPT AND CONCORDANCE**
**PREPARED BY:**

*NEAL R. GROSS & CO., INC.*
*1323 RHODE ISLAND AVE., N.W.*
*WASHINGTON, DC 20005*
*Phone: (202) 234-4433*

Page 5

Gbenjo. I represent Mr. Hamilton in this case. Ill be asking you a series of questions related to Mr. Hamiltons case, and you have been sworn to tell the truth, the whole truth and absolutely nothing but the truth. And I would appreciate that you do just that.

I would allow you to finish your responses to your questions before I ask follow-up questions, and I also ask that you do me the same, or give me the same courtesy and let me finish the questions before you provide answers.

If I ask any question thats typical of two interpretations, please stop me and tell me to clarify. Whatever questions you answer today, you will be deemed to have fully understood them. At a trial at a future date, whatever testimony you give today will have a full force and effect. The only difference between this proceeding and the courtroom is that a judge is not present, but the testimony is the same.

Have you been deposed before?
**A No.**
Q Have you ever been a witness to any

Page 6

lawsuits?
**A No.**
Q Even been a party to any lawsuit?
**A No.**
Q Who is your employer, Ms. Carraway?
**A The Department of Commerce.**
Q Department of Commerce?
**A Commerce, yes.**
Q How long have you been employed there?
**A Since March of 2004.**
Q Where were you employed before?
**A Internal Revenue Service.**
Q Have you completely left the Internal Revenue Service, or are you still there on a part-time basis?
**A Im completely separated from the Internal Revenue Service.**
Q Since March of 2004?
**A Yes.**
Q And what was your position at the time you left?
**A I was an occupational safety and health**

Page 7

**manager.**
Q And what grade level was that?
**A It was a bit confusing because when I actually left, I was in a detailed 14. My official permanent rate was 13.**
Q But you say you were on a detail when you left?
**A Yes.**
Q Who selected you for that detail?
**A I was told I had the detail by Stuart Burns.**
Q Did you have to apply for that detail?
**A No, I did not.**
Q Do you recall the circumstances under which he told you that you will be placed on a detail?
**A I received a phone call. I was told that I was not selected for the 14 position, but because I needed extra help, they would be offering me a detail for a 14 position.**
Q Who called you?
**A That was Stuart.**
Q Do you recall when he called you.

Page 8

**A No, I dont.**
Q But it was after you were not selected for the -
**A It was after the - the non-selection, yes. But I could not give you a date.**
MR. TRUONG: Ms. Carraway, make sure Ms. Gbenjo finishes a question so that we can have a clear record.
Q That was part of my preliminary instructions, but thats okay. And how long were you on the detail for?
**A I cant tell you the exact days. It was - I cant tell you the exact. It was shorter than the detail was arranged for. I got other employment.**
Q Do you recall the detail being over 120 days?
**A I cant remember what it officially was.**
Q Do you recall - you did not complete the detail as I understand it?
**A No, I did not.**
Q Okay. Youd gone about halfway, or shorter than halfway before you left?

Page 9

MR. TRUONG: Objection, asked and answered.
**A I really dont remember.**
Q Have you completed a task for that detail prior to the time you left?
**A The tasks of that detail were not clearly defined. I did not have deliverables. I completed several items, but since there were no detail deliverables, I dont know how to really answer that question.**
Q What are detail deliverables?
**A Well, usually when you have the detail or a project, you may be given several things to complete. I was assigned to a lot of – well, a lot of small, very general things, doing intermittent products that I – they were pieces of a much bigger puzzle. So I dont know what percentage of done or not done they were.**
Q So at the time that you left, would you say you have completed the detail tangentially or substantially?
**A What was the first word?**

Page 10

Q Okay. Would you say you have completed a small portion of the detail, or mid-way through the work in terms of your –
**A Well, because I dont know what the – what the end point was, I can only guess to what point I was at. So it would only be a guess that I could give you.**
Q Okay. What would it be?
**A As a guess?**
Q Yes.
**A Maybe a half, but thats only a guess.**
Q Maybe a half?
**A But thats a guess because I dont know what the percent, total percent, was.**
Q Okay, and the remaining half that was not done; did they tell you how the work was going to be completed?
**A No.**
Q You did attempt to press the way through, to complete the work?
**A I was asked if there was anything they could do to keep me in the position, then I resigned.**

Page 11

**But that was it.**
Q Keep you in that position you were detailed to?
**A Thats correct.**
Q Were you left with the impression that the position will become permanent?
**A If you use the work impression and not fact, I had that impression that it could become. But I did not know that it would become permanent.**
Q Okay. Who gave you that impression that it could become permanent?
**A Basically, Stuart.**
Q At what point did he give you that impression that that detail position could become permanent?
**A Im not sure I can give you an exact time, but it was an impression that grew as I performed work.**
Q Okay. At that time that – was that before the time that you turned in your resignation letter? Or you just told them you were going to leave?

Page 12

**A I resigned and I - I honestly cant remember how I resigned.**
Q But was it clear to Stuart Burns that you were going to leave at a time that you had completed about one-half of the task?
**A It was clear to Stuart that I was leaving.**
Q Was it also clear to Stuart that you were leaving when he gave you the impression that the position could become permanent?
**A Im sorry, I dont really understand your question.**
Q Do you believe that it was clear to Stuart that you were leaving at the time he gave you the impression that a position, the detailed position –
**A No.**
Q – could become permanent?
**A No.**
Q So he gave you that impression as the work – as the other work progressed?
**A Thats correct.**
Q Now, who was your immediate supervisor at the time that you left the Internal Revenue Service?

Page 17

a month?
**A They called as they had tasks and as per a rotated schedule.**
Q And approximately how many times would that be in a month?
**A What happened is that they had tasks. They could call you and use you full time.QOkay.**
**A If you were deployed to a disaster, you would be working full time until you were sent home.**
Q So if there was no disaster, you may never get called?
**A Basically thats correct.**
Q I cant hear you.
**A That was correct.**
Q And prior to working this federal emergency agency, where did you work?
**A From July 1987 until the transition into FEMA, I owned my own business, which was STI Incorporated.**
Q Okay, you said – youre saying from July 87 through 96?
**A Right.**

Page 18

Q You had your own business?
**A Thats correct.**
Q And what was the business called?
**A STI Incorporated.**
Q STI Incorporated. Was that in Maryland, DC, or Virginia?
**A Maryland.**
Q What was the nature of the business?
**A Industrial hygiene consultation.**
Q And you did that for approximately nine years or so? What is your level of education?
**A I have a bachelors degree and –**
Q Im sorry, whats the bachelors degree in?
**A Biological sciences.**
Q Biological sciences? And do you have any degree other than the bachelors?
**A No actual degree.**
Q Do you have a masters degree?
**A No, I do not.**
Q No actual degree, but you took other classes and process?

Page 19

**A Yes, I went through an entire PhD program, except for the dissertation.**
Q So the only degree that you have is a bachelors degree in biological science?
**A Thats correct.**
Q What is biological science?
**A The study of biology.**
Q And what is biology?
**A Well, I guess if you want to get Greek, its the study of life.**
Q All right. When did you graduate? When did you obtain that first degree in biological science?
**A 1977.**
Q Where?
**A Goucher College.**
Q What college?
**A Goucher College.**
Q How do you spell that?
**A G-O-U-C-H-E-R.**
Q Where is that?
**A Baltimore, Maryland.**

Page 20

Q And you got that in 77?
**A Thats correct.**
Q Did you take or pursue the other classes at Goucher College or elsewhere?
**A I pursued the PhD at the University of Maryland.**
Q Okay. You never obtained that degree?
**A No, I did not.**
Q Okay. Now, lets go back to the interview. The safety and health manager position that you applied for in 2003; you applied for that position, right?
**A Thats correct.**
Q Why did you apply for that position?
**A Well, money.**
Q Okay. Other than the money?
**A We did hear rumors that the position was set up for someone else, but I continued to apply.**
Q Who did you believe it was set up for.
**A I believe it was set up for Annette.**
Q Annette Burrell? Do you – what was your understanding as to who set it up for her?

Page 29

Stuart, I hope I pronounce her name right; Tatika Mitchell.
Q Yes.
**A And Mr. Huston. I believe his first name is Mike.**
Q And I know you already said that you knew Mr. Burns prior to the interview, but did you know the other two panel numbers prior to the interview date?
**A I had – I knew Tatika in a situation very similar to how I worked with Annette, in that Tatika participated in quite a few of the working groups as the management representative.**
Q Now –
**A And Mike, I had met in like continuing education classes. But I would be hesitant to say I knew him or knew him well. I knew his name and I knew who he was but that was it.**
Q Okay. Did you know the ranking official for that position prior to the interview?
**A At this point, I dont know who the ranking official was.**
Q Paul Carroll?

Page 30

**A No.**
Q What?
**A No.**
Q You didnt know Paul Carroll prior to the interview?
**A No. I still dont know who Paul Carroll is.**
Q I think he –
**A I still dont know who that person is.**
Q Did you know Mr. Carroll prior to that interview?
**A No, I dont –**
Q I cant hear you.
**A No, I may have met him but I dont remember knowing that person.**
Q Okay. Now, how long did your interview last with the panel?
**A I dont remember.**
Q What time was the interview? Do you recall?
**A No.**
Q Do you recall the questions you were asked

Page 31

at the interview?
**A The only question I remember was they asked some questions about how would you start marketing the program or promoting the program, or flowing the program. And thats the only question I really remember.**
Q How do you – what makes you remember the question?
**A Because I was interviewing for another job and they asked me the same questions.**
Q Okay. And how many times were you called for an interview?
**A Just once.**
Q And did there come a point that you were notified that you were not selected?
**A Thats correct.**
Q Was that the same time that you were placed on the detail for the safety health manager position?
**A Thats correct.**
Q I cant hear you.
**A That is correct.**

Page 32

Q At the time that you announced that you were leaving, at the time that you knew that it was clear to Stuart Burns that you were leaving the IRS, did he tell you that they needed somebody to complete the work that you did not finish?
**A No, he did not say that.**
Q Did he tell you how the work would be completed?
**A No.**
Q Now, you said that you worked at the IRS from 2002 to 2004.
**A From 2000 to 2004.**
Q Right. And did you hold the same position throughout the time you were there?
**A No, I did not.**
Q What was the starting position?
**A Starting position was a GS-690, industrial hygiene position.**
Q GS what?
**A GS-690, series 690.**
Q What would that be equivalent to? Would that be a 12, 13, 14?

Page 33

**A Oh, no, thats a – thats what it is, an industrial hygienist.**
Q Okay. So –
**A And it was a 12 position.**
Q Oh, it was a 12. When were you promoted to a 13?
**A The exact date, I dont remember.**
Q Yes.
**A It was the next year, or the same year. It was in 2000.**
Q It was in 2000; you were promoted to a 13 in 2000? And in 2003 was when you applied for this position and did not get?
**A Thats correct.**
Q And it was the same position that when you didnt get it, they gave you a detail?
**A Thats correct.**
MR. TRUONG: Objection. Theyre not the same as two positions.
MS. GBENJO: What was – what did you say? Did you say thats correct? Okay, never mind. What was the witness last answer on the record? We were

Page 34

speaking over one another. I just want to be sure of the witnesses last answer.
COURT REPORTER: Thats correct.
MS. GBENJO: Okay.
DIRECT EXAMINATION (Resumed)
BY: MS. GBENJO
Q Now, prior to the time you left, was there a GS, that same safety specialist position, that was announced and subsequently withdrawn.
**A Not that I am aware of.**
Q Okay. And are you familiar with Alice Mays?
**A Yes.**
Q And what did he tell you with respect to - - to advances or relationship with Tammy Burns prior to them getting married?
MR. TRUONG: Objection, foundation, irrelevance.
**A That they had had a relationship in the workplace.**
Q And did Alice Mays also tell you about the other females that Stuart Burns had a relationship

Page 35

with?
**A No.**
Q Just with Tammy?
**A Just Tammy.**
Q At the time that Stuart Burns was married to his ex-wife?
MR. TRUONG: Objection, speculation, foundation.
**A Just Tammy.**
Q Just Tammy?
**A Thats correct.**
Q Okay. Now, you testified earlier that you did not recall when Stuart Burns joined the IRS; is that right?
**A I do not remember the date.**
Q Okay. Do you remember the month?
**A No.**
Q Okay. Now, do your recall that it was an issue with the Department of Treasury?
**A Yes.**
Q Do you also recall that for about two- three months, he was working on and off of the IRS

Page 36

prior to coming there permanently?
**A I recall transition.**
Q Okay. And you recall that transition being early in the year 2003.
**A I dont recall when it was. I just recall the transition.**
Q Now, who came first to the IRS? I mean who came first at the time we are talking about; was it Stuart Burns or McFadden?
**A At this point, I honestly do not remember.**
Q Now, did there come a point within the past, lets just say six months to a year, that you learned that Annette Burrell was banned from coming to the Arlington, Virginia office?
MR. TRUONG: Objection, foundation.
**A I heard rumors of it. I dont have confirmation on it.**
Q And the rumor that you had was what?
MR. TRUONG: Objection, foundation.
**A That she would not longer be coming to the Crystal City office.**
Q Because?

Page 41

A Could you restate that, please?

Q Do you recall Mr. Hamilton telling you that he told Mr. Reagan that he, Mr. Hamilton, was interested in getting the industrial hygiene, GS level 14 position?

**A Yes, I – I recall him saying that he spoke to Mr. Reagan about getting a GS-14 position.**

Q Do you recall when he made that statement?

**A No.**

MS. GBENJO: Lets just take a five-minute break. I think Im done, but I just want to go through my stuff.

(Whereupon, the above-entitled matter went off the record at 3:23 p.m. and resumed at 3:30 p.m.)

DIRECT EXAMINATION BY: MS. GBENJO

Q Yes, Ms. Carraway, were back on the record from break, and I just had a few more questions. Do you talk to Jesse Walters?

**A On an average, less than once a month.**

Q Have you experienced an interest in going back to the IRS?

Page 42

**A I listened to him tell me about jobs they had, and said – I did not express an interest. I was content where I was at the time.**

Q At the time being when?

**A I dont remember the time, but when we had the conversation, Jesse mentioned there were jobs, and I was like, No, thank you. Im happy where I am.**

Q Okay. What is Jesses present position with the IRS now?

**A Hes an industrial hygienist.**

Q What GS level?

**A Fourteen.**

Q Oh, okay. Was he already there before you got there in 2000?

**A Yes.**

Q At the time you left, you were a 14 on that detail, right?

**A On the detail.**

Q And they were paying you for that – the GS-14 salary?

**A Thats correct.**

Q Okay. Did you believe that you were

Page 43

qualified for that position you didnt get in the safety and health manger 14 position that you didnt get, and they gave you the detail in its stead? Do you believe you were qualified for that position?

**A Yes.**

Q And did you speak – did you attempt to grieve the fact that you did not get that position?

**A Not officially.**

Q Informally, did you attend?

**A I researched it formally.**

Q Did you speak with IGs office?

**A Yes, I did.**

Q And you spoke with the IGs office because you didnt get a position, right?

**A Thats correct.**

Q And the reason that you spoke with the IG office was that you believed that you were more qualified for the position; is that true?

**A Thats true.**

Q And as I understand it, you were discouraged from pursuing this time, because there was also a white female that got the position; is that a

Page 44

true statement?

MR. TRUONG: Objection, foundation.

**A Yes.**

Q I didnt hear you.

**A Yes.**

Q Okay. So because you were discouraged from pursuing it, you gave the matter us. Is that correct?

**A Thats correct.**

Q Do you have any kind of relationship with Annette Burrell?

**A No.**

Q And you do not have any kind of relationship with Stuart Burns, do you?

**A No.**

Q You are not having a sexual relationship with Stuart Burns, are you?

**A No.**

MR. TRUONG: Objection.

Q I didnt hear you.

**A No.**

MR. TRUONG: Im marking this section

Page 45

confidential.
MS. GBENJO: You can do what you want, John. Just do your job. Why did you believe you were more qualified that Annette Burrell?
THE WITNESS: Education, experience.
DIRECT EXAMINATION (Resumed)
BY: MS. GBENJO
Q Tell me the difference between your education and Annette Burrells education.
**A I have a bachelors degree, graduate school. I have successful completion of the CIH exam.**
Q And as far as you know, Annette Burrell does not have those qualifications?
**A Correct.**
Q Dont you also have the executive leadership training?
**A No, I do not.**
Q And thats all that I have. Im done. So this was very brief.
CROSS EXAMINATION BY: MR. TRUONG
Q I just have one question for you, Ms.

Page 46

Carraway. You mentioned that the IGs office discouraged you from pursuing the case. How did they – what did they do to discourage you, if any?
**A Their words to me were since it was two white females, both the same age, I would not have a good chance of successful pursuit, and that my reputation would probably be damaged.**
MS. GBENJO: I didnt hear.
THE WITNESS: My reputation would be damaged.
MS. GBENJO: If you pursued the suit?
THE WITNESS: Thats right.
MR. TRUONG: No more questions.
MS. GBENJO: And it was because you were trying to maintain your reputation, and a possibility that you may not succeed in this lawsuit, given those – the representation that you gave it up. In other words, you gave up pursing the matter because of the reasons you were given by the IGs office; is that correct?
MR. TRUONG: Objection, foundation, leading.

Page 47

THE WITNESS: I gave it up because I could have had the reputation as a troublemaker for pursuing the suit.
RE-DIRECT BY: MS. GBENJO
Q And you didnt want that reputation?
**A Thats correct.**
Q You believe that if you didnt give it up, some other things may come, which you may not like. Is that correct?
MR. TRUONG: Objection, foundation, leading.
**A Nothing official.**
Q I cant hear you.
**A Nothing official.**
Q Nothing official meaning?
**A I did not fear recrimination.**
Q Okay. But you wanted to maintain that reputation of not being a troublemaker; is that correct?
MR. TRUONG: Objection, foundation, leading.

Page 48

**A Thats correct.**
Q Did you say, Thats correct?
**A Thats correct.**
MS. GBENJO: Very good. Thats it. Thanks you.
MR. TRUONG: I think Ms. Carraway has probably reserved the right to read and review.
MS. GBENJO: All right. Ms. Carraway, thank you so much. I appreciate it.
(Whereupon, the above-entitled matter went off the record at 3:37 p.m., and the signature was not waived.)