## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                    )
GARY HAMILTON,                      )
                                    )
             Plaintiff              )
                                    )
      v.                            )      Civil Action No. 05-1549(RBW)
                                    )
HENRY M. PAULSON, JR.,              )
Secretary for Department of Treasury, )
                                    )
             Defendant.             )
                                    )
_____ )
```

## MEMORANDUM OPINION

Gary Hamilton, the plaintiff in this civil lawsuit, seeks compensatory damages and injunctive and declaratory relief against Henry M. Paulson, Jr., in his official capacity as the Secretary for the Department of Treasury,[1] for alleged unlawful discrimination against the plaintiff by the plaintiff's former employer, the Internal Revenue Service (the "IRS"), on the basis of race and sex pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (2000).  Civil Complaint (the "Compl.") ¶¶ 1, (i)-(iii).  Currently before the Court is the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  After carefully considering the parties' pleadings, the defendant's motion, and all memoranda of law and exhibits with these filings,[2] the Court concludes that it must not only grant the

---

[1]  The plaintiff's complaint, filed August 1, 2005, names John Snow, at that time the Secretary for the Department of Treasury, as the defendant in this case.  The Court has substituted Secretary Paulson as the defendant in lieu of former Secretary Snow pursuant to Federal Rule of Civil Procedure 25(d)(1).

[2]  In addition to the plaintiff's complaint, the defendant's answer, and the defendant's motion for summary judgment, the Court considered the following documents in reaching its decision: (1) the defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment (the "Def.'s Mem."), (2) the

(continued...)

defendant's motion in part and deny it in part, but also grant the plaintiff limited leave to file an amended complaint for the reasons that follow.[3]

## I. Background

The following facts are either admitted or not in dispute.[4]  The plaintiff, "an African-American male, graduated from the University of North Alabama with a [b]achelor['] s degree in Industrial Hygiene in [1982], and shortly thereafter obtained a [m]aster['] s degree in Public Health from George Washington University."  Pl.'s Facts ¶ 1.  The "[p]laintiff worked with the Department of Defense . . . as an [i]ndustrial [h]ygienist until about 2001, when he joined the [IRS] in the same position."  Id. ¶ 3.  Since joining the IRS, he has "worked within the Real Estate and Facilities Management" department.  Id.

"On May 5, 2003," Compl. ¶ 13, "the IRS announced a vacancy for the position of . . . Safety and Occupational Health Manager ('Safety Manager')," Pl.'s Facts ¶ 7.  "Four candidates m[ade] the 'best qualified' list[:] two females, a white male and [the p]laintiff."  Compl. ¶ 15.  Three of those four candidates, including the plaintiff, received a "ranking score"

---

[2](...continued)
Defendant's Statement of Material [Facts] Not in Genuine Dispute, (3) the Plaintiff's Opposition to Defendant's Motion for Summary Judgment, (4) the plaintiff's Memorandum in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment (the "Pl.'s Opp'n"), (5) the plaintiff's Supplemental Memorandum in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment (the "Pl.'s Suppl. Opp'n"), (6) the Plaintiff's Statements of Genuine Issue of Material Facts Necessary to Be Litigated (the "Pl.'s Facts"), (7) the Defendant's Reply in Support of Motion for Summary Judgment (the "Def.'s Reply"), and (8) the Defendant's Responses to Plaintiff's Statement of Genuine Issue of Material Facts to Be Litigated.

[3]  The plaintiff has also filed a motion to strike portions of the defendant's reply memorandum in support of his motion for summary judgment.  Because the Court does not need to consider the specific arguments made by the defendant in his reply brief that the plaintiff seeks to strike to conclude that summary judgment should be granted in favor of the defendant, the Court will deny the motion to strike as moot.

[4]  Unless otherwise noted, all allegations from the complaint cited herein are admitted in the defendant's answer, and all statements extracted from the plaintiff's statement of material facts cited herein are undisputed.

2

of 25 based on their responses to questions posed on a worksheet used to determine the applicants' knowledge, skills, and abilities (the "KSAs"); "[t]he fourth person, a white male, received a ranking score of 19."  Pl.'s Facts ¶ 11.

The top four candidates "were interviewed by a panel of three . . . members . . . : Stuart Burns ([a] Caucasian male)[,] Mike Huston ([also a] Caucasian male)[,] and Tatika Mitchell (who [represents] that she is [of] . . . Hispanic, African-American[,] and French [descent])."  Id. ¶ 14.  In addition to serving on the interview panel, Burns was the "selecting official" for the position.  Compl. ¶ 15.  "The panel members all took notes [during] the interview[s]," but "they did not rate [the applicants] or give the applicants any scores."  Pl.'s Facts ¶ 15.  Ultimately, Burns "selected Annette Burrell . . . , a white female who has . . . no college degree, no formal . . . training . . . in [s]afety[,] and no formal training in [s]ecurity," for the position of Safety Manager.  Id. ¶ 20.

In October of 2003, the plaintiff filed a formal complaint with the Office of Equal Employment Opportunity ("EEO") regarding the selection of Burrell for the Safety Manager position.  Id. ¶ 46.  A few months later, in January of 2004, "Camille Carraway, a white female, informed [the p]laintiff that [Burns] had detailed her to a GS-14 Safety Manager position and had promised her that the position would become permanent."  Id. ¶ 50.  "Immediately thereafter," in February of 2004, the plaintiff "filed another EEO [complaint] claiming discrimination based on race and gender."  Id. ¶ 51.

The plaintiff filed his complaint in this Court on August 1, 2005.  In his complaint, the plaintiff alleges that "his gender and race were motivating factors in [Burns's] decision not to promote him to the Safety [Manager] position."  Compl. ¶ 23.  Further, he alleges that the IRS

retaliated against him for filing an EEO complaint based on his non-selection for the Safety

Manager position when Carraway was selected for a detail as a Safety Manager.  Id. ¶¶ 26-29.

      The defendant filed his motion for summary judgment on August 14, 2007.  In support of

his motion, the defendant argues that the IRS had a legitimate, non-discriminatory reason for

selecting Burrell over the plaintiff for the Safety Manager position. Def.'s Mem. at 1, 7-11.  He

also asserts that the plaintiff's retaliation claim is untimely, id. at 12-15, that the plaintiff cannot

establish a prima facie case of retaliation, id. at 15-17, and that even if the plaintiff "c[ould]

establish a prima facie case of retaliation, [the d]efendant ha[d] legitimate, non-retaliatory

reasons for giving . . . Car[r]away the 120-day detail," id. at 17.

      The plaintiff counters that the reason advanced by the defendant for the selection of

Burrell over the plaintiff for the Safety Manager position is a pretext for race- and sex-based

discrimination.  Pl.'s Opp'n at 8, 11-24; Pl.'s Suppl. Opp'n at 1-2.  He contests the defendant's

description of his retaliation claim as untimely, id. at 31-33, asserts that he has established a

prima facie case of retaliation, id. at 33-37, and disputes the legitimacy of the defendant's

proffered reasons for selecting Carraway for the Safety Manager detail, id. at 38-42; Pl.'s Suppl.

Mem. at 2.  Finally, the plaintiff introduces an entirely new claim for race- and sex-based

discrimination based on the selection of Burrell for a detail in the National Office Safety Program

in August of 2002.  Id. at 25-30.

      In addition to reiterating his arguments from his initial memorandum of law, the

defendant argues in reply that the Court should grant him summary judgment because the

plaintiff failed to properly dispute his statement of material facts not in genuine dispute as

required by this Court's local rules.  The defendant also asserts that the Court should not consider

the plaintiff's claims based on the selection of Burrell for a Safety Manager detail in 2002

because that claim was not asserted in the plaintiff's EEO complaints or in his complaint in this

Court and is untimely in any event.  Pl.'s Reply at 2-5.

## II. Standard of Review

The defendant seeks summary judgment pursuant to Federal Rule of Civil Procedure 56.

Under that rule, summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56.  When ruling on a Rule 56 motion, the Court must view the

evidence in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889,

895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)).

The Court must also draw "all justifiable inferences" in the non-moving party's favor and accept

the non-moving party's evidence as true.  Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

The non-moving party, however, cannot rely on "mere allegations or denials," Burke v. Gould,

286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation and

citation omitted), for "conclusory allegations unsupported by factual data will not create a triable

issue of fact."  Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999)

(internal quotation and citation omitted).   If the Court concludes that "the non-moving party has

failed to make a sufficient showing on an essential element of h[is] case with respect to which

[]he has the burden of proof," then the moving party is entitled to summary judgment.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### III. Legal Analysis

Title VII provides that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Where, as here, there is no direct evidence of discrimination on one of these impermissible categories, the Court assesses the plaintiff's claim under the framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Under the McDonnell Douglas framework, "the plaintiff must establish a prima facie case of discrimination" in the first instance, Reeves, 530 U.S. at 142, after which "the burden shifts to the defendant, who must 'articulate some legitimate, non-discriminatory reason' for the adverse action.'" Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting McDonnell Douglas, 411 U.S. at 802).

Assuming that the defendant can satisfy that burden, "the McDonnell Douglas framework–with its presumptions and burdens–disappear[s]," Reeves, 530 U.S. at 142-43 (internal quotation and citation omitted), and "the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason," Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003). In this context, the phrase "all of the evidence" refers to "any combination of (1) evidence establishing the plaintiff's prima facie case[,] (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions[,] and (3) any further evidence of discrimination that may be available to the plaintiff." Holcomb, 433 F.3d at 897 (internal quotation and citation omitted). If the plaintiff is ultimately "unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for discrimination, summary

6

judgment must be entered against [the plaintiff]." Paquin v. Fed. Nat'l Mortgage Ass'n, 119

F.3d 23, 27-28 (D.C. Cir. 1997).

The plaintiff raises three separate claims for relief under Title VII: a non-selection claim

based on Burrell's selection for the Safety Manager position in 2003, a retaliation claim based on

Carraway's appointment to a Safety Manager detail in 2004, and a new non-selection claim based

on Burrell's appointment to a management detail in 2002. The defendant seeks summary

judgment with respect to all three claims. The Court will therefore consider the merits of each

claim in turn.[5]

A.     Non-Selection Claim for the Safety Manager Position

With respect to the plaintiff's Title VII claim based on Burrell's advancement to the

permanent position of Safety Manager, the "[d]efendant does not contest that [the p]laintiff can

establish a prima facie case of race and gender discrimination." Def.'s Mem. at 7.[6]  Instead, he

_____

[5]  The Court agrees with the defendant that the plaintiff has failed to comply with Local Civil Rule 7(h),
which states that a party opposing a motion for summary judgment must include "a separate concise statement of
genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be
litigated." Nevertheless, the Court declines to "assume that facts identified by the moving party in its statement of
material facts are admitted" notwithstanding its discretionary right to do so in the interests of justice. However, the
Court fully expects that the plaintiff, specifically his attorney, will faithfully abide by all of this Court's local rules in
the future, and will not hesitate to hold the plaintiff and his attorney to account should he fail to do so.

[6]  The defendant argues in a footnote that the plaintiff's gender discrimination claim is without merit in part
"because the majority of the decision[makers] are in [the p]laintiff's protected class (male)." Def.'s Mem. at 11 n.4.
Had the defendant raised this argument in the body of his memorandum of law in support of his motion, the Court
would have been inclined to agree with him that the plaintiff has not established a prima facie case for gender
discrimination because a claim for gender discrimination is a "reverse discrimination" claim, where "the prima facie
framework is tweaked" by requiring the plaintiff to "show additional background circumstances that support the
suspicion that the defendant is that unusual employer who discriminates against the majority" in lieu of the first
prong of the traditional prima facie test. Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 851 (D.C. Cir. 2006)
(internal quotation and citation omitted). However, the defendant's explicit concession that the plaintiff has
established a prima facie case for gender discrimination along with his placement of this (otherwise meritorious)
argument in a footnote leaves the Court with no choice but to assume that the plaintiff can establish a prima facie
case for gender discrimination in deciding the defendant's motion for summary judgment. See Johnston v. Bumbra,
764 F. Supp. 1263, 1282 n.21 (N.D. Ill. 1991) ("Ordinarily, . . . substantive matters raised in footnotes are to be
disregarded.").

argues that the IRS had a legitimate, non-discriminatory reason for promoting Burrell over the plaintiff; "[n]amely, [the p]laintiff . . . did not perform well in his interview . . . as compared to [Burrell's] performance." Id. He points to deposition testimony and declarations from all three members of the interview panel in support of that proposition. Id. at 8-10. He further notes that the interview panel was diverse in terms of both race and gender, id. at 7, and suggests that where "diverse panels interview[] and cho[o]se the most qualified candidates for the vacant positions," courts have "uniformly found no discrimination," id. at 11.

The plaintiff derides the defendant's explanation for Burrell's promotion as "unworthy of credence." Pl.'s Opp'n at 8. He asserts (1) that there is an "inexplicable gulf between the credentials of [the p]laintiff and Burrell . . . from which one could draw an inference of discrimination," id.; see also id. at 9-10, 13-17 (arguing that the plaintiff was "significantly better qualified than the selected applicant"), (2) that the selection process for the Safety Manager position was "replete with innumerable irregularities," id. at 13; see also id. at 17-19 (arguing that the selection process for the Safety Manager position did not conform to internal IRS procedures), (3) that the IRS may have engaged in the spoliation of evidence, see id. at 20-21 (arguing that the failure of the defendant to produce interview notes for the plaintiff "is another fact that creates a genuine issue"), (4) that there are "contradictions in the panelists['] deposition testimony and their declarations," as well as between the panelists' testimony and other evidence in the record, that "creat[e] a genuine issue in this case," id. at 21, and (5) that there is statistical evidence of disparate treatment within the IRS in favor of white women, see id. at 23-24 (asserting that "white females are promoted at a rate which exceeds their population by ten

percent" (emphasis removed)).  According to the plaintiff, these "numerous genuine issues of material fact" require "that the Court set this matter down for a jury trial." Id. ¶ 25.

1.      Comparative qualifications

The plaintiff argues that his "qualifications are so vastly superior" to Burrell's qualifications that the selection of Burrell over the plaintiff must be pretextual.  Pl.'s Opp'n at 15.  Evidence of a wide disparity in qualifications "may suffice, at least in some circumstances, to show pretext." Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006).  "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job" than the individual selected in the plaintiff's stead, a factfinder "can legitimately infer that the employer consciously selected a less-qualified candidate–something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc).

On the other hand, "[i]n a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." Holcomb, 433 F.3d at 897 (internal quotation and citation omitted).  Thus, "in order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination." Jackson v. Gonzalez, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation and citation omitted); see also Lathram, 336 F.3d at 1092 (finding that "a reasonable jury could find" discrimination where the plaintiff was "substantially more qualified" than co-worker selected for position over the plaintiff); Aka, 156 F.3d at 1299 (holding that reasonable factfinder

9

could infer pretext in employer's selection of another candidate over the plaintiff where the plaintiff was "markedly more qualified" than the selected applicant). Otherwise, the Court "must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone." Aka, 156 F.3d at 1299 (internal quotation and citation omitted).

The job description for the Safety Manager position lists the major duties of the position as follows:

> Develops policies, procedures and standards for the IRS Safety Program. Performs extremely complex and significant functions in the development of decisions and policies and provides technical guidance designed to protect Service personnel, facilities, property and other assets, both tangible and intangible, from the full spectrum of intentional and non-intentional human threats, as well as man-made and natural disasters.
>
> Advises top management on the most complex safety matters in order to resolve questions pertaining to appropriate cost-effective safety measures commensurate with the requirements; safety budget/resources distribution; and strategies for integrating appropriate healthy, safety, and similar issues.
>
> Interprets national safety directives for their applicability to the safety programs; formulates broad policy direction regarding the implementation of these directives; and prepares specific policy and program statements for issuance by the Commissioner, Deputy Commissioner, and other senior management officials.
>
> Serves as representative of the Director in performance of top liaison assignments and in contacts with professional and trade associations, officials of the Treasury Department, representatives of other government departments and agencies, OMB, Congress, and the public. Serves as a technical authority in assignments requiring the application of new theories and developments to safety problems not susceptible to treatment by accepted safety methods and procedures.
>
> Performs other duties as assigned.

Pl.'s Opp'n, Ex. 22 (Internal Revenue Modernization Position Description for Safety and Occupational Health Manager) (the "Position Announcement") at 2.

Both the plaintiff and Burrell were well-qualified to carry out these duties.  As the Court has previously noted, the plaintiff received the highest possible score on his KSAs for the position.  Id., Ex. 18 (Individual Rating Sheet for Gary Hamilton) at 1-3.  In addition to his extensive educational background, the plaintiff had over fifteen years of experience as an industrial hygienist at the time of his application for the position.  Id., Ex. 39 (Electronic Application for National Office Promotion/Reassignment for Gary Hamilton) (the "Hamilton Application") at 12-15 (reproducing the resume submitted by the plaintiff as an attachment to his application for the Safety Manager position).  During his tenure with the IRS, the plaintiff developed a "[s]afety [i]nspection [p]rogram capable of inputting, retrieving, and reporting specific safety inspection data" according to various categories and "developed the first standard operating procedures" for safety inspectors to use during their semi-annual inspections.  Id., Hamilton Application at 22.  Prior to joining the IRS, the plaintiff had "managed the Defense Department's Worker Safety Pilot Program," which required the plaintiff "to implement private sector model safety worker programs" for the Department of Defense and the military, id., Hamilton Application at 23, and, "[w]hile with the Navy, [he] led a group of over [forty] separate base safety managers covering the continental east coast[] in preparing, prioritizing, funding[,] and tracking . . . their respective abatement projects," id., Hamilton Application at 25.

Like the plaintiff, Burrell received a perfect score on her KSAs for the Safety Manager position.  See id., Ex. 19 (Individual Rating Sheet for Annette Burrell) at 1-3 (reflecting the

ranking officer's evaluation of Burrell's KSAs for the Safety Manager position).[7]  She performed

numerous high-level duties in the IRS's National Office Safety Program while on her 2002

detail, including the development of a national concept of operations plan for the National Safety

and Health program, the development of "a nationwide safety management system, which was

used to generate accident data to identify specific hazards," and the creation of a "regional and

national policy and program direction."  Id., Ex. 40 (Merit Program Questionnaire for Annette

Burrell) (the "Burrell Application") at 9.[8]  Burrell also had three years of prior experience as a

Safety Manager,[9] during which time she, inter alia, "planned and administered a comprehensive

Servicewide safety program," "[s]erved as the principal safety advisor to program managers

analyzing and resolving safety hazards and developing programs to ensure [that] accidents d[id]

not reoccur," "[d]eveloped policies and procedures for use Servicewide to regional staffs to

---

[7]  The plaintiff suggests that the ranking official, Paul Carroll, was not qualified to assess the candidates'
KSAs for the Safety Management position.  See Pl.'s Opp'n at 4 ("[t]he [r]anking [o]fficial is not a subject matter
expert in [s]afety"); id. at 18 (asserting that Carroll "is neither a subject matter expert in [s]afety nor in [s]ecurity").
Insofar as the ranking of Burrell is concerned, this assertion, if true, would actually prevent a reasonable jury from
inferring discriminatory motive on the part of Carroll in ranking Burrell so highly because Carroll, lacking the ability
to distinguish qualified candidates from unqualified candidates, could not have known that the ranking he assigned
was unduly high.  See Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[T]he issue is not the
correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it
offers.") (internal quotation and citation omitted).

[8]  Burrell indicated in her deposition testimony that she performs at least some of the same tasks as Safety
Manager that she performed during her 2002 detail, which suggests that her 2002 detail helped to prepare her for the
Safety Manager position.  See Pl.'s Opp'n, Ex. 4 (August 17, 2006 deposition excerpt of Annette Burrell) (the
"Burrell Dep.") at 39:15-40:1 ("Q. Okay.  Now[,] the reengineering and revamping that you said you did for the
safety program, how long did that go on for?  A. It's actually still going on.  Q. Now[,] as we speak?  A. Yes.  Q.
Okay.  So you continued your job duties during that detail up until today?  A. Yes.").

[9]  Burrell testified at her deposition that the Safety Manager position was "abolished" in the 1990s, Pl.'s
Opp'n, Burrell Dep. 109:18-20, which forced her to find a position in different departments until she procured her
detail with the National Office Safety Program in 2002, id., Burrell Dep. at 110:14-111:3.

enable regions to implement programs," and "[r]enewed regional safety programs to ensure

compliance with laws and regulations." Id., Burrell Application at 5.[10]

Given Burrell's exceptionally strong resume, the Court discerns no overall gap between

her qualifications and those of the plaintiff substantial enough to give rise to an inference of

discriminatory motive on the part of Burns. The plaintiff's superior educational credentials and

experience as an industrial hygienist suggests that he may have had a stronger grasp of the

technical aspects of occupational safety, see id., Position Announcement at 2 (describing the

Safety Manager position as one that requires "[e]xpert level knowledge of and experience in the

theories, principles, practices[,] and advances pertaining to safety and occupational health

disciplines and administration"), but Burrell's considerable experience in developing safety

management programs at a national level–including her three years of experience in the same

position for which she was (re-)selected[11]–indicates that she might have been better equipped to

---

[10] The plaintiff asserts that "based on [Burrell's] testimony, there is virtually nothing in the [Position Announcement] that [she] could demonstrate knowledge of [sic]." Pl.'s Opp'n at 13. In point of fact, Burrell testified at her deposition that she had written policies and procedures in the past, id., Burrell Dep. 58:16, that she was familiar with executive orders regarding occupational safety, id. at 60:5, and the Code of Federal Regulation, id., Burrell Dep. at 61:2, that she had formulated a drug policy for a safety program, id., Burrell Dep. at 66:22-67:1, and that she had knowledge of "major conflicts in policy and program objectives," id., Burrell Dep. at 68:21. The basis for the plaintiff's assertion appears to be a protracted colloquy between the plaintiff's counsel and Burrell during which Burrell could not identify, inter alia, the exact title of the executive order directing the IRS's safety program, id., Burrell Dep. at 60:12-15, the date when the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-700 (2000) (the "OSHA"), was enacted, id., Burrell Dep. at 61:11-13, the identity of the President of the United States of America when the OSHA went into effect, id., Burrell Dep. at 61:14-16, or "the eight federal agency responsibilities under the OSHA," id., Burrell Dep. at 61:22-62:4. What little relevancy this line of questioning might have had is nullified by the absence of any indication in the record that the plaintiff could have answered these questions extemporaneously, either.

[11] The plaintiff argues that "though the Safety Manager position that Burrell occupied around 1992 . . . has the same title as the position in controversy, that was a [GS-]level 12 [position, which is] not the same level as the position in controversy." Pl.'s Suppl. Opp'n at 1. However, even if the Court were to assume that the different grade levels assigned to the positions indicated some difference in the relative complexity between the two positions as opposed to a reevaluation of the complexity of the same position after the course of several years, the basic point remains that Burrell's prior experience as a Safety Manager "indicated that she understood the program at a national level," which made her uniquely qualified for the position of Safety Manager in 2003. Def.'s Mem., Ex. 12 (July 25,

(continued...)

13

provide "broad administrative and policy direction through discussion of financial and program goals and national, IRS, and local safety policies affecting the administration of the safety program." Id., Position Announcement at 3. Moreover, while the plaintiff received strong ratings in his preceding annual performance review, see id., Hamilton Application at 5-9 (indicating an average rating of 4.6 out of a possible 5 points in the areas of employee satisfaction and business results), Burrell received the highest ranking possible in every single category for her 2002-2003 annual performance appraisal–i.e., the appraisal covering her time on the management detail, see id., Burrell Application at 15-17 (reflecting the highest possible score for employee satisfaction and contribution, customer satisfaction, and business results).[12]

In short, there is no factual basis whatsoever for a jury to conclude that there are disparities in the relative qualifications of the plaintiff and Burrell "so apparent as to virtually jump off the page and slap [them] in the face." Hammond v. Chao, 383 F. Supp. 2d 47, 58 (D.D.C. 2005) (internal quotation and citation omitted). If anything, the record suggests that Burrell, who had previously worked as a Safety Manager and performed some of the same duties while on her detail in 2002, see supra n.8, was more qualified for the position than the plaintiff. At a minimum, the question is an extremely close one. "[T]herefore[,] the Court must respect the

---

[11](...continued)
2006 deposition excerpt of John S. Burns) (the "Burns Dep.") at 105:6-13.

[12]  The plaintiff states that Burrell's performance appraisal "was purposefully created for Burrell so as to give the impression that she is a stellar candidate." Pl.'s Opp'n at 18. However, he provides no citation to the record whatsoever in support of this inflammatory assertion, and the record does not appear to support it. See Def.'s Mem., Burns Dep. at 141:21-142:5 (testifying that Burns did not know who, if anyone, had evaluated Burrell's work on the 2002 detail); id., Burns Dep. at 144:7-14, 17 (testifying that Burns did not "recall doing a performance evaluation on [Burrell's] detail").

employer's unfettered discretion to choose among qualified candidates." <u>Hammond</u>, 383 F.

Supp. 2d at 58.

      2.   <u>Alleged irregularities in the selection process</u>

     In addition to his arguments concerning his qualifications for the Safety Manager position

as compared to those of Burrell, the plaintiff "takes issue with the specific process used by

[the IRS] in selecting Burrell." Pl.'s Opp'n at 17. Among the litany of complaints raised by the

plaintiff in this regard are the following:

> [C]onsidering a white female's application for the position after the
> deadline; using a [r]anking [o]fficial who is not a subject matter
> expert on [s]afety; [u]sing a [s]electing [o]fficial and a [r]anking
> [o]fficial who know nothing about the Management Selection
> Program for [the] selection of [a] managerial position; the close
> relationship of the [s]electing [o]fficial and the [r]anking [o]fficial;
> the failure to use a representative from personnel at the interview;
> disregard for the points allotted in the position description . . . ; the
> failure of the [r]anking [o]fficial to give the candidates' educational
> background any weight; the improper subjectivity of the
> interview; . . . [and] one panelist's testimony that she thought she was
> interviewing for a different position . . . .

<u>Id.</u> at 8.

     At the outset, the Court notes that "[a]n employer's failure to follow its own regulations

and procedures, alone, may not be sufficient to support the conclusion that its explanation for the

challenged employment action is pretextual." <u>Fischbach v. D.C. Dep't of Corr.</u>, 86 F.3d 1180,

1183 (D.C. Cir. 1996) (internal quotation and citation omitted). Rather, the "irregularities, even

if proven," must "indicate discriminatory hiring practices." <u>Butler v. Ashcroft</u>, 293 F. Supp. 2d

74, 80 (D.D.C. 2003). Thus, many of the purported "irregularities" identified by the plaintiff,

such as the supposed lack of expertise on the part of the ranking and selecting officials, or the

purported misunderstanding by one of the interview panelists as to the nature of the position at issue, are irrelevant because they indicate possible error or, at most, incompetence by the IRS in its selection process, but not bias.  See supra n.7; see also Fischbach, 86 F.3d at 1183 ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates.").

Indeed, none of the plaintiff's assertions with respect to Paul Carroll, the ranking official for the Safety Manager position, could give rise to an inference of bias against the plaintiff.  As the Court has noted several times now, Carroll awarded the plaintiff a perfect score for his KSAs. Pl.'s Opp'n, Ex. 18 (Individual Rating Sheet for Gary Hamilton) at 1.  His supposed "close relationship"[13] with Burns obviously did not have a negative effect on Carroll's assessment of the plaintiff's abilities given that he awarded the plaintiff the highest ranking possible.  And even if Carroll had considered the plaintiff's educational background, it could hardly have improved the plaintiff's already perfect score.

The implication of the plaintiff's arguments regarding Carroll's ranking of the candidates is therefore not that he failed to properly credit the plaintiff in his evaluation of the candidates' KSAs, but rather that he was unduly generous in also awarding Burrell a perfect score.  But as Carroll explained in his deposition testimony, "there was no educational requirement for" the Safety Manager position, so he had no reason to lower Burrell's score due to her lack of a college degree.  Id., Ex. 3 (August 4, 2008 deposition excerpt of Paul Carroll) (the "Carroll Dep.") at

---

[13]  The only evidence in the record of a close friendship between Carroll and Burns is the plaintiff's own deposition testimony.  See Pl.'s Opp'n, Ex. 1 (August 24, 2006 deposition excerpt of Gary Hamilton) (the "Hamilton Dep.") at 181:15-20 ("Q. Mr. Hamilton, during your tenure at the IRS, did you ever have the opportunity to observe Paul Carroll and Stuart Burns's relationship?  A. Yes, I did.  Q. And how would you describe it?  A. Very close friends.").  The plaintiff derived this self-serving assessment from his observation that Carroll and Burns "went out to lunch together a lot like usual friends do."  Id., Hamilton Dep. at 181:21-182:1.

61:7-8.  Instead, the knowledge of the candidates was assessed by recourse to their KSAs.  See id., Carroll Dep. at 61:22-62:2 ("How they presented their experience in their application package is what I am evaluating against the KSA.").  Not surprisingly, the candidate who had previously worked as a Safety Manager for three years and served a detail with some of the same job tasks for the better part of a year had a positive impression on Carroll.

Further, the only way that Carroll's supposed friendship with Burns might have been relevant to Burrell's ranking would have been if Burns was predisposed towards selecting Burrell based on her gender and race and influenced Carroll to inflate her ranking as a consequence.  In other words, absent independent evidence giving rise to an inference of discriminatory motive by Burns, the evidence of their friendship does not suggest any bias in the ranking process at all.  But if the plaintiff could otherwise demonstrate that Burns selected Burrell out of an impermissibly discriminatory motive, any evidence that Carroll might have been influenced by Burns would be redundant of and subordinate to the direct evidence of Burns's discriminatory motive.  Either way, the evidence has no probative value on its own.

The plaintiff's second complaint with respect to the interviewing panel's consideration of Burrell's application–that her application was untimely–fails for lack of evidence.  The plaintiff states that the application deadline for the Safety Manager position was May 19, 2003, and that "Burrell did not submit a complete application package until June 5, 2003."  Id. at 18.  The only support for this assertion is a copy of a post-it note appended to Burrell's performance appraisal dated June 5, 2003, along with a facsimile transmission date of June 5, 2003, located on the cover page of the performance appraisal.  Id., Burrell Application at 13.  However, the application itself is dated May 13, 2003, and it is clear that Burrell did not place the incorrect

17

date on her application because the facsimile of the application bears the same transmission date. Id., Burrell Application at 1-2.  Thus, the undisputed evidence in the record suggests at most that Burrell submitted her application on May 13, 2003, and supplemented it with her latest performance appraisal on June 5, 2003.

As for the plaintiff's assertion that Burns failed to "use a representative from personnel at the interview," id. at 8, this complaint strikes the Court as nothing more than an attempt by the plaintiff to create a proverbial "tempest in a teapot."  The record is clear that Burns assembled an interview panel of mixed race and gender.  See Def.'s Mem., Ex. 7 (Unsworn Declaration of Tatika Mitchell) (the "Mitchell Decl.") at 2 (describing herself as "an African[-]American female"); id., Ex. 8 (Unsworn Declaration of Stuart Burns) (the "Burns Decl.") at 4 ("The panel consisted of two Caucasians and one African[-]American–two males and one female); id., Ex. 9 (Unsworn Declaration of Michael D. Huston) (the "Huston Decl.") at 3 ("Tatika Mitchell, a member of the interview panel, is an African-American [f]emale.").  The panel asked the same questions in each interview, see id., Burns Decl. at 2 ("[d]uring the interviews, all candidates were asked the same questions"); id., Huston Decl. at 2 ("all interviewees were asked the same questions"), and used the same panelists for each interview; see id., Ex. 10 (August 3, 2006 deposition excerpt of Tatika Mitchell) (the "Mitchell Dep.") at 86:8 ("[e]ach panel member was at each interview").  Given these undisputed facts, a reasonable jury could not possibly conclude that the composition of the interview panel was somehow biased against the plaintiff.

Indeed, the procedures used by the IRS in interviewing candidates for the Safety Manager position mirror those approved by the District of Columbia Circuit in Fischbach.  In that case, a

18

District of Columbia Department of Corrections youth facility selected its Chief Psychologist by
using a two-step process whereby the District of Columbia Office of Personnel reviewed written
applications, "on the basis of which it deemed 10 applicants qualified," and after which "a panel
of three Department of Corrections officials interviewed each of those 10 applicants."
Fischbach, 86 F.3d at 1181. The interviewing panel consisted of two Caucasian men and one
African-American man. Id. at 1181-82. "The panel asked each applicant nine questions and
awarded up to ten points for each answer," then "forwarded the[] results [of the
interviews] . . . to . . . the Director of the Department of Corrections along with its
recommendation to hire [the highest-scoring applicant]." Id. at 1182.

     Ronald Fischbach, one of the applicants for the position, "filed a complaint . . . charging
that the Department [of Corrections] had denied him the promotion he sought because he is white
and because he is Jewish." Id. After a bench trial, a former member of this Court "found no
evidence of religious discrimination[,] but did conclude that the Department [of Corrections] had
denied Fischbach the promotion because he is white." Id. The Court based its ruling in part on
the fact "that the selection process followed by the Department [of Corrections] in th[at] case
differed substantially from the process prescribed in the [District of Columbia's] personnel
regulations." Id. at 1183.

     On appeal to the District of Columbia Circuit, the court reversed the District Court's
ruling. In its assessment, "[t]he evidence of record [wa]s not sufficient to prove that the
Department [of Corrections] chose [the selected applicant] over . . . Fischbach for any reason
other than the one that the Department [of Corrections] gave–i.e., that the panel of three
interviewers preferred [the selected applicant's] answers to Fischbach's." Id. at 1185. The court

specifically rejected the Court's reliance on the fact that the procedures used to interview

applicants for the Chief Psychologist position differed from District of Columbia personnel

policies, noting that "the procedure that the Department [of Corrections] followed [wa]s

reasonable." Id. at 1183.

Approximately ten years later, this Court reached the same conclusion based on similar

facts in Brown v. Small, 437 F. Supp. 2d 125 (D.D.C. 2006) (Walton, J.). In that case, the

plaintiff, Jeaneen Brown, applied for the position of Store Merchandiser for the Smithsonian

Institute after her position as a Display Specialist was eliminated. Brown, 437 F. Supp. 2d at

127-28. The Human Resources Manager of the Smithsonian Institute's Corporate & Magazines

Smithsonian Business Venture "determined that the plaintiff, in addition to two other previous

employees, were qualified to be considered for [the Store Merchandiser position] and contacted

each applicant to arrange interviews." Id. at 128. "Each interview was conducted by . . . four

panelists[,] and identical questions were asked of every applicant." Id.

"The other two Smithsonian Institute employees interviewed for the positions, . . . both

Caucasian, were offered Store Merchandiser positions," but the plaintiff "was not selected for the

position." Id. "Believing that her non-selection for the Store Merchandiser position amounted to

racial discrimination, the plaintiff filed a complaint with the Office of Equal Employment and

Minority Affairs . . . in September [of] 2002," id. at 129, and thereafter commenced an action in

this Court against Lawrence Small, the Secretary of the Smithsonian Institute, in his official

capacity, "alleging that the Smithsonian Institute's actions amounted to racial discrimination in

violation of Title VII," id. Small filed a motion for summary judgment, arguing that the plaintiff

was not selected for the Store Merchandiser position "for a variety of reasons, all relating to her

20

performance during her interview." Id. at 131.  In support of her argument that this explanation "was simply [a] pretext for discrimination," Brown argued, inter alia, that the Smithsonian Institute "inappropriately relied solely on [Brown's] performance in the job interview and failed to take into account her prior performance or knowledge," id. at 132.

The Court sided with Small, concluding that Brown "provide[d] no objective evidence to suggest that the adverse action taken against her occurred because of her race." Id. at 133.  In reaching this conclusion, the Court relied in part on the fact that "[i]dentical questions were administered and the same four panelists were present at every interview," which indicated "an impartial method for assessing the ability of each candidate to succeed in the position." Id. at 135.  The Court further noted the "diverse composition of the panel," which consisted of "one Caucasian male, one Caucasian female, one African-American male[,] and one Asian male," in determining that there was no genuine dispute of material fact as to whether the interview process was fair. Id. at 135 n.10.

The procedures used by the IRS to select a Safety Manager fall squarely within the rubric of Fischbach and Brown.  As with those cases, "[n]othing about th[e] procedure" used by the IRS "is so peculiar as to suggest that it was not, in fact, followed." Fischbach, 86 F.3d at 1183.  Moreover, the diversity of the interviewing panel, uniformity of the questions asked, and presence of the same interviewers at each interview "bolster [the Court's] conclusion that [the interviewing panel sought] the candidate who was most qualified for the position and that race and gender were not factors in their decision[making] process." Brown, 437 F. Supp. 2d at 135

21

n.10 (internal quotation and citation omitted).  The absence of a representative from the IRS's

personnel department at the interview does nothing to change this analysis.[14]

Elsewhere in his opposition, the plaintiff asserts that Burns's decision to interview the

four highest-ranked applicants for the Safety Manager position even though an interview was not

required by the job description for the position indicates "that there [wa]s something 'fishy'

underlying the interview selection."  Pl.'s Opp'n at 22.  But as the District of Columbia Circuit

explained in Fischbach, "[s]electing a pool of qualified candidates based upon their written

credentials and then making a final selection based upon personal interviews is an obviously

reasonable method of hiring a professional employee."  Fischbach, 86 F.3d at 1183-84.

Moreover, the defendant has explained–and the plaintiff does not dispute–that Burns convened

an interview panel "because the interview panelists and the selecting official [i.e., Burns] did not

know all of the candidates well."  Pl.'s Opp'n, Ex. 36 (Defendant's Responses to Plaintiff's First

and Second Request for Admissions) ¶ 34 (quoted in Pl.'s Opp'n at 22).  In other words, Burns

seemingly conducted interviews to eliminate any possible bias (or perception of bias) that he

might have held in favor of those applicants with whom he had worked in the past and to give all

---

[14]  The plaintiff asserts that "[the d]efendant claims that its selection process, both in pre-interview ranking and selection at interview[,] was purely subjective."  Pl.'s Opp'n at 17.  In actuality, Carroll testified at his deposition that his assessment of the applicants' KSAs was "subjective" in the sense that he had to determine whether, in his judgment, "the candidate ha[d] addressed all or substantially all of the issues listed in th[e] criteria" for awarding points set forth in the applicable ranking guidelines, id., Carroll Dep. 43:14-22, and Burns testified at his deposition that each member of the interviewing panel "[s]ubjectively" evaluated "each person's response to those questions that were asked" in the interview, id., Ex. 2 (July 25, 2006 deposition excerpt of John S. Burns) (the "Burns Dep. II") at 124:22-125:4. "Reasonable employers . . . do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions," Jackson, 496 F.3d at 709 (internal quotation and citation omitted), and Carroll's and the interviewing panel's reliance on their personal assessments of the applicants responses is hardly the kind of "heavy and absolute reliance on subjective considerations" suggested by the plaintiff.  Pl.'s Opp'n at 17.

four of the best-qualified applicants an equal opportunity to make their case for the Safety

Manager position.

Finally, the plaintiff's assertion that Burns "disregard[ed] . . . the points allotted in the

position description" for the Safety Manager position is also irrelevant.  The "points" described

by the plaintiff actually refer to so-called "factor level descriptions," or "FLDs," which are used

to assign a grade within the General Schedule system to a position.  See id., Position

Announcement at 3 (stating that the Safety Manager position has a Grade Level of 14 based on

the FLD range of 3605-4050); see also Introduction to the Position Classification Standards at

54-56 (1995), http://www.opm.gov/fedclass/gsintro.pdf (explaining the use of FLDs in the

position classification process, and classifying a position with FLDs totaling 3605-4050 as a GS-

14 position).[15]  Contrary to the plaintiff's insinuations, they are not used to evaluate an

applicant's qualifications for a particular position.  That task was accomplished through the

worksheet measuring the applicants' KSAs.  See Def.'s Mem., Ex. 1 (Career Opportunities List

Announcement for the Safety Manager position) at 1 (providing contact information for

applicants to retrieve "the required KSAs" for the position); id., Ex. 4 (Job Analysis Worksheet)

at 1 (listing the questions on the applicants' KSAs).

_____

[15]  This document was not submitted by either of the parties; however, due to the fact that the document is
located on the website for the United States Office of Personnel Management, it is "capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be questioned," and therefore subject to
judicial notice by the Court.  Fed. R. Evid. 201(b); see also Coleman v. Dretke, 409 F.3d 665, 667 (5th Cir. 2005)
("fail[ing] to see any merit to an objection" to appellate court taking judicial notice of the contents of a state
agency's website); Dulaney v. United States, 472 F. Supp. 2d 1085, 1086 (S.D. Ill. 2006) (taking judicial notice of
the contents of the website for the United States Department of Veterans Affairs, and citing other cases in which
courts have done the same); United States ex rel. Dingle v. BioPort Corp., 270 F. Supp. 2d 968, 972 (W.D. Mich.
2003) (collecting cases for the proposition that government documents are generally subject to judicial notice,
"includ[ing] public records and government documents available from reliable sources on the Internet").

3.     Spoliation of evidence

The plaintiff finds it "puzzling" that the defendant "produced all [of] the interview notes"

written by the interviewing panel "for all [of] the candidates except [for the p]laintiff."  Pl.'s

Opp'n at 20.  He bemoans the fact that no one "knows what the missing (or withheld) page says

to the [p]laintiff's benefit, honor[,] and credit," and speculates that it might say something to the

effect of, "WE CAN NEVER GET A BETTER CANDIDATE THAN THIS FOR THE

POSITION."  Id.  The plaintiff therefore "submits that this is another fact that creates a genuine

issue."  Id.

This argument is wholly without merit.  The "destruction of notes or other documents

purportedly relevant to a case of discrimination has no effect except when the circumstances of

destruction provide a basis for attributing bad faith to the agency involved."  McIntyre v. Peters,

460 F. Supp. 2d 125, 138 (D.D.C. 2006) (internal quotation and citation omitted).  Here, the

missing evidence at issue consists of one page of one interviewer's notes.  The absence of such

"evidence" is too minimal to create an inference of bad faith, or, for that matter, a genuine issue

of material fact.[16]

4.     Inconsistencies in the record

The plaintiff contends that numerous genuine issues of material fact are caused by

"the . . . contradictions in the panelists['] deposition testimony and their declarations."  Pl.'s

Opp'n at 21.  These supposed inconsistencies include the fact that Burns "testified on the one

---

[16]  The plaintiff makes the bald assertion that "[the] defendant is required to keep this type of record for at
least two years," but he does not specify which, if any, agency regulation compels this policy.  Pl.'s Opp'n at 20.  In
the absence of such evidence, the Court will not "act as an advocate for [] the [plaintiff] and construct legal
arguments on [his] behalf."  United States v. Real Property, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (Walton, J.)
(internal quotation and citation omitted).

hand that there were instances in which [the p]laintiff did not answer interview questions at all,"
but later testified "that [the p]laintiff answered all [of] the interview questions," that Mitchell
testified at her deposition "that she noted her concern about [the p]laintiff's communication skills
in her interview notes," when "[h]er interview notes reflect[] no such thing," id., that Burns
testified at his deposition "that the panel conferred . . . six . . . times on the day of the interview,"
which contradicts Mitchell's deposition testimony "that no such thing occurred and that the panel
only conferred once and that was at the end of all [of] the interviews," and that Huston testified at
his deposition that he approved of the women who interviewed for the Safety Manager position
but not the men when he stated in his declaration written thirty-eight months earlier "that he
could not comment on the performance of any of the candidates at the interview" because it had
occurred eighteen months prior.  Id. at 22.  The plaintiff also takes issue with the fact that
"nowhere in the panelists' notes does any of them comment on [the p]laintiff's communication
skills."  Id. at 21.

       Upon closer inspection, several of the inconsistencies in the record identified by the
plaintiff disappear.  For example, the plaintiff's claim that Burns "testified . . . that there were
instances in which [the p]laintiff did not answer interview questions at all," id. at 21, rests on a
misinterpretation of Burns's statement in his declaration that "in some cases [the plaintiff] did
not answer the question at all."  Def.'s Mem., Burns Decl. at 2.  The lines preceding that
statement make clear that Burns meant to convey that the plaintiff failed to address the substance
of the panel's questions in some instances, not that he literally refused or forgot to answer certain
questions:

> In responding to the interview questions, the [plaintiff] failed to provide clear answers to the questions asked. On several occasions, panel members tried to rephrase the questions to get a response that more clearly addressed the issue. His responses were consistently difficult to follow, provided extraneous and irrelevant information, and in some cases did not answer the question at all.

Id. (emphasis added). This explanation accords with Burns's deposition testimony:

> Q.    Tell me why you didn't select [the plaintiff] for [the Safety Manager] position.
>
> A.    I didn't feel that his interview went very well.
>
> Q.    In what aspects?
>
> A.    My recollection was that the answers were not clear and concisely aligned with the questions that were asked and that we had to a significant amount of follow-up to the questions to try to get the answers to the question.

Id., Burns Dep. 115:5-14. The fact that Burns couldn't "recall a question without an answer" from the plaintiff does not contradict his earlier statement from his declaration because his earlier statement was actually that "[the plaintiff's] responses . . . in some cases did not answer the question at all," id., Burns Decl. at 2, not that the plaintiff failed to give any answers. The plaintiff's entire argument in this regard is, in other words, a red herring.

Similarly, Huston's statement in his declaration that he could not "remember any specifics" from his interviews of the applicants, id., Huston Decl. at 2, does not contradict his later testimony that "[t]he two females were the two up [and] . . . the two males were down," id., Ex. 11 (August 23, 2006 deposition excerpt of Michael Huston) (the "Huston Dep.") at 68:15-16. The former comment was made in response to a direction to list the qualifications "considered by the interview panel in assessing the interviewees." id., Huston Decl. at 2. The latter comment

was made in response to a question directly referencing a gesture made by Huston at the conclusion of the interviews.  See id., Huston Dep. at 68:12-18 ("Q. Can you tell me which two candidates were you referring to when you put your hand up and which were the candidates that you were down?  A. The two females were the two up.  Then the two males were down and that's at the time I could not remember the other candidate's name.  I knew Burrell's [name] but that was my general opinion.").  These answers do not overlap and therefore do not contradict each other.

Other inconsistencies described by the plaintiff have some support in the record but fail to give rise to any inference of discriminatory motive on the part of the IRS.  The Court agrees, for example, that there may be something of an inconsistency between Mitchell's deposition testimony and Burns's testimony with respect to the number of times that the interview panelists conversed on the day of the interview.  Compare id., Burns Dep. 123:1-16 ("Q. Okay.  How many times did you discuss or confer during the interview altogether? . . . A. Probably six.") with Pl.'s Opp'n, Ex. 5 (August 3, 2006 deposition excerpt of Tatika Mitchell) (the "Mitchell Dep. II") at 65:9-12 ("Q. Okay, and when you conferred, did you confer in the morning or at the end after everybody had been interviewed?  A. At the end after everybody had been interviewed.").[17] But the only way this supposed inconsistency could possibly inure to the plaintiff's benefit would be if the jury accepted the plaintiff's contention that this purported inconsistency between the

---

[17]  Arguably, the "inconsistency" here is the result of imprecise questioning from the plaintiff's attorney, nothing more.  The plaintiff's attorney asked Burns how many times he had conferred with the other interview panelists "that day," Def.'s Mem., Burns Dep. 123:7, to which Burns responded that the panelists had conferred "before any interview started," id. at 123:10, "at the conclusion of each [interview]," id. at 123:12, and "at the very end," id. at 123:14.  In contrast, the plaintiff's attorney asked Mitchell only whether the panelists "confer[red] in the morning or at the end after everybody had been interviewed," Pl.'s Opp'n, Mitchell Dep. II at 65:9-11, to which Mitchell responded, "[a]t the end after everyone had been interviewed," id. at 65:12.

deposition testimony of Burns and Mitchell gives rise to an inference that the panelists may not have met at all, "which would show that the entire thing was orchestrated by prearrangement." Pl.'s Opp'n at 22.  "The plaintiff must show that a reasonable jury" could make this inference, Lathram, 336 F.3d at 1088 (emphasis added), and no reasonable jury could make such a gargantuan inferential leap other than through rank speculation.

In a similar vein, the Court fails to see how a reasonable jury could infer pretext based on Mitchell's erroneous statement in her declaration that her written notes from her interview of the plaintiff "include[d] feedback on the [plaintiff's] interview and oral communication skills." Def.'s Mem., Mitchell Decl. at 3; see also Pl.'s Opp'n, Ex. 32 (notes regarding interview of Gary Hamilton by Tatika Mitchell) at 1-2 (containing no reference to the plaintiff's communication skills).  Assuming arguendo that, as the plaintiff contends, Mitchell was engaged in a conspiracy to deprive the plaintiff of the Safety Manager position on the basis of his race and gender and "the panelists' account of the [plaintiff's] interview was invented after the fact," Def.'s Mem. at 21, Mitchell would have no reason to suggest that her notes contain comments about the plaintiff's communication skills when (according to the plaintiff's theory) she would have known all along that no such comments would be found.  Therefore, the only reasonable inference that a jury could draw from the error in Mitchell's statement is that her recollection as to what she wrote on her notes was simply wrong.[18]

---

[18]  The Court does not mean to suggest that an inconsistency of this sort would be irrelevant at trial; obviously, the inconsistency between Mitchell's statement in her declaration and the notes themselves might affect the credibility of her other statements in the eyes of the jury.  Cf. Fed. R. Evid. 613 (governing the use of prior inconsistent statements at trial).  But the plaintiff is not attempting to use this inconsistency to impeach a witness. Rather, he submits that the inconsistency is affirmative evidence that Burns and the other panelists lied under oath when they testified at their various depositions that Burrell was the better choice for the Safety Manager position because the plaintiff did not fare well at his interview.  As with other inconsistencies identified by the plaintiff, such

(continued...)

The plaintiff also suggests that there is something untoward about the fact that "nowhere in the panelists' notes does any of them comment on the [p]laintiff's communication skills." Id. at 21. But except for a few elliptical comments from Huston, the interview panelists did not make evaluative comments about any of the applicants on their interview notes. See id., Ex. 24 (notes regarding interview of Annette Burrell by Michael Huston) at 2 (describing one of Burrell's responses as a "good answer"); id., Ex. 25 (notes regarding interview of Gary Hamilton by Michael Huston) at 1 (noting that the plaintiff "restated questions" and "thinks through [his] answers"); id., Ex. 26 (notes regarding interview of Camille Carraway by Michael Huston) at 1 (noting the "good examples" given by Carraway in response to one question); see also id., Ex. 28 (notes regarding interview of Annette Burrell by Stuart Burns) at 1-2 (making no evaluative comments whatsoever); id., Ex. 29 (notes regarding interview of Gary Hamilton by Stuart Burns) at 1-2 (same); id., Ex. 30 (notes regarding interview of Camille Carraway by Stuart Burns) at 1-2 (same); id., Ex. 31 (notes regarding interview of Michael Perkins by Stuart Burns) at 1-2 (same); id., Ex. 32 (notes regarding interview of Gary Hamilton by Tatika Mitchell) at 1-2 (same); id., Ex. 33 (notes regarding interview of Annette Burrell by Tatika Mitchell) at 1-2 (same); id., Ex. 34 (notes regarding interview of Camille Carraway by Tatika Mitchell) at 1-2 (same); id., Ex. 35 (notes regarding interview of Michael Perkins by Tatika Mitchell) at 1-2 (same). Instead, the notes "reflect what [the panelists] learned when the candidates [answered] the questions." Def.'s Mem., Mitchell Dep. at 103:8-9; see also Pl.'s Opp'n, Burns Dep. II at 116:20-117:3 ("Q. Did you put that [the plaintiff's answers were not clear] anywhere in your interview notes?  A. I don't

---

[18](...continued)
an inference would require a flight of fancy too great for any reasonable jury to make.  See supra part III.A.4.

recall.  It probably would not be something that I would write in a space for a question.  I was trying to find answers that fit the question.").

To recapitulate, the assorted alleged inconsistencies between the deposition testimony of Burns, Mitchell, and Huston, and other evidence in the record advanced by the plaintiff fall into one of two camps.  On the one hand, several of these supposed "inconsistencies" are in reality the product of the plaintiff's selective use of the record.  The remaining discrepancies, while authentic, could not serve as a basis for a reasonable jury to infer pretext on the part of the interviewing panel.  None of the contradictions asserted by the plaintiff create a genuine dispute of material fact with respect to the authenticity of the defendant's explanation for the selection of Burrell over the plaintiff for the Safety Manager position; consequently, none of these contradictions suffices to defeat the defendant's motion for summary judgment.

5.    Other evidence of discrimination

The plaintiff's final argument in support of his contention that the defendant's explanation for its selection of Burrell over the plaintiff is a pretext for discrimination on the basis of race and gender is that there is quantifiable evidence of discrimination on those grounds throughout the IRS.  Specifically, the plaintiff asserts that "[he] observed three [Caucasian] females . . . placed on detail and eventually made permanent," Pl.'s Opp'n at 23, and that "[the] defendant's own statistics show that unlike [African-American] males, or other [African-Americans], [Caucasian] females are promoted at a rate which exceeds their population by ten percent," id. at 24.  According to the plaintiff, "[t]his is clear evidence of disparate treatment." Id.

The Court disagrees. "[W]hen submitting statistical evidence, a party must make the evidence 'meaningful to the [finder] of fact.'" Saunders v. White, 191 F. Supp. 2d 95, 132 (D.D.C. 2002) (quoting Frazier v. Consolidated Rail Corp., 851 F.2d 1447, 1453 (D.C. Cir. 1988)) (second alteration added to restore original internal quotation). "Statistical calculations performed on data in discrimination cases are not probative of anything without support from an underlying statistical theory," Frazier, 851 F.2d at 1452, and "[s]imply presenting numerical compilations to the [C]ourt is not sufficient," Saunders, 191 F. Supp. 2d at 132. Moreover, this Court has specifically rejected the use of anecdotal "evidence" as a substitute for statistical data in the past. See Brown, 437 F. Supp. 2d at 136 (refusing to consider the plaintiff's "anecdotal evidence concerning the reduction in force in one small department" in determining whether there was a genuine issue of material fact as to whether the defendant had engaged in impermissible "whitewashing").

The only statistical evidence presented by the plaintiff is an excerpt from an agency presentation indicating that "[m]inorities received promotions at a rate comparable to their workforce population," while "[w]hite females received promotions at a rate which exceeds their population percentage by 10 percent." Pl.'s Opp'n, Ex. 45 (Excerpt from FY 2003 Update Report) at 3. As the District of Columbia Circuit noted in Lutheran Church-Mo. Synod v. FCC, 154 F.3d 487 (D.C. Cir. 1998), "statistical evidence can be relevant in determining whether an employer's past practice is discriminatory," but that does not mean "that the absence of proportionality makes out discrimination." Id. at 494. Here, the scant evidence of promotion practices by the IRS provided by the plaintiff actually indicates that minorities such as the plaintiff are hired at rates proportional to their workplace population; i.e., they are not

31

discriminated against at all. That women have been promoted at marginally higher rates than their workplace population would suggest does not prove a discriminatory motive on the part of the IRS, particularly where, as here, there is no evidence indicating that this surplusage of promotions for women is statistically significant. Ultimately, the plaintiff's entire argument is just another non-sequitur, with no facts in the record to support it.

      6.    <u>Summary</u>

Having canvassed the entirety of the plaintiff's opposition, the Court finds nothing in the record that would permit a reasonable jury to infer that the defendant's explanation for the selection of Burrell over the plaintiff for the Safety Manager position–<u>i.e.</u>, that he did not perform well at his interview, but she did–is in any way a pretext for discrimination based on gender or race. In the absence of such evidence, the defendant's otherwise legitimate explanation must be given credence. The Court must therefore grant the defendant's motion for summary judgment with respect to the plaintiff's non-selection claim for the Safety Manager position.

**B.**    <u>Retaliation Claim</u>

Count II in the plaintiff's complaint is for retaliation based on his "denial of [a] selection to [a] non-competitive detail" in January of 2004, Compl. ¶ 27, which, the plaintiff contends, occurred because of his earlier EEO complaint based on his non-selection for the Safety Manager position, <u>id.</u> ¶ 26. "Title VII prohibits federal agencies from retaliating against employees for asserting their rights." <u>Holcomb</u>, 433 F.3d at 901. Like the plaintiff's claim of discrimination for non-selection, <u>supra</u> part III.A, "[c]laims of retaliation are governed by the <u>McDonnell Douglas</u> burden-shifting framework," <u>Holbrook v. Reno</u>, 196 F.3d 255, 263 (D.C. Cir. 1999). Thus, "a plaintiff must [first] establish a prima facie case of retaliation; if []he meets that burden,

the employer must articulate a legitimate nonretaliatory reason for its action; [and] finally, the plaintiff has the ultimate burden of establishing that the reason asserted by the employer is [a] pretext for retaliation." Holcomb, 433 F.3d at 901.

"To establish a prima facie case [of retaliation], a plaintiff must show that (1) []he engaged in statutorily protected activity; (2) h[is] employer took an adverse personnel action against h[im]; and (3) a causal connection between the two exists." Holbrook, 196 F.3d at 263. The defendant "does not dispute that [the p]laintiff can meet the first two elements of this prima facie case." Def.'s Mem. at 15. However, he argues that the plaintiff "cannot demonstrate causation because there was a six-month gap between his initial EEO complaint and the alleged retaliatory act (his non-selection [for the Safety Manager detail])." Id.

"To satisfy the third element of a prima facie case," the plaintiff must show that the defendant "had knowledge of h[is] protected activity[] and that the adverse personnel action took place shortly after that activity." Holbrook, 196 F.3d at 263 (internal quotation and citation omitted). "While courts have not definitely established the maximum time lapse between protected Title VII activity and alleged retaliatory actions, . . . [t]his Court has often followed a three-month rule to establish causation on the basis of temporal proximity alone." McIntyre v. Peters, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) (internal quotation and citation omitted); see also Walker v. Johnson, 501 F. Supp. 2d 156, 174 (D.D.C. 2007) ("This Court has held that a span of three months between the employee's EEO activity and the employer's adverse action may be too long to support a presumption of causation."); Davis v. District of Columbia, 503 F. Supp. 2d 104, 125 (D.D.C. 2007) (holding that delays between a plaintiff's engagement in protected activities and supposed retaliatory acts by an employer of three to four months are "too tenuous

33

to support an inference of causation").  As the Court has noted in the past, this practice accords

with precedent from both the District of Columbia Circuit and the Supreme Court.  See Buggs v.

Powell, 293 F. Supp. 2d 135, 148 (D.D.C. 2003) (Walton, J.) (noting that cases cited with

approval by the Supreme Court "seem to suggest that if a plaintiff relies upon temporal proximity

alone to establish causation, the time span must be under three months"); see also Clark County

Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citing with approval cases in which delays

between protected activity and employer's adverse action of three and four months was

considered too long to give rise to an inference of retaliation); Woodruff v. Peters, 482 F.3d 521,

529 (D.C. Cir. 2007) (citing Clark County for this point).

The plaintiff disputes the defendant's argument in two ways.  First, he asserts that he

"filed a formal EEO Complaint in October [of] 2003[,] . . . not in August [of] 2003," Pl.'s Opp'n

at 33, and that the defendant has "swap[ped] the date of [the] commencement of the process of

filing [the EEO complaint] with the actual date of filing in [the c]omplaint," id. at 34.  Second,

he argues that his retaliation claim "survives the defendant's [causality] argument[] based on the

chain of events and the pattern of antagonism following [the plaintiff's] engagement in protected

activity."  Id. (citing Kachmar v. SunGuard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).

The plaintiff's first argument is easily rejected.  As the defendant correctly notes, the

"[p]laintiff engaged in a protected activity in August [of] 2003 when he first contacted an EEO

counselor complaining about his non-selection" for the Safety Manager position.  Def.'s Reply at

8; see also Def.'s Mem., Ex. 19 (Excerpt from the plaintiff's EEO complaint) at 1 (reflecting that

the plaintiff contacted an EEO counselor on August 31, 2003).  The plaintiff himself has stated

under oath that he told Burns "that the selection process was [un]fair and that [he] would file [an

EEO] complaint" just before he initiated EEO counseling on August 31, 2003. Pl.'s Opp'n, Ex. 9 (Affidavit of Gary Hamilton) (the "Hamilton Aff.") ¶ 25. Thus, there is no question that the plaintiff engaged in protected activity (the initiation of an EEO proceeding) and that Burns knew about it long before the plaintiff filed his formal complaint in October of 2003. See Richardson v. Gutierrez, 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."); Bell v. Gonzalez, 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("[i]nitiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity").

The plaintiff's second argument also fails for lack of factual support. He suggests that Burns engaged in a "pattern of antagonism" against him, Pl.'s Opp'n at 36, evidenced by Burns's selection of another employee, Brenda Goulding, to lead a voluntary program known as the Revision of the Safety Inspection Program (the "RSIP"), even though Goulding, a Caucasian female, "d[id] not have a degree, ha[d] no background in [s]afety[,] and[,] in fact, had no exposure to [s]afety at all prior to . . . 2001," as well as Burns's exclusion of the plaintiff "from the kick-off and final meetings [that] he held with key players of the RSIP," id. at 35. He further argues that Goulding "failed to accord [the p]laintiff the honor and dignity appurtenant to his role" as co-chair for the RSIP and "encumbered him with additional responsibilities by apportioning him extra tasks." Id. at 36. Finally, the plaintiff asserts that when he asked Burns about the possibility of filling the Safety Manager detail that was eventually given to Carraway in December of 2003, Burns "ignored his inquiries about it." Id. at 37.

All of these assertions are either factually unsupported, irrelevant, or immaterial. With respect to the plaintiff's role in the RSIP, there is no dispute in the record that Goulding was

selected as the team leader for the program, with the plaintiff to assist her as her "co-chair" or "co-lead." Id., Hamilton Dep. at 174:8-11. Although the plaintiff evidently believes that he was more qualified to be the team leader than Goulding, see id. at 35 (asserting that the selection of Goulding over the plaintiff as team lead for the RSIP "arguably is an adverse employment action and/or evidence of discriminatory or disparate treatment"),[19] the record is bereft of any evidence that would allow a jury to discern the qualifications needed for that position, much less whether the plaintiff's qualifications were so superior to Goulding's with respect to that position that a reasonable jury could infer a retaliatory motive behind the decision to choose Goulding over the plaintiff.

As for Goulding's supposed treatment of the plaintiff while he was a member of the RSIP, there is nothing in the record that indicates her actions were taken at the behest of Burns. Indeed, Goulding testified at her deposition that she "d[idn't] recall specifically speaking to [Burns]" while she was working on the RSIP. Id., Ex. 8 (July 13, 2006 deposition excerpt of Brenda Goulding) (the "Goulding Dep.") at 119:7-8. The plaintiff's complaints with respect to her attitude towards him and her distribution of work among the members of the RSIP are therefore irrelevant.

The plaintiff's remaining complaint with respect to his work on the RSIP is that Burns excluded the plaintiff from a meeting of "the key players for the RSIP" at the beginning of the

---

[19] It is unclear from this fleeting passage in the plaintiff's opposition whether he now desires to assert a non-selection claim based on the selection of Goulding for the RSIP team leader position. Similarly, the plaintiff asserts in his supplemental opposition that "the [d]efendant's placement of [Carraway] on [a] detail in January [of] 2004 constitutes another act of discrimination against the [p]laintiff based on his race and gender," but does not clarify whether he seeks to amend his complaint to reinstate his non-selection claim based on the selection of Carraway for a Safety Manager detail in 2004. If so, he will need to file a motion for leave to file an amended complaint pursuant to Federal Rules of Civil Procedure 15(a)(2) and 7(b)(1) and Local Civil Rule 15.1.

program and another such meeting at the end of the assignment.  Id. at 35.  The only "evidence"
that these undisclosed meetings occurred is the plaintiff's own statements to that effect, and he
never provides any explanation as to how he knows that meetings to which he was not a party
occurred, much less that Burns intentionally excluded him from the meetings.  See id., Hamilton
Aff. ¶ 32 (asserting baldly that Burns "met with the key players for the RSIP but excluded me
from that meeting"); id., Hamilton Aff. ¶ 36 ("At the end of the RSIP, . . . Burns once again had
another meeting with the key players in the program and again excluded me from it."); id.,
Hamilton Dep. 175:17-176:6 ("Q. And how many kickoff meetings [for the RSIP] were
there? . . . [A.] To my knowledge, it was two. . . . Q. Were you a part of any one of those two
meetings?  A. Only one.").  Both Goulding and Burrell testified to the contrary.  See id.,
Goulding Dep. 78:18-79:12 (testifying that she met with Burns, Burrell, and Hamilton at her
initial RSIP meeting on August 12, 2003, and that she "d[id not] recall" having a prior meeting
without Hamilton); id., Ex. 4(a) (August 17, 2006 deposition excerpt of Annette Burrell) at
130:19-22 (testifying that she was "not aware of two meetings," just "the one meeting . . . with
[the plaintiff] and [Goulding] and [Burns] and I and Guy Burnett, the contractor").

     But even if the Court were to assume that the plaintiff has personal knowledge of the
facts asserted in his affidavit and at his deposition, there is nothing in the record that would
indicate that the exclusion of the plaintiff from two meetings over the course of a lengthy project
was somehow motivated by prejudice against (and therefore indicative of a retaliatory mindset
with respect to) the plaintiff.  The plaintiff is not even sure whether the first undisclosed meeting
occurred before or after he met with Goulding.  See id., Hamilton Dep. 176:4-6 ("Q. Was it the
first or the second [meeting from which you were excluded]? . . . A. I think it was the second."

(emphasis added)).  And he has produced no evidence whatsoever indicating that the subject matter of the meetings concerned or affected him in the slightest.  An aggrieved employee might speculate that Burns, Goulding, and Burrell met in secret to conspire or otherwise nefariously plot against him; "[h]owever, a plaintiff may not rest on mere speculation alone[,] but must produce some <u>objective</u> evidence" in support of his theories.  <u>Guerrero v. Univ. of District of Columbia</u>, 251 F. Supp. 2d 13, 25 (D.D.C. 2003) (internal quotation and citation omitted).

Finally, the plaintiff asserts in his affidavit that he asked Burns about the Safety Manager detail when he first learned of it in December of 2003 "but was ignored."  Pl.'s Opp'n, Hamilton Aff. ¶ 37.  While the defendant suggests that the Court should ignore this statement because it differs from the plaintiff's prior deposition testimony,[20] the Court need not do so because this isolated occurrence–itself occurring more than three months after the plaintiff informed Burns that he would start EEO counseling–does not show a "pattern of antagonism" by Burns with respect to the plaintiff.  <u>Kachmar</u>, 109 F.3d at 177.  Nor does Burns's equivocal response, by itself, give rise to an inference that Burns selected Carraway for a Safety Manager detail in January of 2004 based on the plaintiff's initiation of the EEO process in August of 2003.  The Court must therefore grant the defendant's motion for summary judgment with respect to Count II of the plaintiff's complaint.

---

[20]  The defendant asserts that the plaintiff "repeatedly testified that he did not recall ever informing . . . Burns of any interest in serving a detail" at his deposition, Def.'s Reply at 9, but the excerpts from the plaintiff's deposition testimony cited in support of that assertion do not appear to be a part of the record before the Court.  The Court therefore cannot consider this argument in evaluating the merits of the defendant's motion, but notes that even if the Court were somehow persuaded to reconsider its decision with respect to the sufficiency of the plaintiff's prima facie claim and determined that the defendant's other arguments in support of summary judgment with respect to this claim failed as a matter of law, it would deny the defendant's motion without prejudice so that the defendant could file a renewed motion with the cited excerpt from the plaintiff's deposition testimony attached.

C.     Non-Selection Claim for Safety Manager Detail

The plaintiff claims that he was "discriminated against when . . . Burrell was selected for a detail to a higher GS-14 position in violation of the [IRS's] [m]erit [p]romotion [p]lan." Pl.'s Opp'n at 26. As the defendant correctly observes, the "first time" that the defendant asserts this claim is in his opposition to the defendant's motion for summary judgment. Def.'s Reply at 3. He makes no allegations in this regard in either his EEO complaints or his complaint filed in this Court. See Def.'s Mem., Ex. 15 (undated excerpt from first Individual Complaint of Employment Discrimination with the Department of Treasury) at 1 (alleging race and sex discrimination only in the selection of Burrell for the permanent Safety Manager position in 2003); id., Ex. 14 (Individual Complaint of Employment Discrimination with the Department of Treasury filed Apr. 24, 2004) at 2 (alleging race and sex discrimination only in the selection of Carraway for a Safety Manager detail in 2004); Compl. ¶¶ 19-29 (claiming only that the defendant violated Title VII by promoting Burrell to the Safety Manager position in 2003 and by retaliating against the plaintiff because of his 2004 EEO complaint).

Members of this Court have found in the past that a claim asserted for the first time in a memorandum of law is "invalid because it was not made in the original complaint or advanced in a motion to amend." Kilpatrick v. Paige, 193 F. Supp. 2d 145, 158 (D.D.C. 2002); see also Richardson, 477 F. Supp. 2d at 27 n.1 (holding that "[t]o the extent" the plaintiff "attempt[ed] to raise" a new retaliation claim, the "plaintiff failed to raise such a claim in her amended complaint and the Court cannot consider it now"); Ames v. Yellow Cab of D.C., Inc., Civil Action No. 00-3116 (RWR) (DAR), slip op. at 17 n.6, 2006 WL 2711546, at *7 n.6 (D.D.C. Sept. 21, 2006) (refusing to consider a plaintiff's claim raised for the first time in opposition to the defendant's

motion for summary judgment because the plaintiff "ha[d] not submitted a motion for leave to amend his complaint . . . or shown good cause as to why" the new claim "should be added at th[at] stage in the proceedings"). However, this practice may no longer be appropriate in light of the District of Columbia Circuit's ruling in Wiley v. Glassman, 511 F.3d 151 (D.C. Cir. 2007). In that case, another member of this Court, inter alia, "granted [the defendant's] motion to strike [the plaintiff's] claim for retaliatory harassment, primarily on the grounds that it was raised for the first time in [the plaintiff's] opposition to [the defendant's] motion for summary judgment." Id. at 159. The Circuit Court held that this determination was in error because "[t]he factual basis for [the plaintiff's] 'new' claim was substantially similar to [the plaintiff's other, properly raised Title VII claim] and [the defendant] did not demonstrate that allowing [the plaintiff's] claim would cause undue prejudice." Id.

The new Title VII claim apparently being asserted by the plaintiff would seem to fall squarely within the reach of Wiley, insofar as his new claim (i.e., that Burrell was selected for a position with a higher pay grade over the plaintiff because of the plaintiff's race and gender) is "substantially similar" to his non-selection claim based on the selection of Burrell for the Safety Manager position and the defendant has not articulated any undue prejudice arising from the consideration of this claim. Moreover, the plaintiff indicated in his deposition that he intended to "alleg[e] discrimination [based on the fact] that . . . Burrell got a detail that [the plaintiff] should have been afforded." Pl.'s Opp'n, Hamilton Dep. 45:6-8. Thus, the Court finds that it cannot dismiss the plaintiff's newly-minted claim out of hand notwithstanding "'his counsel's failure to perceive the true basis of the claim at the pleading stage.'" Wiley, 511 F.3d at 159 (quoting 5

Charles A. Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1219 at 281-83 (3d ed. 2004) (footnote omitted)).

This conclusion, while seemingly compelled by the Circuit Court's ruling in <u>Wiley</u>, nevertheless places the Court in an unusual procedural posture. On the one hand, the defendant argues in his reply brief that the plaintiff's new claim "fails for failure to exhaust administrative remedies." Pl.'s Reply at 3. Ordinarily, "[c]ourts highly disfavor parties creating new arguments at the reply stage that were not fully briefed during the litigation." <u>Bates v. Northwestern Human Servs., Inc.</u>, 466 F. Supp. 2d 69, 103 (D.D.C. 2006) (Walton, J.) (internal quotation and citation omitted). In this case, however, the Court can hardly fault the defendant for failing to raise an argument concerning a claim that did not even exist when he filed his motion for summary judgment. It would therefore be inappropriate to ignore the defendant's exhaustion argument simply because it was articulated for the first time in his reply brief.

At the same time, the plaintiff has not had an opportunity to respond to the defendant's exhaustion argument, and the Court cannot "act as an advocate for [] the [plaintiff] and construct legal arguments on [his] behalf in order to counter those in [a motion for summary judgment]." <u>United States v. Real Property</u>, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) (Walton, J.). Consequently, the Court cannot adjudicate the merits of the defendant's exhaustion argument without additional briefing from the parties. Further, the Court is at a loss as to how it could grant or deny summary judgment with respect to the plaintiff's claim as a technical matter unless and until the plaintiff has amended his complaint to include his Title VII claim based on the selection of Burrell for the 2002 detail.

41

The only solution readily apparent to the Court is to deny the defendant's motion for summary judgment without prejudice with respect to the plaintiff's apparent new claim and grant the plaintiff leave to file an amended complaint asserting a claim for non-selection regarding the 2002 detail and incorporating the facts alleged in the plaintiff's opposition.[21] Once the plaintiff has filed an amended complaint to that effect, the defendant can renew his motion for summary judgment and the briefing cycle will begin anew. This process is obviously disadvantageous for the defendant, who will need to expend additional resources if leave to file an amended complaint is pursued due to an error on the part of the plaintiff's counsel. But the Court sees no better way to balance the dictates of Wiley with its countervailing interest in maintaining some semblance of order in the procession of this case.

### IV. Conclusion

"Title VII . . . does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation and citation omitted). The Court therefore "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." Fischbach, 86 F.3d at 1183 (internal quotation and citation omitted). In this case, the evidence in the record, once stripped of the plaintiff's unsupported insinuations and innuendo, in no way contradicts the defendant's legitimate, non-discriminatory explanation as to why the IRS chose another candidate for the permanent Safety Manager position, nor is there any evidence in the record

---

[21] The Court emphasizes that it will grant the plaintiff leave to file an amended complaint only with respect to his non-selection claim arising from Burrell's GS-14 detail in 2002. The Court will dismiss sua sponte any allegations or claims in an amended complaint outside those parameters (including any attempt to reinstate Counts I-II of the complaint, which the Court will dismiss pursuant to this memorandum opinion) unless the amended complaint is filed as an attachment to a motion for leave to file an amended complaint as required by Federal Rules of Civil Procedure and this Court's local rules. See supra n.19.

from which a reasonable jury could infer that the selection of another employee for a Safety Manager detail in January of 2004 was made in retaliation for the plaintiff's EEO activity in August of 2003.  As for the plaintiff's newly-raised non-selection claim regarding the Safety Manager detail awarded in 2002, that claim must be decided another day.  The Court will therefore grant the defendant's motion for summary judgment with respect to Counts I and II of the plaintiff's complaint, deny the motion without prejudice with respect to the new non-selection claim made by the plaintiff in his opposition to the plaintiff's motion, and grant the plaintiff limited leave to file an amended complaint in conformance with the instructions set forth above.

> **SO ORDERED** this 3rd day of April, 2008.[22]

REGGIE B. WALTON
United States District Judge

---

[22]  An order granting in part and denying in part the defendant's motion for summary judgment, granting summary judgment in the defendant's favor with respect to Counts I and II of the plaintiff's complaint, denying the plaintiff's motion to strike as moot, and granting the plaintiff limited leave to file an amended complaint follows.